# UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE:  THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| **GIORGIO FOODS, INC.,** )| |
| )| |
| **Plaintiff,** )| |
| )| |
| **v.** )| |
| )| |
| **UNITED STATES,** )| **Court No. 23-00133** |
| )| |
| **Defendant,** )| |
| )| |
| **and** )| |
| )| |
| **PROCHAMP B.V.,** )| |
| )| |
| **Defendant-Intervenor.** )| |

## ORDER

Upon consideration of the Rule 56.2 motion of Plaintiff Giorgio Foods, Inc., all responses thereto, and all other relevant papers and proceedings herein, it is hereby:

**ORDERED** that Plaintiff's Rule 56.2 Motion for Judgment on the Agency Record is granted; and it is further

**ORDERED** that the U.S. Department of Commerce's final determination set forth in *Certain Preserved Mushrooms From*

*the Netherlands: Final Affirmative Determination of Sales at Less Than Fair Value*, 88 Fed. Reg. 18,115 (Dep't Commerce Mar. 27, 2023), is remanded for disposition in a manner consistent with the judgment of this Court; and it is further

**ORDERED** that the U.S. Department of Commerce will reconsider its factual findings that Prochamp B.V. did not withhold information, significantly impede the investigation, and cooperated to the best of its ability; and it is further

**ORDERED** that if the U.S. Department of Commerce continues to conclude that Prochamp did not withhold information, significantly impede the investigation, and cooperated to the best of its ability, the agency will revisit its comparison market selection and instruct Prochamp B.V. to submit a database based on French sales.

**SO ORDERED.**


Date: _____          _____
     New York, NY                              M. Miller Baker, Judge

# UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE:  THE HONORABLE M. MILLER BAKER, JUDGE

_____
)
**GIORGIO FOODS, INC.,**                )
)
　　　　　　　　**Plaintiff,**            )
)
　　v.                                   )
)
**UNITED STATES,**                       )          **Court No. 23-00133**
)
　　　　　　　　**Defendant,**            )
)
　　**and**                              )
)
**PROCHAMP B.V.,**                       )
)
　　　　　　　　**Defendant-Intervenor.** )
_____)

**Plaintiff's Rule 56.2 Motion for Judgment on the Agency Record**

Pursuant to Rule 56.2 of the Rules of the United States

Court of International Trade, Plaintiff Giorgio Foods, Inc.

respectfully moves for judgment on the agency record in the

above-referenced action. For the reasons set forth in the

Memorandum of Law of Plaintiff Giorgio Foods, Inc. in

Support of its Motion for Judgment on the Agency Record,

Plaintiff requests that this Court hold that the final

determination by the U.S. Department of Commerce, as set forth in in *Certain Preserved Mushrooms From the Netherlands: Final Affirmative Determination of Sales at Less Than Fair Value*, 88 Fed. Reg. 18,115 (Dep't Commerce Mar. 27, 2023), is unsupported by substantial evidence and otherwise not in accordance with law.  Plaintiff, therefore, moves that the Court remand the Department of Commerce's final determination to the agency for disposition in a manner consistent with the judgment of the Court.

<div style="margin-left: 40%;">

Respectfully submitted,

/s/ John M. Herrmann
JOHN M. HERRMANN
PAUL C. ROSENTHAL
JOSHUA R. MOREY
KELLEY DRYE & WARREN LLP
3050 K Street, N.W., Suite 400
Washington, DC 20007
(202) 342-8400

Counsel to Plaintiff Giorgio Foods, Inc.

</div>

Dated:  November 21, 2023

NONCONFIDENTIAL

# UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE:  THE HONORABLE M. MILLER BAKER, JUDGE

_____

|  |  |  |
|---|---|---|
| **GIORGIO FOODS, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **UNITED STATES,** | ) | **Court No. 23-00133** |
| | ) | |
| **Defendant,** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **PROCHAMP B.V.,** | ) | |
| | ) | |
| **Defendant-Intervenor.** | ) | |

_____)

## <u>MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD</u>

JOHN M. HERRMANN
PAUL C. ROSENTHAL
JOSHUA R. MOREY
KELLEY DRYE & WARREN LLP
3050 K Street, N.W., Suite 400
Washington, DC  20007
(202) 342-8400

Counsel to Giorgio Foods, Inc.

November 21, 2023

NONCONFIDENTIAL

## Table of Contents

Page

Administrative Determination Under Review ........................................ 1

Issues Presented And Summary Of Argument ...................................... 2

Standard Of Review .................................................................. 8

Statement Of Facts ................................................................. 10

Facts Pertaining to Selection of Comparison Market ........................... 11

Facts Pertaining to Prochamp's Failure to Submit Copies of Financial Statements Requested by the Department ........................... 27

Argument ........................................................................... 35

    I.    The Department's Selection Of Germany As The Comparison Market Is Unlawful ........................................ 35

        A.    The Department's Selection of a Third-Country Market Is Not Insulated from Challenge During an Administrative Proceeding or from Judicial Review ........................................................ 35

        B.    None of the Department's Factual Findings Underlying Its Selection of Germany as the Comparison Market Is Supported By Substantial Evidence ......................................................... 41

            1.    Legal Background ............................................. 41

NONCONFIDENTIAL

Table of Contents
(continued)

Page

2.   The Department's Finding That Differences in Product Weights Are **[          ]** Is Not Supported By Substantial Evidence ..................44

3.   The Record Does Not Support the Department's Finding That the German and U.S. Sales Channels and Types of Customers Are Similar ......................................50

4.   The Record Does Not Support the Volume of Sales Prochamp Reported to Germany .............54

II.   The Department's Determination To Calculate A Dumping Margin For Prochamp Is Unlawful ....................57

A.   Legal Background on Application of Adverse Facts Available .............................................................57

B.   The Department's Factual Findings That Prochamp Did Not Withhold Information or Impede the Department's Investigation Are Not Supported by Substantial Evidence ..........................59

1.   Unsupported Factual Findings Related To Third-Country Market Selection .......................59

2.   Unsupported Factual Findings Related to Prochamp's Financial Statements ....................64

ii

NONCONFIDENTIAL

Table of Contents
(continued)

Page

    C.    The Department's Factual Findings That
        Prochamp Did Not Fail to Cooperate to the Best
        of Its Ability Are Not Supported by Substantial
        Evidence ..................................................................... 68

III.   Conclusion ............................................................................ 73

NONCONFIDENTIAL

# TABLE OF AUTHORITIES

**Page(s)**

### Cases

*An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*, 287 F. Supp. 3d 1361 (Ct. Int'l Trade 2018).............9-10, 46-47

*Assan Aluminyum Sanayi ve Ticaret A.S. v. United States*, 624 F. Supp. 3d 1343 (Ct. Int'l Trade 2023).......................................58

*Coalition of Am. Flange Producers v. United States*, 448 F. Supp. 3d 1340 (Ct. Int'l Trade 2020).........................................9

*Fresh Garlic Producers Ass'n v. United States*, 121 F. Supp. 3d 1313 (Ct. Intl Trade 2015)..................................58-59

*Goodluck India Ltd. v. United States*, 11 F.4th 1335 (Fed. Cir. 2021)......................................................70-71

*Max Fortune Indus. Co. v. United States*, 37 C.I.T. 549 (2013) ..............................................................70-71

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29 (1983)..............................................................................8-9

*Nippon Steel Corp. v. United States*, 337 F.3d 1373 (Fed. Cir. 2003) ...............................................57-58, 72

*Nippon Steel Corp. v. United States*, 458 F.3d 1345 (Fed. Cir. 2006) ........................................................8, 9

*NTN Bearing Corp. v. United States*, 74 F.3d 1204 (Fed. Cir. 1995) ......................................................39-40

*Shenzhen Xinboda Indus. Co. v. United States*, 2017 Ct. Intl. Trade LEXIS 166 (Dec. 5, 2017) ..................................40

ii

*Stupp Corp. v. United States*,
413 F. Supp. 3d 1326 (Ct. Int'l Trade 2019)......................................38

*Stupp Corp. v. United States*,
435 F. Supp. 3d 1307 (Ct. Int'l Trade 2020),
*aff'd in part, vacated in part on other grounds*,
5 F.4th 1341 (Fed. Cir. 2021) .........................................................38-39

*Tianjin Mach. Imp. & Exp. Corp. v. United States*,
353 F. Supp. 2d 1294 (Ct. Int'l Trade 2004),
*aff'd without op.*, 146 Fed. Appx. 493 (Fed. Cir. 2005) .....................71

*Universal Camera Corp. v. NLRB*,
340 U.S. 474 (1951)...........................................................................8, 9

## Statutes and Regulations

19 U.S.C. § 1516a(b)(1)(B)(i) .........................................................8, 39, 58

19 U.S.C. § 1516a(b)(2)(A)(i) ................................................................39

19 U.S.C. § 1677(16) ..............................................................................46

19 U.S.C § 1677b(a)(1)(B)(i) .................................................................41

19 U.S.C § 1677b(a)(1)(B)(ii) ................................................................43

19 U.S.C. § 1677b(a)(1)(B)(ii)(I)-(III) ..............................................42-43

19 U.S.C. § 1677b(a)(1)(C)......................................................................11

19 U.S.C. § 1677b(a)(1)(C)(i)-(ii) ..........................................................41

19 U.S.C. § 1677b(a)(1)(C)(ii) ...............................................................42

19 U.S.C. § 1677b(a)(1)(C)(iii) ..............................................................42

19 U.S.C §§ 1677b(a)(4).....................................................................41-42

19 U.S.C. § 1677e(a) ..........................................................................57, 64

19 U.S.C. § 1677e(b) .............................................................. 57

19 U.S.C. § 1677e(a)-(b) ................................................ 6, 34, 58

19 C.F.R. § 351.404(b) ......................................................... 42

19 C.F.R. § 351.404(e) ......................................................... 43

## Administrative Determinations

*Certain Preserved Mushrooms From the Netherlands,*
  *Poland, and Spain: Antidumping Duty Orders,*
  *88 Fed. Reg. 33,096 (Dep't Commerce May 23, 2023)*
  *(the "Order") (Appx13698-13706)* ............................................... *passim*

*Certain Preserved Mushrooms From the Netherlands:*
  *Final Affirmative Determination of Sales at Less Than*
  *Fair Value, 88 Fed. Reg. 18,115*
  *(Dep't Commerce Mar. 27, 2023) ("Final Determination")*
  *(Appx1271-1273)* ..................................................................... *passim*

*Certain Preserved Mushrooms from the Netherlands:*
  *Preliminary Affirmative Determination of Sales at Less*
  *Than Fair Value, Postponement of Final Determination,*
  *and Extension of Provisional Measures,*
  *87 Fed. Reg. 66,265 (Dep't Commerce Nov. 3, 2022)*
  *("Preliminary Determination")* ................................................... *passim*

*Decision Memorandum for the Final Affirmative*
  *Determination in the Less-Than-Fair-Value Investigation*
  *of Certain Preserved Mushrooms from the Netherlands,*
  *(Dep't Commerce Mar. 20, 2023) ("I&D Memo")*
  *(Appx1007-1083)* .................................................................... *passim*

*Final Results of Redetermination Pursuant to Court*
  *Remand; Stupp Corporation et al. v. United States,*
  Consol. Court No. 15-00334
  (Dep't Commerce May 2, 2019) *("Stupp I Remand")* ................... 37-38

**NONCONFIDENTIAL**

*Final Results of Redetermination Pursuant to Court*
    *Remand; Stupp Corporation et al. v. United States,*
    Consol. Court No. 15-00334
    (Dep't Commerce Jan. 14, 2020) *("Stupp II Remand")* ...............37-38

NONCONFIDENTIAL

## Glossary

| Acronym | Item |
|---|---|
| [     ] | [                                            ] |
| CONNUM | control number |
| CPMs | certain preserved mushrooms |
| [     ] | [                                            ] |
| DIFMER | difference in merchandise |
| FCA | Free Carrier |
| MUC | Merchandise Under Consideration |
| POI | Period of Investigation |
| PwC | PricewaterhouseCoopers |

vi

NONCONFIDENTIAL

On behalf of Giorgio Foods, Inc. (hereinafter "Giorgio" or "Plaintiff"), we submit this Memorandum of Law in Support of Plaintiff's Rule 56.2 Motion for Judgment on the Agency Record. As set forth below, Plaintiff urges this Court to determine that certain aspects of the U.S. Department of Commerce's (hereinafter, "Commerce" or the "Department") final affirmative determination of sales at less-than-fair-value are not supported by substantial evidence and are not otherwise in accordance with law, and to remand the agency's determination for further proceedings.

## Administrative Determination Under Review

Plaintiff challenges certain aspects of the Department's affirmative determination in the less-than-fair-value investigation of certain preserved mushrooms ("CPMs") from the Netherlands. *See Certain Preserved Mushrooms From the Netherlands: Final Affirmative Determination of Sales at Less Than Fair Value*, 88 Fed. Reg. 18,115 (Dep't Commerce Mar. 27, 2023) (hereinafter, "*Final Determination*") (Appx1271-1273) and the accompanying *Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value*

NONCONFIDENTIAL

*Investigation of Certain Preserved Mushrooms from the Netherlands*, (Dep't Commerce Mar. 20, 2023) (hereinafter "*I&D Memo*") (Appx1007-1083). In its *Final Determination*, the Department calculated a *de minimis* antidumping margin for Dutch respondent Prochamp B.V. (hereinafter, "Prochamp"). Appx1271-1273.

Following the U.S. International Trade Commission's issuance of its unanimous affirmative final injury determination, the Department published the antidumping duty order on CPMs from the Netherlands. *See Certain Preserved Mushrooms From the Netherlands, Poland, and Spain: Antidumping Duty Orders*, 88 Fed. Reg. 33,096 (Dep't Commerce May 23, 2023) (hereinafter, the "*Order*") (Appx13698-13706). As a result of its calculation of a *de minimis* antidumping margin for Prochamp, the Department excluded CPMs produced and exported by Prochamp from the *Order*. *See* Appx13698-13706.

## Issues Presented And Summary Of Argument

The Department's *Final Determination* is not supported by substantial evidence and is not otherwise in accordance with law because the Department improperly:

NONCONFIDENTIAL

1. Selected Germany as the third-country comparison
   market for purposes of determining normal value; and

2. Determined that Prochamp did not withhold information,
   significantly impede the investigation, and cooperated to
   the best of its ability.

First, the Department typically determines normal value based on a respondent's home market sales prices. In situations where a respondent's home market sales volume is not viable (*i.e.*, the volume of sales is less than five percent of the volume of the respondent's U.S. sales), the agency prefers to rely on information concerning a respondent's sales in a viable third-country market. Here, the Department rejected Plaintiff's arguments that Germany was not an appropriate third-country comparison market on the basis that the agency identifies the appropriate comparison market early in the proceeding and cannot revisit such a determination later in the proceeding. The agency's explanation is unlawful because: (1) Plaintiff challenged the Department's selection of Germany as the comparison market throughout the investigation, thereby exhausting its administrative remedies, (2) the precedent the Department relies on in the *I&D Memo* for its purported practice of reaching a determination

early in the proceeding is inapposite, and (3) the applicable standard of review requires the Department's determinations to be supported by substantial evidence, which requires an evaluation of the entire record, including evidence that fairly detracts from the agency's determination. The Department's selection of Germany as the third-country comparison market, therefore, is not insulated from Plaintiff's challenge in this action.

Moreover, the record did not support the Department's selection of Germany as the comparison market at the time the agency reached its determination, nor following additional development of the record. In particular, the record does not support the Department's findings that there were "[                                    ]" between Germany and France, or that these differences were outweighed by "the [                    ] overall quantity of {Merchandise Under Consideration ("MUC")} sold to the German market." Based on the second most important physical characteristic for matching U.S. and comparison market sales – the net drained weight of the mushrooms in the containers – there were [            ] direct matches between

Prochamp's German and U.S. sales of CPMs, whereas [                ] of

Prochamp's U.S. and French sales of CPMs were identical matches. No

reasonable mind could conclude that the difference between [

    ] and [            ] is [          ]

   The Department also found that the volume of Prochamp's sales to

Germany, as well as the type of sales channels and customers,

supported its selection of Germany as the third-country comparison

market. Prochamp, however, revised the volume of its CPMs sales to

Germany twice, resulting in an overall decline of [              ] of the

previously reported volume, and further the Department verified that

this significantly reduced volume was inaccurate because it included

sales to other third-country markets. In addition, Prochamp's claim that

its sales channels in Germany and the U.S. were similar was also

contradicted by several of Prochamp's questionnaire responses. Thus,

all three of the reasons the Department identified in support of its

selection of Germany as the third-country comparison market are not

supported by substantial evidence.

NONCONFIDENTIAL

Second, like all other factual findings, the Department's determinations under 19 U.S.C. § 1677e(a)-(b) that a respondent did not withhold information, significantly impede an investigation, and cooperate to the best of its ability, must be supported by substantial evidence. The Department's findings that Prochamp did not withhold information requested by the Department concerning the appropriate normal value methodology or its financial statements – two core issues for purposes of calculating antidumping margins – are not supported by substantial evidence. Regarding normal value, Prochamp claimed in its initial questionnaire response that Germany was the appropriate comparison market because among potential third-country comparison markets, it accounted for the largest volume of Prochamp's sales, the products sold in the U.S. and German markets were the same, and the channels for U.S. and Germany sales were the same. The latter two of these claims proved to be untruthful, and there is no record support for Prochamp's reported German sales volume. Prochamp's failure to provide the Department with complete and accurate information regarding this issue early in the proceeding significantly impeded the

NONCONFIDENTIAL

agency's conduct of its investigation. Similarly, Prochamp failed to provide Commerce with requested financial documents for itself and several affiliated parties despite multiple requests by the agency for this information. The Department's analysis of this issue ignores the agency's own clearly stated and explicitly crafted questions, which Prochamp ignored, only to later provide the requested documents to agency officials at verification.

Moreover, contrary to the Department's findings, Prochamp did not cooperate to the best of its ability. Prochamp did not report accurate information concerning the various comparison markets, despite being in possession of all the information needed to respond to the Department's questions accurately and completely. Similarly, Prochamp's statement "that standalone financial statements, in any form, do not exist for Prochamp" or any of Prochamp's affiliates is demonstrably wrong. The standard for cooperation requires that a respondent "has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries." Prochamp's failure to submit information requested by the Department, and its submission of

NONCONFIDENTIAL

multiple inaccurate statements to the Department, do not meet this standard – and the Department's findings to the contrary are not supported by substantial evidence.

## Standard Of Review

In reviewing a challenge to a final determination by the Department, this Court will sustain a determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence means "'more than a mere scintilla.'" *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006) (quoting *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939)). Substantial evidence has also been determined to mean "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951)). "{T}he agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck*

NONCONFIDENTIAL

*Lines v. United States*, 371 U.S. 156, 168 (1962)). When reviewing an agency determination, the court will evaluate whether the agency action is reasonable given the record as a whole and "must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp.,* 340 U.S. at 488; *see also Nippon Steel Corp.,* 458 F.3d at 1350–51.

In addition, the Department "is obligated to respond to those arguments made by interested parties that bear on issues material to Commerce's determination" and "must discuss issues of law and fact that are material to its determination, including any evidence that reasonably detracts from its determination." *Coalition of Am. Flange Producers v. United States*, 448 F. Supp. 3d 1340, 1351-52 (Ct. Int'l Trade 2020) (citation omitted). Further, the Department is obligated "'to address important factors raised by comments from petitioners and respondents,'" and "the agency's explanation must be adequately detailed to permit judicial review." *Id.*, 448 F. Supp. 3d at 1352 (quoting *SKF USA, Inc. v. United States*, 630 F.3d 1365, 1374 (Fed. Cir. 2011)). Finally, the Department abuses its discretion when its decision "'is

clearly unreasonable, arbitrary, or fanciful . . . is based on an erroneous conclusion of law . . . rests on clearly erroneous fact findings{,} or follows from a record that contains no evidence on which the {agency} could rationally base its decision.'" *An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*, 287 F. Supp. 3d 1361, 1376 n.25 (Ct. Int'l Trade 2018) (quoting *Gerritsen v. Shirai*, 979 F.2d 1524, 1529 (Fed. Cir. 1992)).

## Statement Of Facts

On April 20, 2022, the Department initiated a less-than-fair value investigation of CPMs from the Netherlands. Appx10555-10559.

In the Department's notice initiating the antidumping investigations on CPMs from France, the Netherlands, Poland, and Spain, the agency set aside a period for all interested parties to comment on product characteristics. Appx10556. Plaintiff was the only interested party to comment on the appropriate product characteristics to be applied by the Department in conducting its investigations. Appx10567-10575.

On May 17, 2022, the Department selected Prochamp and a second company – Greenyard Prepared Netherlands BV (which later explained

NONCONFIDENTIAL

that the correct corporate name was Okechamp BV) as mandatory respondents. Appx1688-1694.

On May 24, 2022, the Department placed a memorandum on the record of all four antidumping investigations identifying the relevant product characteristics, which in order of importance from highest to lowest were: (1) container type; (2) net drained weight; (3) mushroom style; (4) certified organic; (5) product labeling; and (6) packing solution. Appx10899-10902.

### Facts Pertaining to Selection of Comparison Market

The Department's initial antidumping questionnaire provided instructions to Prochamp for how to determine whether its home market (or any third-country market) is "viable" for purposes of calculating normal value. Appx10722-10723, 10754. The statute provides that a respondent's home market sales will normally be considered to be viable if they account for more than five percent (by quantity or value) of the sales of subject merchandise in the United States. *See* 19 U.S.C. § 1677b(a)(1)(C).

NONCONFIDENTIAL

The Department's questionnaire indicated that if the level of Prochamp's home market sales (*i.e.*, sales in the Netherlands) was close to the viability threshold, Prochamp should "contact the official in charge by no later than fourteen calendar days after the issuance of this questionnaire." Appx10754. Prochamp did not contact the Department regarding the viability of its sales in the Netherlands.

On June 21, 2022, 33 days after the Department issued its initial questionnaire, Prochamp informed the Department that its "volume of home market sales of the foreign like product during the POI is less than five percent of the volume of United States sales of the subject merchandise" – and submitted the quantity and value of its sales to its "three largest third-country market{s}." Appx1706, 1734-1735. Indeed, at the time Prochamp belatedly informed the Department that its home market was not viable, Prochamp asserted that it had **[          ]** of the foreign like product in the home market. Appx1735.

The three largest third-country markets identified by Prochamp, and the associated volumes to each country, were as follows:

NONCONFIDENTIAL

| Market | Quantity in Kgs. | % of U.S. Market |
|---|---|---|
| United States | [        ] | N/A |
| Germany | [        ] | [      ] |
| Israel | [        ] | [      ] |
| France | [        ] | [      ] |

Appx1735.

Prochamp also asserted that "Germany is the most appropriate third-country market for determining the normal value" because "the product sold to the USA and Germany are the same" and "the channel of export/distribution i.e. all sales are made to unaffiliated customers in both the countries." Appx1707.

In addition, Prochamp claimed that it identified the destination of its sales to various markets based on:

- "{T}he destination port/port of delivery" as set forth on the commercial invoices for sales in the U.S., French, and Israeli markets; and

- The customer's address and packaging of the product, instead of the port of destination, for the German market because "the sales to Germany are mostly on Free Carrier (FCA) incoterms" and Prochamp delivers the merchandise in the Netherlands.

Appx1704-1705.

Shortly after Prochamp submitted its response to the Department's Section A questionnaire asserting that it had **[          ]** of the foreign like product in the home market, the Department issued a supplemental questionnaire requesting additional information from Prochamp regarding the physical characteristics and channels of distribution of its third-country market sales. In its response, dated June 30, 2023, Prochamp stated that it "did not make any home market sales of the merchandise under consideration during the POI." Appx2265. Prochamp also claimed regarding its channels of distribution that "the sales made to the USA and Germany are directly to unrelated customers," but that its sales to "Israel and France" are "through an unaffiliated agent." Appx2266.

Regarding the physical characteristics of its sales, Prochamp identified the percentage of sales to the United States and to each of the three third-country markets that met the various product characteristics identified by the Department. Appx2267-2271. For the first characteristic – container type – because Prochamp reported that its sales to all countries were in steel cans, this characteristic did not

NONCONFIDENTIAL

differentiate among the potential comparison markets. Appx2267.

Prochamp also reported limited differences among the three comparison

markets with respect to the third through sixth most important product

characteristics – *i.e.*, mushroom style, certified organic, product

labeling, and packing solution characteristics. Appx2269-2271. For the

second most important characteristic – net drained weight – Prochamp

reported that [      ] of its U.S. sales and sales to France involved cans

containing [

              ] Appx2267-2268. With respect to sales from Germany,

however, [                        ] of Prochamp's sales volume involved

cans with a net drained weight of [

        ] of Prochamp's sales volume involved cans with a net drained

weight of [                        ], and the remainder of Prochamp's

German sales were in containers with a net drained weight [

                                              ] Thus,

there would be limited direct matches between Prochamp's sales in the

German and U.S. markets based on the Commerce Department's

product characteristics used for matching sales. Appx2267-2268.

NONCONFIDENTIAL

Also on June 30, 2022, Plaintiff submitted comments to the Department explaining why Prochamp's methodology for determining the quantity and value of its sales to Germany and the United States was contrary to the Department's practice. Appx2555-2563. With respect to Prochamp's methodology for identifying German sales, Plaintiff pointed out that the statute requires normal value to be based on sales of the product "for consumption in the exporting country," and that relying on the customer address and language on the label may not satisfy this criterion. Appx2559-2563. Importantly, Prochamp's German customer, which Prochamp explained took custody of the merchandise in the Netherlands, [

                                  ] Appx2560-2561, 2588-2592. Moreover, German is the official language of several countries throughout Europe, so the fact that German is the (or a) language on the label is not determinative of the country in which the preserved mushrooms were ultimately consumed. Appx2562, 2584-2587.

On July 5, 2022, Plaintiff submitted additional comments to Commerce addressing Prochamp's comparison market questionnaire

NONCONFIDENTIAL

response demonstrating that France – not Germany as alleged by Prochamp – was the most appropriate comparison market based on the comparability of the physical characteristics of the CPMs that Prochamp sold in the United States and France, as well as the lack of comparability of the physical characteristics for Prochamp's sales of CPMs in the United States and Germany. Appx2610-2613. Plaintiff also identified an issue with the manner in which Prochamp identified its sales in Germany that undermined the reliability of the volume of sales to Germany reported by Prochamp and further undermined Prochamp's contention that the Department should rely on its sales to Germany to determine normal value. Appx2613-2614.

On July 11, 2022, the Department issued a supplemental questionnaire requesting that Prochamp provide additional information about how it determined the quantity and value of its sales to the various markets. Appx2762-2766.

Before responding to the Department's July 11 supplemental questionnaire, and before the Department determined the appropriate comparison market, Prochamp filed its response to the Department's

Section B questionnaire (*i.e.*, information on sales used to determine normal value) and supplied the Department only with information on its preferred comparison market (*i.e.*, Germany). Appx 2784-2786. In its response, Prochamp stated it had

> discovered that certain reported sales {initially} believed to be sales to Germany were actually ultimately destined to another country (even though the invoice stated Germany, the merchandise was delivered outside of Germany).

Appx2785. Based on its purported "discovery," Prochamp submitted a revised quantity and value chart for its sales of CPMs to Germany. Appx2844-2846.

   On August 1, 2022, Prochamp responded to the Department's July 11 supplemental questionnaire and in doing so again "found that the product" initially reported as sold to Germany "was delivered to other countries as well." Appx4859. As a result, Prochamp revised its quantity and value chart once more, this time reducing the volume of sales to Germany **[                    ]** and increasing the volume of sales to other third-country markets. Appx4870. The revised quantity and value chart submitted by Prochamp identified the following volumes for

the company's sales of CPMs to the United States and various third-country markets:

| Market | Quantity in Kgs. | % of U.S. Market |
|--------|------------------|------------------|
| United States | [          ] | N/A |
| Germany | [          ] | [          ] |
| France | [          ] | [          ] |
| Israel | [          ] | [          ] |

Appx4870.

The Department's supplemental questionnaire also instructed Prochamp to provide breakdowns of its CPMs sales by channel of distribution – retailer, reseller, or distributor – but Prochamp withheld this information from the Department and provided no response to the Department's questions. Appx4859-4860.

On August 25, 2022, Prochamp responded to another supplemental questionnaire in which the Department instructed Prochamp to update its response concerning the physical characteristics and channels of distribution of its CPMs sales to third-country markets, based on the revised quantities and values. Appx5306-5313. Prochamp's revisions to the quantity and value had little impact on product characteristics one (container type), three (style), four (certified organic), five (label), and

six (solution). Appx5309-5313. With respect to the second characteristic – net drained weight – Prochamp indicated that [      ] percent of its U.S. sales were made in cans containing [                    ] of mushrooms, that [      ] of its CPMs sales to Germany or Israel involved cans containing that volume of mushrooms, and that [      ] percent of its sales to France were made at this weight. Appx5309-5310. Moreover, [      ] percent of Prochamp's CPMs sales in Germany had a net drained weight of [                ], but Prochamp made [   ] sales of CPMs to the United States in cans that contained that volume of mushrooms. Appx5309-5310. Further, the remaining [      ] percent of Prochamp's sales of CPMs to the United States involved cans containing [                ] of mushrooms, and a mere [      ] percent of Prochamp's CPMs sales in Germany involved that same can size, whereas [      ] percent of Prochamp's CPMs sales in France involved cans containing that volume of mushrooms. Appx5309-5310. In sum, due to the mix of Prochamp's CPMs sales in the various markets under the second most important CONNUM characteristic, only [      ] percent of Prochamp's CPMs sales in Germany – or approximately

[            ] kilograms of such sales – were direct matches with

Prochamp's U.S. sales. In contrast, nearly all of the [                    ]

kilograms of Prochamp's CPMs sales in France were direct matches

with Prochamp's sales of CPMs to the United States.

It bears noting that out of the 190 days the Department has to

complete its preliminary determination under the statute, by August

25, 2022, 127 of those days (or two-thirds of the time accorded the

Department to complete its preliminary determination[1]) had passed

without the agency selecting a comparison market.

However, the day after Prochamp submitted its updated analysis of

the physical characteristics of its sales to third-country markets based

on its revised sales volumes, the Department selected Germany as the

appropriate third-country market. The Department explained its

determination as follows:

_____

[1] *See Certain Preserved Mushrooms from the Netherlands: Preliminary
Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final
Determination, and Extension of Provisional Measures*, 87 Fed. Reg. 66,265 (Dep't
Commerce Nov. 3, 2022) ("*Preliminary Determination*") (Appx11707-11710) and
accompanying *Preliminary Decision Memorandum* ("*PDM*") (Appx11678-11695).

> Germany constitutes the appropriate comparison market for Prochamp because the market is viable, Prochamp's sales to Germany are similar to the products that Prochamp sold to the U.S. market during the POI, Germany provides the largest volume of the {merchandise under consideration ("MUC")}, and sales are made through the most similar channel of distribution and to the most similar type of customers when compared to the French and Israeli markets.

Appx1006.

On August 31, 2022, Plaintiff filed comments with the Department demonstrating that its analysis was not supported by record evidence. Appx5314-5325. First, Plaintiff demonstrated that the record established that Prochamp had again significantly overstated the volume of its sales to Germany by relying on the language on the label to determine country of consumption. Appx5315-5318. Second, Plaintiff again pointed out that based on the reported physical characteristics of merchandise sold in the United States and the relevant third-country markets, France was the superior choice. Appx5319-5322. Importantly, Plaintiff demonstrated that the Department's conclusion in the third-country selection memo that "that the [

] outweighs the [                    ] overall quantity of MUC

-22-

sold to the German market" was mathematically wrong. Appx5322-5324. Third, Plaintiff also demonstrated that Prochamp's claim (and the Department's reliance on Prochamp's claim) that its German sales were sold through the most similar channel of distribution was also wrong, because Prochamp's purported "German" sales were sold through a unique sales channel whereby they were delivered to the customer's warehouse in the Netherlands and then distributed [

] Appx5324. Thus, all of the reasons the Department relied on to support its selection of Germany as the third-country comparison market for determining normal value were not supported by record evidence.

The Department did not respond to Plaintiff's August 31 comments and did not instruct Prochamp to submit a database containing information on its sales of CPMs in France.

In comments filed with Commerce in advance of the preliminary determination, Plaintiff again explained why Prochamp's German sales volume was significantly overstated and why the Department's decision to select Germany as the most appropriate third-country market was

NONCONFIDENTIAL

not supported by record evidence. Appx7078-7086. The Department did not address any of the arguments raised by Plaintiff in the decision memorandum accompanying its preliminary determination. Appx11678-11695.

Following the Department's preliminary determination, Plaintiff submitted pre-verification comments urging that Department officials verify the volume of Prochamp's sales that were reported as involving merchandise consumed in Germany. Appx9394-9397.

On January 11, 2023, the Department released a report summarizing its on-site verification of Prochamp's sales information that included a discussion of Prochamp's attempts to determine the destination of the CPMs sales it identified as involving product consumed in Germany. Appx10071-10074. The Department's report notably confirmed that Prochamp marked sales to [

] as German sales, but Prochamp did not possess any information to confirm that its sales to [      ], which were delivered in the Netherlands, involved products that were actually consumed in Germany. Appx10072 ("Prochamp has no actual

knowledge of the eventual destination of the product within [        ]

own distribution chain, or that it even left the Netherlands, much less

where the product was sold for retail and ultimately consumed.").

Moreover, the Department's verification report confirmed that

"virtually all [        ] language labels for [            ] brand

contained a label code identifying the product as [          ]

Appx10072. As such, Prochamp's [        ]-language label

demonstrated that the product was intended for retail display in either

[                ], but the Department's verification report stated

that "the label alone did not distinguish sales intended for the

[        ] market from those going to the [        ] market."

Appx10072. Further, during their verification of Prochamp, Commerce

officials

> scrutinized the accompanying sales and transport
> documentation, including that provided to
> Prochamp by [    ], as well as correspondence
> related to relevant sales to test whether there is
> any disambiguation for sales or portions of a sale
> destined for [
> ] markets.

Appx10073. Based on this analysis, the Department's verification report

states that "{t}he documentation confirmed that [

] are the likely countries of consumption but did not offer information to disambiguate between the two." Appx10073.

In addition to confirming that Prochamp's claimed sales volume to Germany was significantly overstated due to the fact that [

] of that volume was destined for and consumed in [                  ], the Commerce officials conducting the verification also identified certain sales that were unambiguously sold to markets other than Germany and, thus, wrongly reported by Prochamp as involving German sales. Appx10073-10074 (stating "we did identify a subset of reported German language sales which indicated that they were not likely to be consumed in Germany").

Plaintiff again challenged the Department's selection of Germany as the appropriate third-country market in its administrative case brief. Appx10221-10227. Plaintiff also argued in its case brief that Prochamp withheld requested information from the Department, impeded the agency's investigation, and failed to cooperate to the best of its ability in providing the Department with information to determine the appropriate basis for calculating normal value. Appx10187-10203.

In reaching its final determination, the Department rejected

Plaintiff's arguments, stating that the agency did

> not agree that Prochamp significantly impeded
> the investigation with respect to comparison
> market identification and reporting, nor that the
> later-developed record supports a reconsideration
> of third country market selection.

Appx1059-1065. The Department also reasserted that its selection of

Germany as the appropriate third-country market was correct based on

the record that existed at the time of its selection, as well as the record

at the conclusion of the investigation. Appx1080-1083.

## Facts Pertaining to Prochamp's Failure to Submit Copies of Financial Statements Requested by the Department

In Section A of its initial antidumping questionnaire, the Department

instructed Prochamp to submit copies of a list of financial documents for

the two most-recently completed fiscal years, as well as all subsequent

monthly or quarterly statements, including:

- "audited, consolidated and unconsolidated financial statements (including any footnotes and auditor's opinion)";

- "internal financial statements or profit and loss reports of any kind that are prepared and maintained in the normal course of business for the merchandise under investigation or, in the

absence of such reports, for the product line that corresponds most closely to the definition of the merchandise under investigation, including those for the next largest and smallest categories of merchandise and for the next largest and smallest internal business unit producing or selling the merchandise under investigation"; and

- "financial statements or other relevant documents (i.e., profit and loss reports) of all affiliates involved in the production or sale of the subject merchandise in the foreign market and the U.S. market, of all affiliated suppliers to these affiliates, and of the parent(s) of these affiliates."

Appx1726.

In response, Prochamp submitted a copy of what it described as a consolidated audited financial statement for an entity known as [

] for fiscal year 2020. Appx1726, Appx1733, Appx1783-1894. Prochamp also stated that it was submitting a copy of what it described as a consolidated unaudited financial statement for the same entity for fiscal year 2021, but Prochamp did not actually submit any such document with its response. Appx1726, Appx1733, Appx1895.

The Department instructed Prochamp to submit the company's 2021 financial statements in supplemental questionnaires on several additional occasions. Appx3869, Appx5891, Appx5895-5896, Appx7602-

7603. The agency also instructed Prochamp to submit the financial statements of a number of its affiliates on numerous occasions. Appx3890, 5895, 7602-7603. Throughout the investigation, however, Prochamp did not submit the requested financial statements to Commerce. In response to each request by Commerce, Prochamp steadfastly refused to submit *any* financial statements for these entities, claiming that neither it, nor any of its affiliates, prepares financial statements and that Prochamp and its affiliates are not required to prepare such documents under Dutch law. In particular, on these various occasions, Prochamp stated:

- "Prochamp does not have a standalone financial statement, it only prepares consolidated audited financial statements with its group companies as per the Dutch Civil law/Netherlands Corporate Law complying with the requirements of the Dutch GAAP." Appx1725.

- "{T}he parent company of Prochamp and Peffer group i.e., Peffer Holding BV NL has been filing consolidated financial statements for the group since 2015. The group files its consolidated financial statement in accordance with Declaration 403 of Dutch law which states that if legal bodies are part of a group they can be exempted from the requirement to file their annual financial statements with the trade register. It is thus possible that the consolidated

NONCONFIDENTIAL

financial statements for the group will suffice." Appx3399.

• "Thus Peffer Holding BV NL is required to file the consolidated annual financial statement of the whole group. The subsidiary company does not need to file financial statements to the Chamber of Commerce, because the parent company already does this and ensures that a legal person belonging to a group of company does not need to set up the financial statements in accordance with the regulations in force." Appx3400.

• "Prochamp is not required to prepare the unconsolidated financial statements as already explained in Section A initial questionnaire response ("AQR") dated June 21, 2022. Prochamp reiterates and submits that it only prepares consolidated financial statements with its group companies as per the Dutch Civil law/ Netherlands Corporate Law complying with the requirements of the Dutch GAAP." Appx5891-5892.

• "Prochamp *does not maintain any internal financial statements or profit and loss reports of any kind that are prepared in the normal course of business for the merchandise under investigation* or for the product line that corresponds most closely to the definition of the merchandise under investigation, including those for the next largest and smallest categories of merchandise and for the next largest and smallest internal business unit producing or selling the merchandise under investigation. Prochamp maintains the consolidated financial

statements for all the companies under the [                    ] umbrella which is provided in Exhibit A-31.3 for the POI 2021." Appx5895 (emphasis added).

On August, 8, 2022, Plaintiff submitted a copy of a PricewaterhouseCoopers ("PwC") publication titled "An overview of financial reporting in the Netherlands" to rebut Prochamp's claims that it is not required to prepare financial statements under Dutch law. Appx11422-11551. As Plaintiff noted in further comments submitted to Commerce on August 16, 2022, this report states that:

> Prior to any discussion on filing exemptions, it is important to understand the distinction between the preparation of financial statements on the one hand and filing on the other.

> Financial statements have to be prepared by the managing board of the company for adoption by the shareholders of the company. The financial statements prepared by the managing board for this purpose are subject to certain exemptions in the case of micro, small and medium-sized companies.

Appx5265-5266; *see also* Appx11465.

Further, as Plaintiff explained in more detail in comments submitted in advance of the agency's preliminary determination, while Prochamp may be excused from *filing* its unconsolidated financial statements with

the Dutch authorities, as Article 2:403 provides "{a}n exemption from *filing* the financial statements" to group companies, Dutch law unequivocally requires that Prochamp must *prepare* unconsolidated financial statements. Appx7071-7072; Appx11492.

Other than acknowledging that "Prochamp has not provided its stand-alone financial statements for the fiscal year (FY) 2021," the Department did not address this issue in its preliminary determination. Appx7560.

Shortly after the Department issued its preliminary determination, Prochamp submitted a supplemental questionnaire response in which it again claimed that Prochamp does not, and is not required to, prepare financial statements under Dutch law. Appx7603-7605. In fact, in response to the Department's fifth request for copies of its financial statements, Prochamp confirmed "that standalone financial statements, *in any form,* do not exist for Prochamp" or any of Prochamp's affiliates. Appx7603.

In this same questionnaire response, Prochamp also submitted a letter from its auditor to the Board of Directors [

NONCONFIDENTIAL

**]**, that addresses the relevant portion of the

Dutch Civil Code, as follows:

**[**


**]**

Appx7772-7773 (emphasis added). Thus, the letter from Prochamp's

auditor confirmed – **[                                        ]** – that

under Dutch law, Prochamp, **[**


**]** standalone financial statements. Appx11459-11461. The

auditor's letter also directly contradicted Prochamp's earlier statements

that

> Prochamp does not maintain any internal
> financial statements or profit and loss reports of
> any kind that are prepared in the normal course
> of business for the merchandise under
> investigation or for the product line that
> corresponds most closely to the definition of the
> merchandise under investigation.

Appx5895.

-33-

During verification, Commerce officials discussed these discrepancies with company officials from Prochamp, memorializing those discussions in the agency's cost verification report. Appx10093-10095. Further, despite its continued insistence that such documents did not exist, during the verification Prochamp also provided to Department officials 403-abbreviated 2021 financial statements for Prochamp, Richamp, Champignoncultuur, Peffer Vastgoed I BV, Peffer Vastgoed II BV, and Peffer Vastgoed III BV. Appx10095; Appx9130-9137.

In its administrative case brief, Plaintiff argued that Prochamp's failure to submit its financial statements to the Department – among several other financial and accounting issues – despite numerous requests by the agency, constituted withholding necessary information, impeding the Department's investigation, and demonstrated that Prochamp had not cooperated to the best of its ability in responding to the Department's requests for information under 19 U.S.C. § 1677e(a)-(b). Appx 10162-10187.

In the final determination, the Department rejected Plaintiff's arguments, acknowledging that

> during the course of this investigation, Commerce
> requested that Prochamp submit the
> unconsolidated financial statements of all the
> Peffer Holding BV NL (Peffer) group companies,
> as well as any consolidated financial statements
> prepared by Peffer group companies.

Appx1051. Commerce's decision memorandum, however, continued on
to state that "Prochamp had a valid reason under Dutch law to not
prepare these kinds of records." Appx1051. Moreover, the Department
determined that "Prochamp's 'internal statements' obtained at
verification are not 'standalone financial statements'" and "the '403
financial document' does not reasonably constitute standalone financial
statements that would fall within" the agency's requests. Appx1051-
1052.

   This appeal followed.

## ARGUMENT

**I.    The Department's Selection of Germany As the
       Comparison Market Is Unlawful**

   **A.    The Department's Selection of a Third-Country
          Market Is Not Insulated from Challenge During an
          Administrative Proceeding or from Judicial Review**

In rejecting Plaintiff's claim that the Department's third-country

market selection was unlawful, the Department explained that it "must

identify a viable and appropriate third country as a concrete basis for normal value early in a proceeding." Appx1080. Contrary to the Department's explanation, the agency's selection of a third-country market for determining normal value is not insulated from reconsideration when new facts or arguments are presented during administrative proceedings – or from subsequent judicial review after the conclusion of the administrative proceedings.

*First*, Plaintiff challenged the Department's selection of Germany as the most appropriate third-country market immediately after the Department announced its intention to rely on Prochamp's sales of CPMs to Germany as the basis for calculating normal value. Appx5314-5325. Approximately one month after the Department's announcement of its selection of Germany as the third-country market, Plaintiff again argued that Germany was not an appropriate comparison market in comments submitted in advance of the Department's preliminary determination. Appx7078-7086. Following Commerce's announcement of its preliminary determination, in which the agency provided no analysis to explain or support its selection of Germany as the

appropriate comparison market, Plaintiff again urged Commerce to verify factual information submitted by Prochamp related to the comparison market selection factors – and in particular the volume of sales that Prochamp claims to have sold in Germany during the period of investigation. Appx9394-9397. As such, the lack of an "appropriate remedy" was entirely of the agency's own making – and not for a lack of Plaintiff exhausting its administrative remedies. At any time during its administrative proceedings, the Department could have instructed Prochamp to submit a database consisting of Prochamp's sales of CPMs in France in order to preserve the issue for reconsideration following the preliminary determination. Commerce, however, chose not to do so. Plaintiff cannot be blamed for the Department's inaction.

*Second*, the Department cited its own remand results in *Stupp I* and *Stupp II* to support its claim of the existence of an established practice that the agency is not required to revisit a third-country market selection. Appx1081 (citing *Final Results of Redetermination Pursuant to Court Remand; Stupp Corporation et al. v. United States*, Consol. Court No. 15-00334 (Dep't Commerce May 2, 2019) ("*Stupp I Remand*")

and *Final Results of Redetermination Pursuant to Court Remand; Stupp*

*Corporation et al. v. United States*, Consol. Court No. 15-00334 (Dep't

Commerce Jan. 14, 2020) ("*Stupp II Remand*"). The remand

redeterminations relied on by the Department, however, do not support

its claims regarding the existence of an established practice, nor do they

support a conclusion that any such practice is lawful. Indeed, the U.S.

Court of International Trade ("CIT") rejected the Department's

explanation in *Stupp I Remand* that it is required to determine home

market viability early in the proceeding. The Court noted that

> Commerce itself has recognized that although it
> would prefer to make a determination early in
> the proceeding, it may sometimes need to delay
> the determination or reconsider a determination.

*Stupp Corp. v. United States*, 413 F. Supp. 3d 1326, 1332 (Ct. Int'l

Trade 2019) (*"Stupp I"*) (citing *Antidumping Duties; Countervailing*

*Duties*, 62 Fed. Reg. 27,296, 27,358 (Dep't Commerce May 19, 1997)).

The Court also explained that "it would be unreasonable for Commerce

to refuse to revisit its viability determination when it determines that

the components of its prior determination were incorrect" and that

"{f}ailing to reconsider viability in such cases would render judicial

review meaningless." *Id.*[2] Thus, the Court rejected the Department's explanation that it can ignore new facts that undermine an earlier determination due to the agency's preference for making a determination early in the proceeding.[3]

*Third*, the applicable standard of review requires this Court to "hold unlawful any determination, finding, or conclusion" that is "unsupported by substantial evidence on the record." 19 U.S.C. § 1516a(b)(1)(B)(i). The record includes "a copy of all information presented to or obtained by" the Department "during the course of the administrative proceeding." 19 U.S.C. § 1516a(b)(2)(A)(i). The Department cannot limit the Court's authority to review a decision by claiming the existence of an established practice to issue a decision early in the administrative proceedings. The agency's findings of fact

_____

[2] The Court also did not sustain the Department's practice of evaluating home market viability in *Stupp II*. Indeed, on remand the Department re-evaluated home market viability, but ultimately provided a reasoned explanation why the home market was viable, which the Court sustained absent any challenge from the parties. *See Stupp Corp. v. United States*, 435 F. Supp. 3d 1307, 1310-11 (Ct. Int'l Trade 2020) ("*Stupp II*"), *aff'd in part, vacated in part on other grounds*, 5 F.4th 1341 (Fed. Cir. 2021).

[3] Indeed, the Department did not reach a determination on the appropriate comparison market early in the proceeding. Two-thirds (or 127 out of 190 days) of the time the Department has to complete its preliminary determination under the statute had passed before the agency identified Germany as the comparison market.

must be supported by substantial evidence, including evidence that

fairly detracts from those findings, regardless of when that evidence

came before the agency during the investigation. *See NTN Bearing*

*Corp. v. United States*, 74 F.3d 1204, 1208 (Fed. Cir. 1995) ("The

Supreme Court has noted: 'Whenever a question concerning

administrative, or judicial, reconsideration arises, two opposing  policies

immediately demand recognition: the desirability of  finality, on the one

hand, and the public interest in reaching what, ultimately, appears to

be the right result on the other.' However, preliminary determinations

are 'preliminary' precisely because they are subject to change.") (quoting

*Civil Aeronautics Bd. v. Delta Air Lines, Inc.,* 367 U.S. 316, 321 (1961));

*see also Shenzhen Xinboda Indus. Co. v. United States*, 2017 Ct. Intl.

Trade LEXIS 166, at *17-18 (Dec. 5, 2017) ("Once again: preliminary

results are just that, preliminary – Commerce has until the final results

to make its decision."). As discussed in Section I.B., the record did not

support the agency's conclusion at the time the Department reached its

initial third-country selection determination, and additional

information placed on the record subsequent to the Department's

NONCONFIDENTIAL

preliminary determination further undermined the agency's continued

reliance on Germany as the third-country market.

     **B.**   **None of the Department's Factual Findings Underlying Its Selection of Germany as the Comparison Market Is Supported By Substantial Evidence**

        **1.**   **Legal Background**

The Department typically calculates normal value based on

> the price at which the foreign like product is first sold (or, in the absence of a sale, offered for sale) for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade and, to the extent practicable, at the same level of trade as the export price or constructed export price.

19 U.S.C. § 1677b(a)(1)(B)(i). However, if "the foreign like product is not

sold (or offered for sale) for consumption in the exporting country," or

"the aggregate quantity (or, if quantity is not appropriate, value) of the

foreign like product sold in the exporting country is insufficient to

permit a proper comparison with the sales of the subject merchandise to

the United States,"[4] the Department may rely on "the price at which the

---

[4] 19 U.S.C. § 1677b(a)(1)(C)(i)-(ii).

foreign like product is so sold (or offered for sale) for consumption in a country other than the exporting country or the United States," if certain conditions are met, or constructed value. 19 U.S.C § 1677b(a)(1)(B)(ii), (a)(4).

The Department normally considers "the aggregate quantity (or value) of the foreign like product sold in the exporting country" to be "insufficient" under 19 U.S.C. § 1677b(a)(1)(C)(ii), "if such quantity (or value) is less than 5 percent of the aggregate quantity (or value) of sales of the subject merchandise to the United States." 19 U.S.C. § 1677b(a)(1)(C)(iii); *see also* 19 C.F.R. § 351.404(b).

Moreover, the Department may rely on "the price at which the foreign like product is so sold (or offered for sale) for consumption in a country other than the exporting country or the United States," pursuant to 19 U.S.C § 1677b(a)(1)(B)(ii), if "such price is representative," "the aggregate quantity (or, if quantity is not appropriate, value) of the foreign like product sold by the exporter or producer in such other country is 5 percent or more of the aggregate quantity (or value) of the subject merchandise sold in the United States or for export to the

United States," and the Department "does not determine that the particular market situation prevents a proper comparison with the export price or constructed export price." 19 U.S.C. § 1677b(a)(1)(B)(ii)(I)-(III).

If more than one third country satisfies the criteria set forth in 19 U.S.C. § 1677b(a)(1)(B)(ii), the Department selects a third-country market based on the following criteria:

1. The foreign like product exported to a particular third country is more similar to the subject merchandise exported to the United States than is the foreign like product exported to other third countries;

2. The volume of sales to a particular third country is larger than the volume of sales to other third countries; and

3. Such other factors as the Secretary considers appropriate.

19 C.F.R. § 351.404(e).

The Department's "practice is to consider all of the criteria" under 19 C.F.R. § 351.404(e) "when determining the appropriateness of a third-country comparison market," and only if "all other factors are equal" will Commerce "select the largest third-country market by volume." Memorandum from Allison Hollander to Alex Villanueva re: *Common Alloy Aluminum Sheet from Bahrain – Selection of an Appropriate*

*Third Country Market*, at 3 (Dep't Commerce June 24, 2020) (ACCESS barcode: 3990601-01); Memorandum to Abdelali Elouradia re: *Less-Than-Fair-Value Investigation of Raw Honey from Argentina: Selection of Appropriate Third Country Market*, at 6 (Dep't Commerce Aug. 11, 2021) (ACCESS barcode: 4151668-01) *see also* Memorandum to Melissa G. Skinner re: *2018-2019 Administrative Review of the Antidumping Duty Order on Welded Line Pipe from the Republic of Turkey; Selection of an Appropriate Third Country Market*, 3 (Dep't Commerce Apr. 16, 2020) (ACCESS barcode: 3966047-01); Memorandum to Jill E. Pollack re: *Certain Frozen Warmwater Shrimp from India; Selection of an Appropriate Third Country Market*, 3 (Dep't Commerce Nov. 30, 2020) (ACCESS barcode: 4059889-01).

2. **The Department's Finding That Differences in Product Weights Are [          ] Is Not Supported By Substantial Evidence**

After correctly finding that "Prochamp's sales to France have the

[                              ] to match with U.S. sales," the

Department incorrectly concluded that "the record reflects that the

products sold in each of the third-country markets all appear to be very

similar to the MUC" and that "the [

NONCONFIDENTIAL

] outweighs the [                                  ] overall quantity of MUC

sold to the German market." Appx1004. The Department's own

memorandum demonstrates that the Department's analysis is

mathematically wrong, and Plaintiff provides additional analysis below

demonstrating the significant impact the Department's failed analysis

had on the agency's dumping analysis in this investigation.

*First*, as set forth in the Department's third-country selection

memorandum, [        ] percent of Prochamp's U.S. sales had a net

drained weight of [                                ] Appx1003-1004; *see also*

Appx5309-5310. Prochamp, however, made [      ] German sales of

CPMs with a net drained weight in this category, meaning that [     ]

German sales match with the vast majority of Prochamp's U.S. sales. In

contrast, [        ] percent of Prochamp's French sales had a net drained

weight of [                                  ], meaning that unlike Prochamp's

German sales, there are robust and identical matches between

Prochamp's French sales and the vast majority of its U.S. sales.

Appx1003-1004; *see also* Appx5309-5310.

NONCONFIDENTIAL

Furthermore, the remaining [        ] percent of Prochamp's U.S. sales have a net drained weight of [                        ] Appx1003-1004; *see also* Appx5309-5310. While only [       ] percent of Prochamp's German sales had a net drained weight of [

[        ] percent of Prochamp's French sales of CPMs were in this category. Appx1003-1004; *see also* Appx5309-5310. Accordingly, based on the second most important product matching characteristic, it was clear that a maximum of [        ] percent of Prochamp's German sales (representing a mere [          ] kilograms) could be identically matched with Prochamp's U.S. sales, assuming all other CONNUM characteristics were identical. In contrast, more than [      ] percent of Prochamp's French sales could have been matched identically with Prochamp's U.S. sales, accounting for more than [              ] kilograms of Prochamp's CPMs sales in France. The Department's characterization of this difference as [          ] is clearly erroneous, contrary to the statute's preference for identical matches (19 U.S.C. § 1677(16)), and no reasonable mind could reach the Department's conclusion that the volume of Prochamp's CPMs sales in Germany

outweighed differences in product characteristics when simple math demonstrates otherwise. *An Giang Fisheries Imp. & Exp. Joint Stock Co.*, 287 F. Supp. 3d at 1376 n.25 (Commerce abuses its discretion when its decision "'is clearly unreasonable, arbitrary, or fanciful . . . is based on an erroneous conclusion of law . . . rests on clearly erroneous fact findings{,} or follows from a record that contains no evidence on which the {agency} could rationally base its decision'").

In its final determination, the Department continued to rely on this incorrect analysis, explaining that "any such overstatement" regarding the difference in similarity of the products sold in U.S. and German markets

> was not determinative and does not conflict with the conclusion that the record reflects that the products sold in each of the third-country markets for this characteristic all appear to be very similar to the MUC.

Appx1082. Nearly the entire basis for the Department's selection of Germany as the third-country comparison market was that the volume of German sales outweighed the similarity of U.S. and French products, so it is unclear how the Department's weighing of these factors "was not determinative." Appx1003-1005. Moreover, the Department's assertion

that "the record reflects that the products sold in each of the third-country markets for this characteristic all appear to be very similar to the MUC" is clearly erroneous, as demonstrated above. Appx1082.

*Second*, the impact of the Department's erroneous analysis on the dumping calculation (and ultimate exclusion of Prochamp from the *Order*) was enormous. As Plaintiff argued, both before and after the Department issued its third-country market selection, relying on Germany as the comparison market would result in very limited matches with Prochamp's U.S. sales of CPMs and, therefore, a lack of a robust analysis. *See*, *e.g.*, Appx7078-7086, Appx10221-10227. This is, indeed, what happened. As shown in the chart at *Attachment 1 hereto*, Prochamp sold [       ] CONNUMs in the U.S. market and sold [

     ] CONNUMs in the German market during the period of investigation. There is only [                              ] that represented [       ] percent of Prochamp's U.S. sales and [   ] percent of Prochamp's German sales. *See Attachment 1*. As a result, the Department compared [       ] U.S. CONNUMs with prices for a non-identical German CONNUM adjusted for differences in merchandise

("DIFMER") based on costs, and **[          ]** U.S. CONNUMs with constructed value because the difference in prices between the U.S. CONNUMs and the non-identical German CONNUM were too great to rely on a DIFMER adjustment. *See Attachment 1*. Ultimately, the agency reached a negative determination of dumping without comparing Prochamp's U.S. sales prices to actual prices in any market, despite the existence of such prices in France. If the Department had selected France as the comparison market, it would have had robust and identical comparisons for *all* U.S. CONNUMs, and a determination of dumping (or lack thereof) would have been supported by record evidence. As the record stands, however, the Department's selection of Germany as the third-country market undermined the agency's dumping analysis and masked any actual dumping, as there were no identical normal value comparisons for the vast majority of Prochamp's U.S. sales.

NONCONFIDENTIAL

**3.** **The Record Does Not Support the Department's Finding That the German and U.S. Sales Channels and Types of Customers Are Similar**

In selecting Germany as the third-country comparison market, the Department also relied on "Prochamp{'s} state{ment}" (*i.e.*, not documentary evidence or an evaluation of the record) that

> the sales channel and type of customer in Germany is the most similar to the sales channel and type of customer in the United States, as the sales in Germany and the United States are made directly to unrelated customers, whereas in Israel and France, Prochamp sold the subject merchandise through an unaffiliated agent, which further supports the selection of Germany as the appropriate comparison market.

Appx1004. The record, however, did not support the Department's reliance on Prochamp's statement – either at the time of the third-country selection or at the time of the Department's final determination.

Prochamp asserted in its response to the Department's Section A questionnaire that "Germany is the most appropriate third-country market for determining the normal value" because "the channel of export/distribution i.e. all sales are made to unaffiliated customers in both the countries," but the record demonstrated that Prochamp's

German sales were unique and quite different from sales to the U.S. and all other markets. Appx1705. Specifically, in explaining how Prochamp identified the destination of its sales to the U.S. and third-country markets (other than Germany), Prochamp relied on "the destination port/port of delivery" as set forth on the commercial invoices. Appx1703. In contrast, Prochamp could not rely on this method for identifying German sales because "the sales to Germany are mostly on Free Carrier (FCA) incoterms" and Prochamp delivers the merchandise in the Netherlands. Appx1703. As a result, Prochamp relied on the customer's address and packaging of the product instead of the port of destination to identify sales to the German market. Appx1703.

Notably, in a supplemental questionnaire, the Department instructed Prochamp to breakdown its sales to each market by channel of distribution – *i.e.*, retailer, reseller, or distributor, but Prochamp withheld this information from the Department and ignored the questions completely. Appx4859-4860.

Moreover, a substantial majority of Prochamp's reported German sales were to customer [        ] and delivered in the Netherlands. Appx8780-8788 (showing that [        ] percent of Prochamp's sales were to [        ] and [        ] of these are marked with sales term [

[        ]). [        ] then distributed these products [

[        ], as verified by the Department. Appx5182-5186; Appx10073-10074. The same is not the case for Prochamp's U.S. sales, which were both delivered to and sold within the United States. Appx3102-3104.

In addition, contrary to Prochamp's claim in its Section A response that it did not use selling agents for U.S. sales, Prochamp reported in its Section C questionnaire response that it "pays commission of [        ] or [        ] percentage of the invoice value to the selling Agent or Intermediaries for sales made to [        ] of its customers." Appx3122. As a result, the fact that Prochamp's sales to France are [

[        ] is more similar to Prochamp's U.S. sales, [        ], than to its German sales, which involve no selling agents. Prochamp's Section C

questionnaire response was filed with Commerce on July 18, 2022, more than a month prior to the Department's third-country selection decision and reliance on Prochamp's disproven statements that the sales channels for its U.S. sales were more similar to the sales channels for its German sales than to the sales channels for other third-country markets. Thus, the Department's reliance on Prochamp's self-serving statement is not supported by substantial evidence.

In its final determination, the Department stated that its original reliance on Prochamp's statement concerning sales channels was

> not determinative, {} merely provided additional corroboration for the selection of Germany and the later revision did not result in the record supporting that another proposed third country market to be more similar than Germany with respect to sales channel and type of customer.

Appx1082. The only reason the Department offered for selecting Germany, other than the volume of Prochamp's German sales outweighing the similarity of U.S. and French sales, was the channels of distribution and type of customer. Appx1002-1004. As a result, if neither of those findings was "determinative," it is unclear what led the Department to select Germany as the third-country comparison market.

Moreover, contrary to the Department's statement that "the later revision did not result in the record supporting that another proposed third country market to be more similar than Germany with respect to sales channel and type of customer," the record did actually support a determination that Prochamp's U.S. and French sales were sold through the same two channels of distribution – *i.e.*, direct to end users and through selling agents, whereas that was not the case for German sales. Appx1082. Thus, the Department's explanation is not supported by substantial evidence.

### 4.  The Record Does Not Support the Volume of Sales Prochamp Reported to Germany

In selecting Germany as the third-country comparison market, the Department also rejected Plaintiff's argument that Prochamp's reported volume of sales to Germany was not reliable. Appx1005. Specifically, the Department stated that "there is no record evidence that sales to Germany were not consumed in the German market." *Id.* The Department's statement was wrong at the time it selected Germany as the third-country market, and was subsequently verified as wrong in connection with the agency's on-site verification of Prochamp.

After Prochamp revised its reported volume of CPMs sales to

Germany downwards twice, reducing the reported sales volume by

nearly **[      ]**, the record continued to demonstrate that Prochamp's

claimed volume of sales to Germany was still overstated. The

Department's sales verification report confirmed that Prochamp treated

its sales to **[      ]** as German, but

> Prochamp has no actual knowledge of the
> eventual destination of the product within
> **[      ]** own distribution chain, or that it even
> left the Netherlands, much less where the
> product was sold for retail and ultimately
> consumed.

Appx10072. The Department also verified that while "virtually all

**[          ]** language labels for **[                ]** brand contained a

label code identifying the product as **[          ]**, thus identifying that

the label was intended for **[          ]**-language retail display in either

the **[              ]** market," "the label alone did not distinguish

sales intended for the **[          ]** market from those going to the

**[          ]** market." Appx10072. In addition to confirming that

Prochamp's reported sales volume to Germany was significantly

overstated due to the fact that **[                ]** of that volume was

destined for and consumed in **[         ]**, the Department also

identified certain sales that were unambiguously sold to **[                ]**

and, thus, were wrongly treated by Prochamp as involving sales to

Germany. Appx10073-10074.

Plaintiff identified these same issues in comments submitted to

Commerce on August 31, 2022, based on evidence Prochamp submitted

to Commerce prior to the agency's selection of Germany as the third-

country comparison market. Appx5316-5318. Thus, the Department's

statement in the third-country selection memorandum that "there is no

record evidence that sales to Germany were not consumed in the

German market," was (and is) wrong. Appx1005.

\*     \*     \*

In sum, none of the Department's reasons for selecting Germany as

the comparison market is supported by substantial evidence.

Accordingly, the Court should remand the Department's final

determination and instruct the Department to require Prochamp to

submit a comparison market sales database based on Prochamp's sales

of CPMs in France. Because no reasonable mind could conclude from

NONCONFIDENTIAL

the record evidence before Commerce that Germany was a superior comparison market to France, the Court should direct the Department to take this action on remand.

## II. **The Department's Determination to Calculate a Dumping Margin for Prochamp Is Unlawful**

### A. **Legal Background on Application of Adverse Facts Available**

In order for the Department to rely on adverse facts available in determining an antidumping margin, it must first find that its reliance on "facts available" is warranted. *See* 19 U.S.C. § 1677e(a). To do so, the agency must find that "necessary information is not available on the record," or that a respondent: (1) "with{held} information" requested by the Department; (2) "fail{ed} to provide such information by the deadlines for submission of the information or in the form and manner requested"; (3) "significantly impede{d} a proceeding"; or (4) "provide{d} such information but the information {could not} be verified." *Id.*

Moreover, if an interested party also "failed to cooperate by not acting to the best of its ability to comply with a request for information," the Department may apply an adverse inference in selecting among the facts available. 19 U.S.C. § 1677e(b). This standard for cooperation

requires that a respondent "has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1381 (Fed. Cir. 2003).

Like all other factual determinations, the Department's determination of whether or not any of the elements under 19 U.S.C. § 1677e(a)-(b) are satisfied must be supported by substantial evidence and the agency's decision to rely on facts available (or not) must be reasonably explained. *See Assan Aluminyum Sanayi ve Ticaret A.S. v. United States*, 624 F. Supp. 3d 1343, 1376-78 (Ct. Int'l Trade 2023) (stating that "it is not 'reasonably discernible' what evidence supports the agency's conclusions that 'Assan . . . cooperated with Commerce's requests for . . . information[ ] and . . . answered each request for . . . information to the best of its ability' -- the crux of Commerce's proffered rationale") (citation omitted); 19 U.S.C. § 1516a(b)(1)(B)(i).

Further, it is generally inappropriate for the Department to use partial adverse facts available "'when the missing information is core to the antidumping analysis and leaves little room for the substitution of partial facts without undue difficulty.'" *Fresh Garlic Producers Ass'n v.*

*United States*, 121 F. Supp. 3d 1313, 1324-25 (Ct. Intl Trade 2015)

(quoting *Mukand Ltd. v. United States*, 767 F.3d 1300, 1308 (Fed. Cir.

2014)).

B. **The Department's Factual Findings That Prochamp Did Not Withhold Information or Impede the Department's Investigation Are Not Supported by Substantial Evidence**

1. **Unsupported Factual Findings Related To Third-Country Market Selection**

In its decision memorandum for the final determination, Commerce

stated that it did not "agree {with Plaintiff} that Prochamp significantly

impeded the investigation with respect to comparison market

identification and reporting." Appx1053. The Department concluded

that there were only "a handful of discrepancies and inaccuracies" in

Prochamp's responses to the Department's requests for information –

and that these "were later corrected," "did not significantly impede the

proceeding," and "Prochamp was cooperative with all request for

information regarding market viability." Appx1053. As demonstrated

below, the Department's factual findings that Prochamp did not

"significantly impede" the proceeding – and was "cooperative with all

requests for information" – are not supported by substantial evidence.

At the outset, it bears noting that the Department espoused a practice for "identify{ing} a viable and appropriate third country as a concrete basis for normal value early in a proceeding" and "not subsequently revisit{ing} the initial viability determination" to support its selection of Germany as the appropriate comparison market in this investigation. Appx1080. Given the agency's strong preference for, and practice of, making this determination early in the proceeding, one would expect that the Department would be particularly sensitive to respondents providing all necessary information for the agency to make such a determination as quickly and accurately as possible. The Department's explanations for why Prochamp did not significantly impede the proceeding are inconsistent with the Department's stated practice regarding reaching a determination on the appropriate comparison market early in the proceeding.

*First*, Prochamp failed to notify the Department that its home market was not viable within 14 days of the date Prochamp received the Department's questionnaire despite: (1) the questionnaire's explicit instructions to do so; and (2) Prochamp's claim 33 days later that it had

[          ] of the foreign like product in the home market. Appx10722-Appx10723, Appx10754; Appx1706, Appx1734-1735. The Department asserts that Prochamp's failure to meet this obligation did not result in a delay because the Department was "in receipt of relevant information regarding market viability submitted in the Section A response, and able to quickly issue a Third Country Questionnaire within two days." Appx1060. Nevertheless, based on the agency's claim that it must determine the appropriate comparison market early in the proceeding, one would expect the Department to consider a three-week delay to be significant. If Prochamp had informed the Department that its home market was not viable within the fourteen day period identified in the agency's questionnaire, Commerce would not have been required to wait to issue a comparison market supplemental questionnaire until after Prochamp's submission of its response to the Department's initial Section A questionnaire.

*Second*, Prochamp urged the Department to determine that Germany was the most appropriate comparison market for the antidumping investigation, proclaiming in its Section A questionnaire response that

"Germany is the most appropriate third-country market for determining the normal value" because "the product sold to the USA and Germany are the same" and "the channel of export/distribution i.e. all sales are made to unaffiliated customers in both the countries." Appx1707. All of Prochamp's claims, however, were inaccurate. As discussed in detail in Section I.B.2, "the product sold to the USA and Germany" were not the same. Moreover, as discussed in Section I.B.3., "the channel of export/distribution" for U.S. and German sales was not the same. In addition, on June 21, 2022, in its response to Section A of the Department's initial antidumping questionnaire, Prochamp reported a sales volume of more than [            ] kilograms to Germany and approximately [            ] kilograms to France. Appx1734-1735. Prochamp significantly revised these sales volumes twice – on July 11 and August 1 – with the reported German sales volume decreasing by almost [                              ] kilograms) and the French volume increasing by more than [                              ] kilograms). Appx2844-2846; Appx4870. Thus, Prochamp itself did not settle on its claimed sales volumes until more than a month after its

NONCONFIDENTIAL

Section A questionnaire response was submitted to the Department. This rendered Prochamp's initial third-country comparison market questionnaire response, which was submitted on June 30, 2022, useless because it was based on Prochamp's initial, inaccurate reporting. Appx2265. The Department did not receive Prochamp's revised third-country comparison market questionnaire response containing the significantly revised sales volumes until August 25, 2022, nearly two months after Prochamp's initial third-country questionnaire was filed and two-thirds of the way through the 190-day period the Department had to complete its preliminary determination in the investigation. Prochamp's failure to identify its sales volumes accurately in its response to the Department's initial Section A questionnaire, or in its June 30, 2022 comparison market questionnaire response, as well as its inaccurate claims regarding the similarity of characteristics and sales channels in its Section A questionnaire response, significantly impeded the Department's investigation by delaying the agency's ability to identify an appropriate comparison market early in the proceeding.

NONCONFIDENTIAL

*Third*, contrary to the Department's claims that Prochamp did not withhold any necessary information or significantly impede the investigation, Prochamp completely ignored a lengthy set of questions the Department issued regarding the sale channels and types of customers for each of the potential comparison markets. Appx4859-4860. Because Prochamp failed to respond to these questions, the Department relied on Prochamp's self-serving (and inaccurate) statement that "the sales channel and type of customer in Germany is the most similar to the sales channel and type of customer in the United States" rather than documentary evidence. Appx1004. As discussed in Section I.B.3., the Department's finding regarding the sale channels and types of customers is not supported by substantial evidence, and Prochamp's failure to respond to the Department's questions regarding this issue constitutes withholding of information under 19 U.S.C. § 1677e(a).

### 2.   Unsupported Factual Findings Related to Prochamp's Financial Statements

The Department also did not agree with Plaintiff that "Prochamp has not acted to the best of its ability and failed to provide Commerce with

information that it possessed regarding its financial statements."

Appx1050. The Department stated that its decision was based on: (1)

"Prochamp {being} exempt under the {Dutch Civil Code} from preparing

standalone financial statements for each of the Peffer group

companies"; and (2) Prochamp's and Prochamp's affiliates' "'internal

statements'" do not "actually constitute 'financial statements' such that

they reasonably fall under the requests made by Commerce." Appx1050.

The Department's analysis of this issue is not supported by substantial

evidence.

Section A of the Department's initial antidumping questionnaire

instructs respondents to submit, among other financial records and

documents, the following:

> 1.    internal financial statements or profit and
> loss reports of any kind that are prepared and
> maintained in the normal course of business for
> the merchandise under investigation or, in the
> absence of such reports, for the product line that
> corresponds most closely to the definition of the
> merchandise under investigation; and
>
> 2.    financial statements or other relevant
> documents (i.e., profit and loss reports) of all
> affiliates involved in the production or sale of the
> subject merchandise in the foreign market and
> the U.S. market, of all affiliated suppliers to

> these affiliates, and of the parent(s) of these affiliates.

Appx1726.

The Department's analysis in the *I&D Memo* is not supported by substantial evidence because it ignores the agency's own instructions. For example, the Department states that under Dutch civil law, "Prochamp had a valid reason . . . to not prepare {standalone financial statements}," but Commerce never finds that Prochamp and its affiliates were exempt from preparing "internal financial statements or profit and loss reports of any kind that are prepared and maintained in the normal course of business" – documents that were explicitly requested in Commerce's initial questionnaire. Appx1051. That is because the record unequivocally demonstrates that Prochamp and its affiliates *were* required to maintain these types of financial documents. Appx11459-11465, Appx11492; Appx7772-7773 ("**[**

]) (emphasis

added)).

The remainder of the Department's explanation that Prochamp did not fail to act to the best of its ability in responding to the agency's questionnaires is that "Prochamp's 'internal statements' obtained at verification are not 'standalone financial statements.'" Appx1051. Again, however, this statement ignores the Department's own explicit requests that Prochamp submit copies of "internal financial statements or profit and loss reports *of any kind that are prepared and maintained in the normal course of business* for the merchandise under investigation." Appx1726 (emphasis added). As discussed in Section II.C.2., Prochamp made explicit representations to the Department that it did not have any such internal documents, despite the record unequivocally establishing that Prochamp is required by Dutch law to prepare, and that Prochamp did indeed have copies of, these financial statements. The Department's determination that Prochamp did not withhold information, and did not significantly impeded the agency's investigation, are not supported by substantial evidence.

C.   **The Department's Factual Findings That Prochamp Did Not Fail to Cooperate to the Best of Its Ability Are Not Supported by Substantial Evidence**

In addition to withholding information specifically requested by the Department and significantly impeding the agency's investigation, Commerce's finding that "Prochamp was cooperative with all requests for information regarding market viability" and Prochamp's financial documents is not supported by substantial evidence. Appx1059.

No reasonable mind could conclude that Prochamp cooperated to the best of its ability in responding to the Department's requests for information. *First*, as discussed above, Prochamp misreported its sales volume to Germany and other third-country markets on several occasions. The Department also verified that Prochamp's final reported sales volume to Germany was overstated. The Department identified certain sales that were unambiguously sold to [            ] and, thus, wrongly treated by Prochamp as involving sales to Germany. Appx10073-10074. Moreover, the Department verified that "virtually all [         ] language labels for [                ] brand contained a label code identifying the product as [         ], thus identifying that the label was intended for [          ]-language retail display in either

NONCONFIDENTIAL

the [                    ] market," and concluded there was no way

for the agency to determine the ultimate destination of these sales.

Appx10072. Prochamp never affirmatively raised these issues with the

Department during the investigation or attempted to come up with a

solution.

 *Second,* Prochamp made inaccurate assertions regarding the sales

channels and product characteristics of its sales of CPMs to Germany in

its initial questionnaire response, stating that "Germany is the most

appropriate third-country market for determining the normal value"

because "the product sold to the USA and Germany are the same" and

"the channel of export/distribution i.e. all sales are made to unaffiliated

customers in both the countries." Appx1707. But as discussed above in

Section II.B.1, all of Prochamp's claims were misleading at best.

Moreover, when the Department attempted to follow up on Prochamp's

claims regarding the channels of distribution and type of customers,

Prochamp completely ignored the Department's requests for such

information. Appx4859-4860.

NONCONFIDENTIAL

*Third*, despite the Department's explicit and broad requests of Prochamp for copies of relevant financial statement and documents, Prochamp blatantly refused to submit documents that were clearly in the company's possession *and* that Prochamp was required to maintain under Dutch civil law.

*Fourth*, verification is not an opportunity for the submission of significant new factual information (particularly information that was explicitly requested on multiple occasions by the Department), and the discovery of such new factual information by Department officials at verification demonstrates Prochamp's failure to cooperate. *See Goodluck India Ltd. v. United States*, 11 F.4th 1335, 1343-44 (Fed. Cir. 2021) ("Here…Goodluck submitted its revised databases at verification. Verification represents a point of no return. The purpose of verification is 'to test information provided by a party for accuracy and completeness.'") (citations omitted); *see also Max Fortune Indus. Co. v. United States*, 37 C.I.T. 549, 554-55 (2013) ("Max Fortune claims that Commerce officials 'summarily and erroneously refused' documentation that it offered at verification 'to conclusively establish that tissue paper

produced from' the Chinese jumbo rolls were 'not exported to the United

States.' . . .  Here, Commerce's decision not to use the information Max

Fortune offered is reasonable and consistent with its practice."); *Tianjin*

*Mach. Imp. & Exp. Corp. v. United States*, 353 F. Supp. 2d 1294, 1304-

05 (Ct. Int'l Trade 2004), *aff'd without op.*, 146 Fed. Appx. 493 (Fed. Cir.

2005). The Department's application of a different standard in this

investigation – by accepting: (1) Prochamp's internal financial

documents during verification; (2) revisions to Prochamp's German

sales database to remove sales destined for [                    ]; and (3) a

significant volume of sales that [                         ]; is

inconsistent with the standard the Department normally applies and,

therefore, is unlawful.

   In sum, Prochamp withheld information explicitly requested by the

Department on numerous occasions and disregarded the agency's

specific requests for information regarding two core issues – the

appropriate methodology for calculating normal value and the financial

and accounting documents that Prochamp and its affiliates are required

to maintain. The standard for cooperation required that Prochamp "put

NONCONFIDENTIAL

forth its maximum effort to provide Commerce with full and complete answers to all inquiries." *Nippon Steel Corp.*, 337 F.3d at 1381. The record does not support Commerce's determination that Prochamp met this standard.

### III.     <u>Conclusion</u>

For the reasons set forth above, Plaintiff respectfully urge this Court to determine that the Department's *Final Determination* is not supported by substantial evidence and is otherwise not in accordance with law. Plaintiff urges this Court to remand the *Final Determination* to the Department with instructions to correct the errors set forth above.

Respectfully submitted,

/s/ John M. Herrmann
JOHN M. HERRMANN
PAUL C. ROSENTHAL
JOSHUA R. MOREY
KELLEY DRYE & WARREN LLP
3050 K Street, N.W., Suite 400
Washington, DC 20007
(202) 342-8400

Counsel to Plaintiff

Dated: November 21, 2023

# ATTACHMENT 1

**THE CONFIDENTIAL ATTACHMENT IS NOT SUSCEPTIBLE TO SUMMARIZATION AND THEREFORE IS NOT PROVIDED WITH THIS NONCONFIDENTIAL VERSION**

**CERTIFICATE OF COMPLIANCE
WITH COURT OF INTERNATIONAL TRADE
STANDARD CHAMBERS PROCEDURES**

Pursuant to this Court's Order dated September 29, 2023 (ECF No. 21), setting the word limitation to the Rule 56.2 Motion for Judgment on the Agency Record and accompanying Memorandum in Support of Plaintiff Giorgio Foods, Inc. to 14,000 words, counsel for Plaintiff certifies that the attached Memorandum in Support of Rule 56.2 Motion for Judgment On the Agency Record contains 12,779 words, including footnotes.  The word count certification is made in reliance on the word-count feature contained in Microsoft Word Office 2016.

/s/ John M. Herrmann
JOHN M. HERRMANN
PAUL C. ROSENTHAL
JOSHUA R. MOREY
KELLEY DRYE & WARREN LLP
3050 K Street, N.W., Suite 400
Washington, D.C.  20007
(202) 342-8400
jherrmann@kelleydrye.com
prosenthal@kelleydrye.com
jmorey@kelleydrye.com

Counsel to Plaintiff

Dated:  November 21, 2023