IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE M. MILLER BAKER, JUDGE

_____
                                          )
GIORGIO FOODS, INC.,                      )
                                          )
           Plaintiff,                     )
                                          )    Court No. 23-00133
     v.                                   )
                                          )    PUBLIC
UNITED STATES,                            )    VERSION
                                          )
           Defendant,                     )    Business Proprietary
                                          )    Information denoted
     and                                  )    by brackets on pages
                                          )    5-8, 11, 14-16, 20, 22
PROCHAMP B.V.,                            )    23, 45, 50-53, 56-58
                                          )
           Defendant-Intervenor.          )
_____ )

## DEFENDANT'S OPPOSITION TO PLAINTIFF'S RULE 56.2 MOTION FOR JUDGMENT UPON THE AGENCY RECORD

BRIAN M. BOYNTON
Principal Deputy Assistant
     Attorney General

PATRICIA M. McCARTHY
Director

TARA K. HOGAN
Assistant Director

OF COUNSEL:

ALEXANDER FRIED
Attorney
Office of the Chief Counsel
    for Trade Enforcement &
    Compliance
U.S. Department of Commerce
1401 Constitution Avenue, NW
Washington, DC 20230


January 22, 2024

DANIEL BERTONI
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
(202) 353-7968

Attorneys for Defendant

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ vi

GLOSSARY OF ABBREVIATIONS ........................................................ vii

STATEMENT PURSUANT TO USCIT R. 56.2(c) ................................... 2

I.   Administrative Decision Under Review .......................................... 2

II.  Statement Of The Issues ................................................................. 2

STATEMENT OF FACTS ......................................................................... 3

I.   Commerce's Initiation Of Investigation And Selection Of
     Respondents And Product Characteristics ....................................... 3

II.  Commerce Received Information From Prochamp Concerning
     Market Viability And Prochamp's Finances .................................... 4

     A.   Prochamp Provided Information Showing That
          Germany Was The Appropriate Third-Country
          Market For Calculating Normal Value ................................... 4

     B.   Prochamp Complied With Commerce's Requests For
          Its Financial Statements To The Extent Of Prochamp's
          Ability Pursuant To Its Obligations Under Dutch Law ......... 9

III. Verification .................................................................................... 13

     A.   Third-Country Market Selection ........................................... 14

     B.   Financial Statements ............................................................. 16

IV.  Administrative Case Briefs And Final Determination .................. 17

SUMMARY OF ARGUMENT ................................................................. 21

ARGUMENT ........................................................................................... 23

I.   Standard Of Review ...................................................................... 23

II.   Substantial Evidence Supports Commerce's Determination
      Not To Employ An Adverse Inference ............................................ 24

      A.   Legal Framework For Application Of Facts Otherwise
           Available With An Adverse Inference .................................... 24

      B.   Commerce Reasonably Determined That The Use Of
           An Adverse Inference Was Not Warranted With Respect
           To Prochamp's Financial Statements ................................... 27

           1.   Substantial Evidence Supports Commerce's
                Determination That Prochamp Did Not Withhold
                Information Or Significantly Impede The
                Investigation ................................................................ 28

           2.   Substantial Evidence Supports Commerce's
                Determination That Prochamp Acted To The
                Best Of Its Ability ....................................................... 37

      C.   Commerce Reasonably Determined That An Adverse
           Inference Was Not Warranted With Respect To
           Prochamp's Third-Country Market Selection Reporting ..... 38

           1.   Substantial Evidence Supports Commerce's
                Determination That Prochamp Did Not Withhold
                Information Or Significantly Impede The
                Investigation ................................................................ 39

           2.   Substantial Evidence Supports Commerce's
                Determination That Prochamp Acted To The Best
                Of Its Ability ................................................................ 45

III.  Commerce's Determination To Choose Germany As The
      Comparison Market Is Lawful And Supported By Substantial
      Evidence .......................................................................................... 46

      A.   Legal Background .................................................................. 46

B.   Commerce's Final Third-Country Decision Is Reviewable, So Commerce's Third-Country Decision-Making Practice Is Not At Issue ........................................................................ 49

C.   Commerce's Third-Country Market Determination Is Consistent With Its Practice And Supported By Substantial Evidence ............................................................. 50

CONCLUSION ......................................................................... 59

# TABLE OF AUTHORITIES

## Cases

*Am. Honey Producers Ass'n v. United States*,
   653 F. Supp. 3d 1329 (Ct. Int'l Trade 2023) ............................27, 38, 39

*Assan Aluminyum Sanayi v. Ticaret A.S.*,
   624 F. Supp. 3d 1343 (Ct. Int'l Trade 2023) .......................................26

*Atl. Sugar, Ltd. v. United States*,
   744 F.2d 1556 (Fed. Cir. 1984) ............................................................24

*BlueScope Steel Ltd. v. United States*,
   548 F. Supp. 3d 1351 (Ct. Int'l Trade 2021) .......................................25

*Consol. Edison Co. v. NLRB*,
   305 U.S. 197 (1938) ..............................................................................23

*Consolo v. Fed. Mar. Comm'n*,
   383 U.S. 607 (1966) ..............................................................................24

*Dillinger France S.A. v. United States*,
   981 F.3d 1318 (Fed. Cir. 2020) ............................................................53

*Goodluck India Ltd. v. United States*,
   11 F.4th 1335 (Fed. Cir. 2021).......................................................35, 36

*Jindal Poly Films v. United States*,
   365 F. Supp. 3d 1379 (Ct. Int'l Trade 2019) .......................................25

*Max Fortune Industrial Co. v. United States*,
   37 CIT 549 (2013).........................................................................35, 36

*McKart v. United States*,
   395 U.S. 185 (1969) ..............................................................................55

*Micron Tech., Inc., v. United States*,
   117 F.3d 1386 (Fed. Cir. 1997) ............................................................34

*Nippon Steel Corp. v. United States*,
   337 F.3d 1373 (Fed. Cir. 2003) ............................................................26

*Nippon Steel Corp. v. United States*,
   458 F.3d 1345 (Fed. Cir. 2006) ............................................................ 24

*Özdemir Boru San. ve Tic. Ltd. Sti. v. United States*,
   273 F. Supp. 3d 1225 (Ct. Int'l Trade 2017) ..................................... 34

*Papierfabrik August Koehler SE v. United States*,
   843 F.3d 1373 (Fed. Cir. 2016) ............................................................ 26

*Sandvik Steel Co. v. United States*,
   164 F.3d 596 (Fed. Cir. 1998) .............................................................. 55

*Stupp Corp. v. United States*,
   5 F.4th 1341 (Fed. Cir. 2021) .............................................................. 36

*Thai Pineapple Pub. Co. v. United States*,
   187 F.3d 1362 (Fed. Cir. 1999) ............................................................ 53

*United States v. Eurodif S.A.*,
   555 U.S. 305 (2009) ............................................................................... 23

*Viraj Forgings, Ltd. v. United States*,
   283 F. Supp. 2d 1335 (Ct. Int'l Trade 2003) ..................................... 48

*Viraj Forgings, Ltd. v. United States*,
   350 F. Supp. 2d 1316 (Ct. Int'l Trade 2004) .............................. 51, 52

## **Statutes**

19 U.S.C. § 1516a(b)(1)(B) ......................................................................... 23

19 U.S.C. § 1677(16) ............................................................................. 53, 54

19 U.S.C. § 1677(16)(B)(i)-(ii) ................................................................... 54

19 U.S.C. § 1677b(a)(1) ........................................................... 7, 46, 47, 54

19 U.S.C. § 1677e .......................................................................... passim

19 U.S.C. § 1677m(d) ................................................................................. 25

**<u>Regulations</u>**

19 C.F.R. § 351.404(e)..................................................................22, 47, 51

**<u>Other Authorities</u>**

*Certain Preserved Mushrooms From the Netherlands: Final Affirmative Determination of Sales at Less Than Fair Value*, 88 Fed. Reg. 18,115 (Dep't Commerce Mar. 27, 2023)...........................................................2

## <u>GLOSSARY OF ABBREVIATIONS</u>

- **CPMs:**  Certain Preserved Mushrooms

- **DCC:**  Dutch Civil Code

- **Netherlands GAAP:**  Generally Accepted Accounting Principles in the Netherlands

- **PWC:**  PricewaterhouseCoopers

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE M. MILLER BAKER, JUDGE

_____

|  |  |  |
|---|---|---|
| GIORGIO FOODS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES, | ) | Court No. 23-00133 |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| PROCHAMP B.V., | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |

_____)

## DEFENDANT'S OPPOSITION TO PLAINTIFF'S RULE 56.2 MOTION FOR JUDGMENT UPON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade (USCIT R.), defendant, the United States, respectfully submits this response to the motion for judgment upon the agency record filed by plaintiff, Giorgio Foods, Inc. (Giorgio).  Because the final determination by the Department of Commerce in the investigation of certain preserved mushrooms (CPMs) from the Netherlands is supported by substantial evidence and otherwise in

accordance with law, we respectfully request that the Court deny Giorgio's motion and sustain Commerce's final determination.

## STATEMENT PURSUANT TO USCIT R. 56.2(c)

## I.   Administrative Decision Under Review

The administrative determination under review is the final determination of the less-than-fair value investigation covering certain preserved mushrooms (CPMs) from the Netherlands.  *See Certain Preserved Mushrooms From the Netherlands: Final Affirmative Determination of Sales at Less Than Fair Value*, 88 Fed. Reg. 18,115 (Dep't Commerce Mar. 27, 2023); Appx1271-1273.  The period of investigation is January 1, 2021 through December 31, 2021.

## II.   Statement Of The Issues

1. Whether substantial evidence supports Commerce's determinations that no gaps existed in the record and that Prochamp cooperated to the best of its ability, thereby providing no basis to rely on facts otherwise available.

2. Whether substantial evidence supports Commerce's selection of Germany as the comparison market to determine normal value for Prochamp B.V.

## STATEMENT OF FACTS

### I.   Commerce's Initiation Of Investigation And Selection Of Respondents And Product Characteristics

Following the filing of a petition by Giorgio, Commerce initiated a less-than-fair value investigation of CPMs from the Netherlands on April 20, 2022.  Appx10555-10559.  To assist Commerce in determining appropriate physical characteristics of CPMs to be reported in Commerce's questionnaires, Commerce asked for comments on product characteristics.  Appx10556.  Commerce stated that the information "will be used . . . in order to report the relevant costs of production accurately, as well as to develop appropriate product comparison criteria."  *Id*.

Commerce selected Prochamp B.V. and Okechamp B.V. as mandatory respondents.  Appx1688-1694.[1]  On May 24, 2022, Commerce informed all interested parties that the final, ordered set of physical characteristics of CPMs were:  (1) container type, (2) net drained weight, (3) mushroom style, (4) certified organic, (5) product labeling, and (6) packing solution.  Appx10899-10902.  These six

---

[1]  Commerce initially identified Okechamp by its former name of Greenyard Prepared Netherlands BV.  *See* Appx1970.

physical characteristics, collectively, defined the control number or

CONNUM for model matching purposes.  Appx10900.

## II.    Commerce Received Information From Prochamp Concerning Market Viability And Prochamp's Finances

During the investigation, Prochamp several times responded to

Commerce's requests for information concerning market viability and

Prochamp's finances.

### A.    Prochamp Provided Information Showing That Germany Was The Appropriate Third-Country Market For Calculating Normal Value

To calculate normal value, Commerce solicited information from

Prochamp regarding home market viability in section A of the

antidumping questionnaire Commerce that issued on May 19, 2022.

Appx10737; Appx10754-10756.  In its response, Prochamp reported it

did not have viable home market sales during the period of

investigation.  Appx1705-1706.  Prochamp instead reported information

on the volume and value of its sales to France, Germany, and Israel.

Appx1735.  On June 23, 2022, Commerce requested additional

information from Prochamp related to its third-country markets.

Appx2253-2258.  Prochamp responded on June 30, 2022, providing the

quantity and value breakdown of sales of CPMs to the United States,

France, Germany, and Israel, broken down by product characteristics. Appx2265-2271.  In both responses, Prochamp recommended that Commerce select Germany as the third-country market for calculating normal value.  Appx1707; Appx2266.

On July 6, 2022, Giorgio submitted deficiency comments and argued that Commerce should select France as the third-country market because, as Gorgio claimed, the product characteristics of the CPMs sold by Prochamp to France were the most similar to those sold by Prochamp to the United States.  Appx2606-2613.  On July 28, 2022, Giorgio again submitted comments arguing that Commerce should select France because sales to the Germany market are [

]  Appx3764-3768.

In response to a supplemental questionnaire from Commerce, Appx2762, Prochamp revised the total quantity and value reported with respect to comparison-market sales in France and Germany, Appx4870. The questionnaire instructed Prochamp to "{p}rovide the quantity and value of all sales with German as the sole language identified on the label."  Appx2765.  In response, Prochamp explained that it had "earlier reported the quantity and value of sales to Germany on the basis of the

5

port of destination as the sales are made on an FCA i.e Free Carrier or Ex-Works basis." Appx4859. But "while analyzing the labels printed for the product sold to the German market," Prochamp "found that the product was delivered to other countries as well." *Id.* Accordingly, following Commerce's instructions, Prochamp revised its reported sales for these products based on the label printed on the CPMs. *Id.*

On August 19, 2022, Commerce issued Prochamp another third-country market supplemental questionnaire asking for revised comparison-market data with regard to physical characteristics. Appx11562-11564. On August 25, 2022, Prochamp submitted a revised third-country market supplemental response to clarify the breakdown of sales by product characteristic. Appx5306-5313.

On August 26, 2022, Commerce selected Germany as the third-country market. Appx1000. Commerce reported Prochamp's final revised total sales to Germany, France, and Israel:

| Country | Sales Volume in Kilograms | | Percentage of U.S. Sales Volume | |
|---------|-----------|---|-----------|---|
| France | [ | ] | [ | ] |
| Germany | [ | ] | [ | ] |
| Israel | [ | ] | [ | ] |

6

Appx1002.  In analyzing the third-country market, Commerce first found that Prochamp does not have a viable home market and that Israel, Germany, and France each met the requirements for a third-country market that are set forth in 19 U.S.C. § 1677b(a)(1)(C) and (a)(1)(B)(ii).  Appx1003.  Further, Commerce found that, although the products sold in France were the most similar to those sold in the United States in terms of net drained weight, the products sold in Germany, France, and Israel were all very similar in their characteristics.  Appx1003-1004.  Commerce then reasoned that the [

                                ] as compared with sales in the United States — only one of the six relevant physical characteristics — did not outweigh the [                        ] overall quantity of CPMs sold to the German market.  *Id.*  Thus, because sales to Germany were identical to sales in the United States in five out of six of the product characteristics and because German sales represented [

], Commerce found that Germany was the most appropriate comparison market.  *Id.*[2]

On August 31, 2022, Giorgio urged Commerce to reconsider its third-country market selection.  Appx5314-5325.  Giorgio claimed that Commerce's analysis was not supported by substantial evidence for three main reasons.  First, Giorgio claimed that Prochamp had overstated the volume of its sales to Germany by relying on the language of the label to determine the country of consumption. Appx5315-5318.  Second, Giorgio argued that sales to France were more similar to sales to the United States based on product weight. Appx5319-5324.  Third, Giorgio disagreed with Prochamp's claim that its German sales were sold through a similar channel of distribution to the United States.  Appx5324.  Giorgio again raised similar arguments in its pre-preliminary comments.  Appx7078-7086.

---

[2]  In the August 26, 2022 memorandum, Commerce also found that the types of customer and sales channel in Germany were more similar to the types of customer and sales channel in the United States. Appx1004-1005.  As we discuss below, Commerce later clarified that this finding was "not determinative" for its third-country market determination and that it was of no consequence that the fully developed record no longer supported the finding that the sales channel and type of customer were more similar in Germany.  Appx1082.

**B.  Prochamp Complied With Commerce's Requests For Its Financial Statements To The Extent Of Prochamp's Ability Pursuant To Its Obligations Under Dutch Law**

Commerce's original antidumping questionnaire also included requests for information about Prochamp's finances.  Appx10741-10857. In June through October 2022, Prochamp submitted timely responses to sections A through D of Commerce's questionnaire and Commerce's supplemental questionnaire.

In particular, Section A of the questionnaire requested that Prochamp provide financial documents for the two most recently completed fiscal years (FY), that is, 2020 and 2021.  Appx10763. Prochamp provided the FY 2020 audited consolidated financial statement of its group companies and the FY 2021 unaudited consolidated financial statement of its group companies.  Appx1725-1726.

Prochamp did not provide any standalone financial statements.  *Id.* Rather, in its response, Prochamp explained that the Dutch Civil Code (DCC) and the Generally Accepted Accounting Principles in the Netherlands (Netherlands GAAP) require only consolidated audited

financial statements with its group companies, and that Prochamp was exempt from preparing and filing standalone financial statements. *Id.*

In Giorgio's comments on Prochamp's Section A response, Giorgio argued that Prochamp had withheld its unconsolidated financial statements and other financial and accounting records requested by Commerce. Appx2248-2249. Giorgio requested that Commerce instruct Prochamp to submit these documents in a supplemental questionnaire. Appx2249.

In a July 11, 2022 supplemental questionnaire, Commerce requested that Prochamp submit consolidated and unconsolidated financial statements for any group company that "engaged in affiliated party transactions." Appx2771. Commerce further instructed Prochamp that "{i}f any of the requested financial statements are not yet available, specify the date that they will be made available and file those missing financial statements at that time." *Id.* In its response, Prochamp reiterated that it does not prepare standalone financial statements and, consistent with the DCC and Netherlands GAAP, it reports financial accounting information consolidated with its group companies. Appx3889.

10

Giorgio submitted comments on Prochamp's supplemental Section A response.  Appx11422; Appx5260.  Giorgio alleged that Prochamp had continued to withhold its financial statements and referred to a publication by PricewaterhouseCoopers (PwC) titled "An Overview of Financial Reporting in the Netherlands."  Appx11423; Appx5264-5266. Giorgio relied on the PwC publication to argue that even if Prochamp had the status under Dutch law of a [

                    ], this status [                                        ] the preparation of its standalone financial statements even if it is not required to file them with the Dutch Chamber of Commerce.  *Id.* Giorgio continued to allege that Prochamp was required to prepare its own financial statements, and that therefore its submitted U.S. sales, comparison market sales, and cost reconciliations were erroneously based on the wrong set of financial statements, that is, the consolidated financial statements of its group companies.  Appx5266-5267.

On September 2, 2022, Commerce issued Prochamp a supplemental questionnaire for Sections B and C, Appx5594, once again inquiring into Prochamp's and its affiliates' financial statements and documents, and asking for Prochamp to reconcile its earlier statements regarding its

11

exemptions under the DCC with the statements to the contrary contained in Giorgio's PwC report, Appx5605. Prochamp, again, cited the DCC and the Netherlands GAAP to explain that it neither prepares nor is required to prepare standalone financial statements. Appx5923-5926.

Commerce issued a supplemental Section D questionnaire to correct inconsistencies in how Prochamp referred to itself or its group companies as respondents in Sections A, B, and C, as opposed to D. Appx7143-7144. Prochamp explained in its response that the financial statements of its consolidated holding company were appropriate for calculating the cost of production of CPMs. Appx7593-7596. In the supplemental Section D questionnaire, Commerce also requested the FY 2021 audited consolidated financial statements of Prochamp's parent company, Peffer Holding B.V., Appx7145, which Prochamp subsequently provided, Appx7603; Appx7875-7876.

Relatedly, in Section D of the original antidumping questionnaire, Commerce requested information about the cost of production of merchandise sold in the foreign market and the constructed value of merchandise sold in or to the United States. Appx10828. The cost of

12

production and constructed value figures provided in a Section D response must reconcile to the actual costs in a respondent's normal cost accounting system and to the accounting records used by the respondent to prepare its financial statements. Appx10837. On July 25, 2022, Prochamp submitted its response to Section D of the initial questionnaire. Appx3382. In its response, Prochamp explained that it calculated its costs based on the FY 2021 unaudited financial statements of its single commercial entity, Peffer Holdings, and that there were no differences between costs computed under Prochamp's normal cost and financial accounting systems and the costs submitted in response to Section D. Appx3424. Prochamp also provided the required trial balance for Peffer Holdings and a reconciliation of the total cost of manufacturing the merchandise under consideration to the total cost of manufacturing of Prochamp for the FY 2021 financial statements. Appx3426.

## III.   <u>Verification</u>

Commerce conducted in-person verifications of cost and export price sales in late November and early December 2022 in Velddriel,

Netherlands, and issued its verification reports on January 11, 2023.

Appx10062; Appx10089.

### A.   <u>Third-Country Market Selection</u>

During verification, Commerce discussed with Prochamp how

Prochamp determined the ultimate destination for its third-country

sales.  Appx10071-10074.  Prochamp explained that it records European

sales in a specific sales journal and uses customer address to identify

the destination country of the sale.  Appx10071.  For some [           ]

sales, Prochamp arranges freight to a customer's warehouse and

maintains a document that shows the goods were shipped from

Prochamp's factory and delivered to [            ].  *Id.*  However, [        ],

Prochamp's largest German customer, arranges pick-up of the finished

merchandise using [                    ] and transports it to a [

            ] in [                    ].  Appx10071-10072.  Since pick-

up and delivery occur in [                    ], Prochamp had no record of

the ultimate country of the consumption of the merchandise.

Appx10072.  Instead, Prochamp inferred the third-country of

consumption based on the language of the label applied to the

merchandise sold.  *Id.*  In other words, Prochamp manually reviewed all

14

sales of CPMs to this customer and removed from consideration [

]. *Id.* Commerce verified this practice, noting

that most [          ] language labels for this customer had a label code

[            ], meaning for either [            ] or [          ]. Because

these labels appear on CPMs sold to the same [          ] customer, [

], Prochamp considered these sales to be [          ]. *Id.* There

was no way to separate sales to these two countries because [

]. Appx10072-10073. Thus, Prochamp

reasoned most of these sales to its largest customer were [          ]

sales because it is a [          ] company with a [          ] address.

Appx10072.

While Commerce found that virtually all of Prochamp's sales of

CPMs were as accurately reported as possible, Commerce discovered

that certain sales reported to be German were not likely to be German.

Appx10073-10074. [          ] sales categorized as German included the

label [                    ] and the associated product code. *Id.*;

Appx9851-9854. [      ] is unique labelling for the [          ] market and [

] indicates a multilingual label that further suggests these sales

were [          ]. *Id.* When asked about these sales, Prochamp

maintained that its approach—primarily using customer address to determine the third country, but looking to the language of the label when there was no address—was reasonable, especially given that all of these sales were to a German customer. *Id.* Prochamp also observed that because it had no record of where its customers ultimately distribute their products, the same problem of being unable to distinguish the ultimate country of consumption also existed for [

], as [          ] labels could be sold in [                    ] areas of other countries. *Id.* Commerce concluded that Prochamp reported virtually all German sales as correctly as possible, as these sales were unable to be separated between [                        ], although the small subset of [               ] sales did conflict with Prochamp's reporting. Appx10074.

## B. **Financial Statements**

Also during verification, Commerce discussed with Prochamp the DCC's requirements for recording the financial information of subsidiary companies and whether Prochamp prepared such statements for individual group companies. Appx10091-10094. Prochamp explained that the audited consolidated financial statements of Peffer

16

Holdings were signed on August 18, 2022, and therefore had not been available for submission with its original questionnaire responses in July 2022.  Appx10094.  Prochamp explained that Peffer Holdings is the only company in the group that prepares audited financial statements and files a tax return on behalf of all subsidiaries pursuant to the DCC.  Appx10091.  Further, Prochamp reiterated that it does not maintain a separate set of audited financial statements in the normal course of business.  Appx10092; Appx9164-9166.  Nevertheless, Prochamp provided Commerce with copies of an abbreviated internal balance sheet and a profit and loss account for each of the individual companies under the Peffer Holdings umbrella.  Appx10095; *see, e.g.*, Appx9136.  Prochamp further provided a cost reconciliation of these individual statements to the consolidated FY 2021 financial statement of Peffer Holdings.  Appx9179-9183.

## IV.   <u>Administrative Case Briefs And Final Determination</u>

Commerce received timely administrative and rebuttal briefs from the parties.  Appx13537; Appx10144; Appx10243; Appx10265.  As relevant here, Giorgio argued that Commerce should apply total AFA to Prochamp.  Appx10162-10163.  That is, Giorgio urged Commerce to rely

17

on facts otherwise available and apply an adverse inference, based on Giorgio's argument that Prochamp failed to submit requested financial documents that were shown at verification to exist. *Id.* Giorgio also argued that Commerce should apply total AFA to Prochamp because, in Giorgio's view, Prochamp had failed to timely inform Commerce of Prochamp's home market viability and had inaccurately reported the comparison market information that led to the identification and selection of Germany as the comparison market. Appx10187. Last, Giorgio argued that the record as developed after the initial reporting errors required reconsideration of Commerce's third-country selection determination. Appx10221.

On March 21, 2023, Commerce published its final affirmative determination. Appx1007.

First, Commerce found that the application of facts otherwise available with an adverse inference was inappropriate, because necessary information was on the record and Prochamp acted to the best of its ability in responding to Commerce's requests for information. Appx1041. Commerce found that Dutch law exempted Prochamp from preparing financial statements and that the abridged financial

18

documents Prochamp provided at verification were not standalone statements such that they should have been reported to Commerce. Appx1050-1052.  Commerce also found that the contents of these abridged documents were "not inconsistent" with the full financial statements of Prochamp's parent company, such that the abridged documents "further support{ed} Prochamp's previously submitted information."  Appx1050-1052.

Further, with respect to Prochamp's third-country sales reporting, Commerce found that an adverse inference was inappropriate because Prochamp was cooperative with all requests for information regarding market viability, and Prochamp answered and resolved Commerce's questions regarding the methodology Prochamp used to identify potential third-country markets.  Appx1059-1061.  Ultimately, Commerce found that the record with respect to sales volume and product characteristics that was established at the time Commerce selected Germany as the appropriate comparison market was consistent with what Commerce officials reviewed at verification.  Appx1059-1060.

With respect to its third-country selection, Commerce reaffirmed its finding that Germany, not France, provided the most robust third-

country market.  Appx1081-1082.  Commerce found that the products sold in Germany were "very similar" to those sold in the United States, that is, they matched five of six product characteristics, and that Germany provided the most robust data compared to the French market.  Appx1082.  Further, Commerce rejected Giorgio's suggestion that the German market database was "overreported," that is, contained sales to other countries.  Appx1081-1082.  Before calculating Prochamp's margin, Commerce removed the [      ] sales to [      ] that had been included in Prochamp's German database. Appx1064; Appx9851; Appx13726-13728; Appx1276.[3]  Commerce additionally found that the record no longer reflected that Germany was similar to the United States market based on sales channels and customer types, but found that this similarity was not determinative of its decision to select Germany.  Appx1082.

---

[3] Commerce identified that the [      ] sales bore the product code [      ].  *See* Appx9851.  [      ] sales bearing this product code were identified in Prochamp's German sales database.  *See* Appx13726-13728.  When calculating Prochamp's margin, Commerce removed these sales from the database.  Appx1276.

## SUMMARY OF ARGUMENT

The Court should reject the arguments Giorgio puts forth in its motion for judgment on the agency record and should sustain Commerce's determinations.

First, substantial evidence supports Commerce's decision not to apply an adverse inference in determining a dumping margin for Prochamp, because Prochamp cooperated to the best of its ability and there were no gaps in the record.  Because Dutch law exempts companies such as Prochamp from filing or preparing standalone financial statements, Commerce could not fault Prochamp for not providing company-level financial statements that Prochamp did not possess.  In addition, even though Prochamp submitted certain abridged financial documents at verification, Commerce reasonably found that these documents were informal and internal in nature and not standalone financial statements of the type requested by Commerce in its questionnaire.  Further, Commerce found that the contents of these abridged documents corroborated the consolidated financial information that Prochamp had already provided.  Therefore, substantial evidence supports Commerce's decision not to apply an adverse inference.

21

Second, substantial evidence supports Commerce's decision not to rely on an adverse inference due to alleged issues with Prochamp's third-country sales reporting.  Commerce found that Prochamp cooperated with all requests for information regarding market viability and answered and resolved Commerce's questions regarding the methodology Prochamp used to identify potential third-country markets.  Moreover, Commerce found that, at verification, it was able to verify the record established at the time Commerce had selected Germany as the appropriate comparison market.

Third, substantial evidence supports Commerce's choice of Germany as the third-country comparison market.  Commerce's regulations at 19 C.F.R. § 351.404(e) outline the criteria that Commerce considers when selecting from among possible third-country markets, including product similarity with the U.S. market and sales volume.  Here, while all Prochamp's exports to France matched all six product characteristics, the French sales volume was only [          ]% of the volume of Prochamp's sales to the United States.  Meanwhile, Commerce found that the physical characteristics of the CPMs exported to Germany matched five out of six product characteristics and that the German

22

sales volume, at [        ] of U.S. sales, was larger than the sales

volume to France so as to offer a more robust data set for calculating

normal value.  Thus, Commerce's decision to select Germany as the

third-country market is supported by substantial evidence and in

accordance with law.

Although Giorgio argues that Prochamp's methodology for reporting

the volume of sales to Germany is unreliable because customer

addresses and label languages are not determinative of the country in

which CPMs are consumed, Commerce verified that Prochamp's

methodology was reasonable and that no other alternative existed.

## ARGUMENT

## I.   Standard Of Review

The Court must sustain any determination, finding, or conclusion by

Commerce unless it is unsupported by substantial evidence upon the

record, or otherwise not in accordance with law.  19 U.S.C.

§ 1516a(b)(1)(B); *United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6

(2009).  "Substantial evidence" denotes "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion."

*Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).

Substantial evidence may also be "less than the weight of the evidence," and the possibility of drawing inconsistent conclusions from evidence upon the record does not render Commerce's findings unsupported by substantial evidence. *See Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966). A party challenging Commerce's determination under the substantial evidence standard "has chosen a course with a high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation and internal quotation marks omitted), and the Court sustains Commerce's factual determinations as long as they are reasonable and supported by the record as a whole, even if some evidence detracts from the agency's conclusions, *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).

## II. Substantial Evidence Supports Commerce's Determination Not To Employ An Adverse Inference

### A. Legal Framework For Application Of Facts Otherwise Available With An Adverse Inference

A two-step analytical framework governs Commerce's ability to apply facts otherwise available with an adverse inference (AFA). First, Commerce may look to "facts otherwise available" when "necessary

24

information is not available on the record," or when a party (1)

withholds requested information, (2) fails to provide information by

established deadlines or in the form or manner requested, (3)

significantly impedes the review, or (4) provides information that

cannot be verified.  19 U.S.C. § 1677e(a).  If Commerce finds that a

party meets any of these conditions, it may use facts otherwise

available, subject to 19 U.S.C. § 1677m(d), to reach the applicable

determination.  19 U.S.C. § 1677e(a).  Commerce, however, is required

"to provide a respondent with notice of deficient responses, and an

opportunity to remediate, before deciding to rely on facts available."

*BlueScope Steel Ltd. v. United States*, 548 F. Supp. 3d 1351, 1359 (Ct.

Int'l Trade 2021) (citing 19 U.S.C. § 1677m(d)).  In addition, "Commerce

may not decline to consider information that is necessary to the

determination but does not meet all the applicable requirements when

the information is timely submitted; the information can be verified; the

information is not so incomplete that it cannot serve as a reliable basis

for reaching the applicable determination."  *Jindal Poly Films v. United*

*States*, 365 F. Supp. 3d 1379, 1386 (Ct. Int'l Trade 2019) (cleaned up).

In the second step of the AFA analysis, if Commerce finds that a respondent failed to cooperate by not acting "to the best of its ability to comply with a request for information," it "may" apply an adverse inference in its selection of facts otherwise available.  19 U.S.C. § 1677e(b).  A respondent's failure to cooperate to the "best of its ability" is "determined by assessing whether {a} respondent has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries."  *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003).  The standard requires that respondents "conduct prompt, careful and comprehensive investigations of all relevant records that refer or relate to the imports in question."  *Papierfabrik August Koehler SE v. United States*, 843 F.3d 1373, 1379 (Fed. Cir. 2016) (quoting *Nippon Steel*, 337 F.3d at 1382).  Therefore, Commerce may employ an adverse inference in selecting among the facts available after it examines "respondent's actions and assesses the extent of respondent's abilities, efforts, and cooperation in responding to Commerce's requests for information."  *Nippon Steel*, 337 F.3d at 1382.

"{W}hether to apply adverse inferences is a matter within Commerce's discretion."  *Assan Aluminyum Sanayi v. Ticaret A.S.*, 624

F. Supp. 3d 1343, 1377 (Ct. Int'l Trade 2023).  The Court should sustain Commerce's decision not to employ AFA when the decision is supported by substantial evidence.  *Am. Honey Producers Ass'n v. United States*, 653 F. Supp. 3d 1329, 1335-37 (Ct. Int'l Trade 2023).

### B. Commerce Reasonably Determined That The Use Of An Adverse Inference Was Not Warranted With Respect To Prochamp's Financial Statements

Commerce reasonably found that no gap in the record required that Commerce resort to facts otherwise available — let alone employ an adverse inference — with respect to Prochamp's financial statements. Appx1041; *see* 19 U.S.C. § 1677e(a).  Therefore, this Court should sustain Commerce's determination not to employ an adverse inference regarding Prochamp's financial statements, just as the Court did in *American Honey Producers*.

In that case, the plaintiffs argued that the use of AFA was appropriate because of the respondents' delay in submitting their financial information and the fact that the information that the respondents submitted lacked certain data.  *Am. Honey Producers*, 653 F. Supp. 3d at 1335-36.  But, after considering Commerce's explanations of why the respondents were delayed and of why the

27

missing data was not critical to the investigation, the Court determined

that Commerce had "clearly justified its conclusion that {the

r}espondents did not impede the investigation." *Id.* at 1337.  This logic

applies to an even greater extent here, where Commerce determined

that there were no gaps in the record, because Prochamp did not

withhold information or significantly impede the investigation and

because Prochamp acted to the best of its ability.

> **1.     Substantial Evidence Supports Commerce's
> Determination That Prochamp Did Not Withhold
> Information Or Significantly Impede The
> Investigation**

Commerce determined that there was no gap in the record of

Prochamp's financial information and that therefore it was unnecessary

to rely on facts otherwise available.  *See* 19 U.S.C. § 1677e(a).

Commerce found that the consolidated financial documents that

Prochamp submitted were usable for margin calculations.  Appx1052-

1055.  Further, Commerce found that Prochamp did not withhold

information, fail to provide information by established deadlines,

significantly impede the proceeding, or provide information that could

not be verified.  Appx1055.

Substantial evidence supports Commerce's determination that Prochamp provided necessary information, that is, the FY 2021 audited consolidated financial statements of Peffer Holdings, and did not withhold information or significantly impede the investigation. *See* Appx1050-1055; Appx7875-7876.  Indeed, the record supports Commerce's determination that Prochamp provided all available financial statements prepared for the Peffer Holdings group companies and also provided for each company the detailed trial balances and consolidation workpapers used for preparation of the audited consolidated and unconsolidated financial statements of Peffer Holdings.  Appx1052; Appx1725-1726; Appx3426; Appx9136; Appx9179-9183.

Giorgio argues that Prochamp withheld information and significantly impeded Commerce's investigation.  Pl. Br. 64-67.  Specifically, Giorgio first argues that Prochamp did not submit standalone financial statements, despite being required to maintain such statements under Dutch law.  Pl. Br. 66-67.  Second, Giorgio argues that Prochamp submitted internal statements at verification that are the type of financial documents Commerce requested in its questionnaires such

29

that Prochamp should have submitted the internal statements in its responses to Commerce's questionnaires.  Pl. Br. 70-72.  Both arguments lack merit.

First, contrary to Giorgio's contentions, Prochamp was "fully cooperative" with all of Commerce's requests for financial statements and supplemental information to confirm the accuracy of the documentation received.  *See* Appx1051.  During the investigation, Commerce requested that Prochamp submit (1) any consolidated financial statements prepared by Peffer Holdings; and (2) the unconsolidated financial statements of all the Peffer Holding group companies.  *Id.*; Appx10763; Appx7145.  In particular, in its Section A questionnaire, Commerce requested that Prochamp provide, in relevant part, its:  "(1) chart of accounts; (2) audited, consolidated and unconsolidated financial statements (including any footnotes and auditor's opinion); (3) internal financial statements or profit and loss reports of any kind that are prepared and maintained in the normal course of business for the merchandise under investigation . . . ."  Appx10763.  And in its supplemental Section D questionnaire, Commerce requested the complete final FY 2021 audited consolidated

30

and unconsolidated financial statements for Prochamp's group companies.  Appx7145.

The information Prochamp provided was responsive to Commerce's requests, to the extent of Prochamp's ability.  In its first response, Prochamp provided the FY 2020 audited consolidated financial statements of Peffer Holdings and notified Commerce that the FY 2021 financial statements were awaiting a finalized audit.  Appx1725-1726. When they were available, Prochamp provided the audited FY 2021 financial statements of Peffer Holdings.  Appx7603.  Although Prochamp did not provide unconsolidated financial statements for subsidiary companies, Prochamp reasonably explained its omission:  the DCC and Netherlands GAAP exempted Prochamp from preparing such financial statements.  *Id.*

As Prochamp consistently explained, the DCC requires only Prochamp's parent company, Peffer Holdings, to produce and file full financial statements.  *Id.*; Appx3889; Appx5923-5926; Appx10092-10092; Appx9164-9166.  Prochamp itself was required to maintain only limited or abridged financial summary documents.  Appx5925-5926; Appx9136; Appx10093-10094.  As Commerce verified, Prochamp

31

qualifies for an exemption pursuant to the DCC because Prochamp is a subsidiary of a parent company that prepares consolidated financial statements and accepts liability for its subsidiary's debts.  *Id.*

The DCC imposes minimal requirements on abridged financial documents internal statements, such as Prochamp maintained. Appx9164-9166.  Indeed, these statements did not even need to comply with Title 9 of the DCC, which outlines the requirements applicable to financial statements maintained by Dutch companies, or to comply with Netherlands GAAP.  *Id.*  Giorgio conceded before Commerce that the DCC allows for subsidiaries to maintain abridged financial statements that do not need to be audited.  Appx1052.  Thus, at the very least, these abridged financial documents do not fall under Commerce's requests for Prochamp to provide "complete" financial statements that would include footnotes and an auditor's opinion, because the DCC exempts Prochamp from an audit.  Appx1052; Appx10763.

Therefore, although the DCC nevertheless requires subsidiary companies using the exemption to maintain internal financial records, these short documents do not qualify as the "standalone financial records" that Commerce had requested.  Appx1051; Appx10095.

32

Consequently, although Giorgio is correct that Commerce requested standalone financial statements for the unconsolidated Peffer Holdings companies and that such statements were not provided, *see* Pl. Br. 67, Prochamp cannot have withheld information it did not have and that it was not obligated to have.

In sum, substantial evidence supports Commerce's conclusion that Prochamp did not withhold information or significantly impede the investigation, because the abridged financial information Prochamp maintained were not the kind of financial information Commerce requested.  *See* Appx1051.

Giorgio's second argument is likewise unmeritorious.  As explained above, the fact that Prochamp submitted abridged financial documents during verification does not demonstrate that Prochamp withheld information, because, as Commerce determined, these documents were not "financial statements" of the type Commerce had requested. Appx1051; Appx10095.  And, in any event, these abbreviated financial documents merely corroborated information Prochamp had already provided.  Appx1051; Appx9136.  Commerce's decision to examine these documents lay well within the "wide latitude" Commerce has during

33

verification.  *See Özdemir Boru San. ve Tic. Ltd. Sti. v. United States*, 273 F. Supp. 3d 1225, 1242 (Ct. Int'l Trade 2017) (citing *Micron Tech., Inc., v. United States*, 117 F.3d 1386, 1396 (Fed. Cir. 1997)).

Substantial evidence supports Commerce's conclusion.  Prochamp's abridged documents are informal and Commerce found that these abridged documents were not Netherlands GAAP complaint. Appx1051; Appx9136.  The documents are just a single page for each entity, whereas Prochamp's parent company's consolidated financial statements run to 36 pages.  Appx1051; *compare* Appx7603; Appx7875-7876 *with* Appx9136.

Further, the abridged documents do not provide any new information, but rather they support Prochamp's previously submitted consolidated financial information:  the aggregate totals that make up the abridged documents agree with the totals found in the company-specific trial balances and the consolidated information that Prochamp provided for itself and its group companies.  Appx1051; Appx10095. Thus, these internal statements did not raise concerns of inconsistencies with Prochamp's reported figures or constitute new factual information.  *Id.*  Indeed, Commerce had previously informed

34

Prochamp that it would accept additional information at verification only under specific circumstances, including if "the information corroborates, supports, or clarifies information already on the record." Appx8733.

As a consequence, even if the Court were to accept that the abridged documents Prochamp provided at verification could be construed as a type of financial statement that Commerce had requested, looking to facts otherwise available would not have been warranted.  Commerce may resort to facts otherwise available when "necessary information is not available on the record" or when information has been withheld or Commerce's investigation has been impeded.  19 U.S.C. § 1677e(a). Here, necessary information was not missing from the record and, thus, there is no basis for Commerce to rely on facts otherwise available, let alone to draw an adverse inference.  *See id.*; Appx1053 ("{T}here is no critical information missing that would justify the application of AFA to fill gaps or otherwise in the administrative record.").

*Goodluck India Ltd. v. United States*, 11 F.4th 1335 (Fed. Cir. 2021), and *Max Fortune Industrial Co. v. United States*, 37 CIT 549 (2013) do not require a different result.  In *Goodluck*, Commerce rejected

35

information submitted at verification that represented a "systemic change to the entire reported database."  11 F.4th at 1343.  And in *Max Fortune*, the company offered at verification "new information that Commerce did not have time to verify."  37 CIT at 555.  By contrast, here, Commerce found that the abridged cost information reported by Prochamp was consistent with its normal books and records and was traceable through the consolidation workpapers to Peffer Holdings' consolidated 2021 financial statements.  Appx9179-9183; Appx10092-10093.  Further, Commerce obtained a complete cost reconciliation between Prochamp's Section D cost file and the Peffer Holdings audited consolidated FY 2021 financial statements.  Appx1053; Appx10092-10093.  Thus, unlike in *Goodluck India* and *Max Fortune*, the information Prochamp provided was both consistent and able to be timely verified.  *See* 11 F.4th at 1343; 37 CIT at 555.  That conclusion was within Commerce's "broad discretion" at the verification stage.  *See Stupp Corp. v. United States*, 5 F.4th 1341, 1350-51 (Fed. Cir. 2021).

In short, Prochamp's submission of the abridged financial documents at verification did not impact Commerce's ability to calculate an accurate margin.  Appx1053.  Therefore, Commerce reasonably

36

determined that there were no grounds to resort to facts otherwise available in relation to Prochamp's financial information.  *See* 19 U.S.C. § 1677e(a).

### 2.    Substantial Evidence Supports Commerce's Determination That Prochamp Acted To The Best Of Its Ability

Even if Commerce were to look to fill a gap in the record, Commerce's determination that Prochamp cooperated to the best of its ability precludes applying an adverse inference in filling that gap.  *See* 19 U.S.C. § 1677e(b).  Giorgio asserts that "{n}o reasonable mind could conclude that Prochamp cooperated to the best of its ability in responding to {Commerce's} requests for information."  Pl. Br. 68. Specifically, Giorgio argues that Commerce requested and Prochamp refused to submit documents Prochamp had in its possession and that Prochamp was required to maintain pursuant to the DCC.  *Id.* at 70. Additionally, Giorgio argues that the abridged financial documents Prochamp submitted during verification were of the type that Commerce had requested and thus Prochamp should have submitted them in its responses.  *Id.* at 70-71.  Giorgio claims that "the discovery

37

of such new factual information by {Commerce} officials at verification demonstrates Prochamp's failure to cooperate."  Pl. Br. 70.

These arguments lack merit.  As detailed above, Commerce determined that the abridged financial documents Prochamp presented at verification did not fall within the scope of Commerce's prior information requests.  Moreover, Commerce found that the information in these documents was not inconsistent with other financial information Prochamp had provided.  To the contrary, Commerce found that the documents "further support Prochamp's previously submitted information."  Appx1051.  Therefore, substantial evidence supports Commerce's determination that Prochamp had cooperated to the best of its ability and Commerce's decision not to employ an adverse inference. *See* 19 U.S.C. § 1677e(b); *Am. Honey Producers*, 653 F. Supp. 3d at 1337.

### C.  Commerce Reasonably Determined That An Adverse Inference Was Not Warranted With Respect To Prochamp's Third-Country Market Selection Reporting

Similarly, Commerce reasonably determined that Prochamp was cooperative with all requests for information regarding market viability and corrected the handful of discrepancies and inaccuracies that arose

without significantly impeding the proceeding.  Appx1041; Appx1059;
*see* 19 U.S.C. § 1677e(a).  Therefore, the Court should find that
substantial evidence supports Commerce's determination not to employ
an adverse inference in regard to Prochamp's third-country market
reporting.  *See Am. Honey Producers*, 653 F. Supp. 3d at 1337.

Prochamp answered Commerce's questions regarding the
methodology Prochamp used to identify potential third-country
markets.  Appx1059-1065; Appx4859; Appx10072-10074.  Additionally,
Commerce found at verification that the record continued to support the
selection of Germany as the comparison market.  Appx1059-1060;
Appx10072-10074.  Therefore, as in *American Honey Producers*, this
Court should uphold Commerce's determination to calculate a margin
for Prochamp without resorting to facts otherwise available, because
Commerce's decision is supported by substantial evidence and in
accordance with law.  *See* 653 F. Supp. 3d at 1335-37.

### 1. Substantial Evidence Supports Commerce's Determination That Prochamp Did Not Withhold Information Or Significantly Impede The Investigation

Commerce's determination that Prochamp provided necessary
information and did not withhold information or significantly impede

the investigation is supported by substantial evidence, such that there was no need or justification for Commerce to resort to facts otherwise available.  Appx1059-1065; *see* 19 U.S.C. § 1677e(a).

Nevertheless, Giorgio makes several arguments for the application of an adverse inference with respect to Prochamp's third-country market selection reporting, based on a purported pattern of non-cooperation. Pl. Br. 59-64.  Specifically, Giorgio argues that Prochamp failed to notify Commerce that its home market was not viable within 14 days of the date Prochamp received Commerce's questionnaire, as instructed in the questionnaire, and that this delay significantly impeded Commerce's ability to accurately identify the appropriate comparison market.  *Id.* at 60-61.  Second, Giorgio asserts that Prochamp provided inaccurate information to Commerce regarding sales volume and product characteristics.  *Id.* at 61-63.  Third, Giorgio argues that Prochamp ignored questions Commerce issued regarding the sales channels and types of customers for each of the potential comparison markets.  *Id.* at 64.  None of these arguments is persuasive.

First, Prochamp did not withhold information or significantly impede the investigation, even if it took more than 14 days from issuance of the

antidumping questionnaire to notify Commerce that its home market was non-viable. Giorgio contends that had Prochamp informed Commerce that its home market was not viable within the 14-day period identified in the agency's questionnaire, *see* Appx10755, Commerce would not have been delayed in issuing a comparison-market supplemental questionnaire. Pl. Br. 61. However, Commerce explained that a lack of advance notice of Prochamp's non-viable home market did not matter operationally for Commerce, because Section A of the antidumping questionnaire contains instructions on how to report home market viability. Appx1060; Appx10754. Thus, Commerce would have had to wait for Prochamp's Section A response in any event before it proceeded with third-country selection. Appx1060. Therefore, Prochamp's failure to notify Commerce of its non-viable home market within the 14-day deadline had virtually no impact on Commerce's ability to identify the appropriate third-country market and did not impede the investigation. *See id.*

Second, Prochamp did not withhold information on sales volume and product characteristics. Giorgio argues that Prochamp's revisions of its third-country sales volumes, as well as its revisions of its responses

41

related to product characteristics and sales channels significantly
impeded Commerce's investigation because Commerce did not receive
Prochamp's finalized information until "two-thirds of the way through
the 190-day period" for Commerce's preliminary determination. Pl. Br.
63.

Prochamp corrected any inaccuracies during its reporting and
provided Commerce with a properly filtered database that permitted
Commerce to make its third-country market determination. Appx1060-
1061. Prochamp submitted its original response on June 21, 2022,
Appx1735, and provided additional information on June 30, 2022, in
response to Commerce's request concerning the quantity and value
breakdown of sales. Appx2265-2271. Prochamp then responded to a
supplemental questionnaire on August 1, 2022 and revised the quantity
and value of sales to Germany and France. Appx4859; Appx4870.
Prochamp explained its methodology — developed in response to
Commerce's instruction — of using product labels to determine the
destination country for the European market and explained that this
method resulted in a revision of its earlier numbers, which had been
based on port of destination. Appx4859. And on August 25, 2022,

Prochamp responded to another supplemental questionnaire to clarify how CPM sales were broken down by product characteristic. Appx5306-5313. Commerce approved of Prochamp's methodology for determining sales to Germany in its third-country decision memorandum on August 26, 2022, Appx1005, and confirmed that Prochamp's methodology was the best possible during verification in December 2022, Appx10072-10073; *see also* Appx1062 ("Prochamp's methodology of determining the ultimate destination of the product based on the language of the packaging labels was entirely reasonable, and consistent with our instructions."). Thus, Prochamp resolved any initial lack of clarity regarding the labelling of its CPMs, and this issue, once resolved, had no impact, let alone a significant one, on Commerce's investigation. *See* Appx1061-1062.

Third, Prochamp provided necessary information and did not significantly impede Commerce's investigation when it responded to Commerce's requests in its Section A supplemental questionnaire. Giorgio claims that Prochamp "completely ignored" questions regarding sales channels and types of customers and that, in consequence, Commerce had to rely on Prochamp's "self-serving (and inaccurate)"

43

characterization of the sales channels and types of customers.  Pl. Br. 64.

In response to Commerce's requests for Prochamp to break down the quantity and value of German and non-German language labelled sales by channel of distribution (retailer, reseller, or distributor), Prochamp provided an updated chart containing its sales volume to Germany. Appx4870.  As Giorgio correctly observes, this chart does not provide the requested breakdown by label language or channel of production. *Id.*; *see* Pl. Br. 64.  However, Prochamp noted separately that it has no sales to resellers.  Appx4860.  But because Commerce verified Prochamp's methodology for reporting German sales and was able to use Prochamp's sales data to perform its margin calculations, Giorgio's argument fails to identify any error in Commerce's determination. Appx10073-10074; Appx1274-1276.  Finally, in any event, Commerce found that the issue of sales channel was "not determinative." Appx1082.  Therefore, Giorgio's argument concerning "ignored" questions carries no weight.

44

**2.      Substantial Evidence Supports Commerce's Determination That Prochamp Acted To The Best Of Its Ability**

Further, even if Commerce had a need to resort to facts otherwise available, Prochamp's cooperation means that an adverse inference is not warranted.  *See* 19 U.S.C. § 1677e(b).  Giorgio argues that "{n}o reasonable mind could conclude that Prochamp acted to the best of its ability."  Pl. Br. 68.  First, Giorgio characterizes Prochamp's revisions to its sales figures as "misreport{ing}."  Pl. Mot. 68.  Specifically, Giorgio argues that Commerce discovered at verification that certain sales to [

] were wrongly classified as German and other sales were labeled for either the [                                    ] market and Prochamp had no way of knowing which destination was correct.  *Id.*  Second, Giorgio argues that Prochamp made misleading assertions about the sales channels and product characteristics of its sales of CPMs to Germany in its initial questionnaire response.  Pl. Br. 69.

These arguments lack merit.  As explained in detail above, Commerce found that Prochamp was cooperative with all requests for information regarding market viability and cooperated with Commerce's supplemental requests on three separate occasions:  on

June 30, 2022, Appx2265-2271; on August 1, 2022, Appx4859; and on August 25, 2022, Appx5306-5313.  These revisions required Prochamp to devise a new methodology to track sales by product label, which Prochamp implemented at Commerce's direction and which Commerce verified as reasonable under the circumstances.  Appx4859; Appx10072-10074.  Further, Commerce explained that Giorgio's second argument concerning Prochamp's initial response on sales channels ignores the additional revisions Prochamp submitted to its databases at Commerce's request.  *See* Appx1082.  Consequently, substantial evidence supports the conclusion that Prochamp acted to the best of its ability and worked with Commerce to clarify and revise its sales database to ensure accuracy.  *Id.* ("{A} single example of revision to earlier reporting does not, by itself reflect an intent to mislead.").

## III.  Commerce's Determination To Choose Germany As The Comparison Market Is Lawful And Supported By Substantial Evidence

### A.  Legal Background

Commerce will typically find normal value to be the price at which the foreign like product is sold in the exporting country.  19 U.S.C. § 1677b(a)(1)(B)(i).  But when the aggregate quantity of foreign like

46

product sold in the exporting country is less than five percent of the
quantity of subject merchandise sold in the United States, Commerce
may base normal value on the price at which the foreign like product is
sold in a third country. *Id.* § 1677b(a)(1)(C). Commerce may use the
price of third-country sales only if such prices are representative. *Id.*
§ 1677b(a)(1)(B)(ii)(I).

Because the statute does not provide guidance on how Commerce
should choose between two or more viable third-country markets,
Commerce has set forth the following criteria for how it generally will
choose a third country:

> (1) The foreign like product exported to a particular third country
> is more similar to the subject merchandise exported to the
> United States than is the foreign like product exported to other
> third countries;
>
> (2) The volume of sales to a particular third country is larger than
> the volume of sales to other third countries;
>
> (3) Such other factors as the Secretary considers appropriate.

19 C.F.R. § 351.404(e). "Commerce's practice is to consider all of the
criteria" listed in the regulation "when determining the appropriateness
of a third-country comparison market." Appx1002. "If all other factors
are equal," Commerce's practice is "to select the largest third-country
market by volume." *Id.*

47

In other words, if all factors other than volume are equal, then volume is determinative.  But if these factors are not equal, then Commerce will weigh the factors — including sales volume — and determine the comparison market accordingly.  Giorgio attempts to refashion Commerce's policy to support its argument.  Giorgio inserts the word "only," stating that "only if 'all other factors are equal' will Commerce 'select the largest third country market by volume.'"  Pl. Br. 43 (citations omitted).  But this insertion changes the meaning and implies that volume is considered "only" when all other factors are equal.  In contrast, Commerce exercises its discretion to consider all factors, including volume, when making its decision.  *See Viraj Forgings, Ltd. v. United States*, 283 F. Supp. 2d 1335, 1344-45 (Ct. Int'l Trade 2003) ("Commerce is not required to choose the appropriate comparison market *solely* because the goods are identical, any more than it is required to choose the appropriate comparison market *solely* because the market is the largest available.").

**B.   Commerce's Final Third-Country Decision Is Reviewable, So Commerce's Third-Country Decision-Making Practice Is Not At Issue**

Giorgio begins with a red-herring argument that Commerce somehow "insulated" its choice of Germany from reconsideration or judicial review.  Pl. Br. 35-37.  Although Giorgio is correct that Commerce explained why it determines questions of home-market viability and third-country selection early in the proceeding and generally does not reconsider its third-country selection decisions during a proceeding, Commerce's analysis did not end there.  Appx1081-1082.  Instead, Commerce observed that, at the time of its final decision, "the record continue{d} to support {its} selection of Germany as the appropriate third country market in this investigation" such that there was no need to reconsider the initial selection.  Appx1081. Commerce's determination, the basis for which is explained in the following section, shows that Commerce did indeed provide a final and reviewable justification for why it continued to choose Germany as the third-country market.  Because Commerce considered the developed record in making its final decision, the Court need not opine on any practice of Commerce's to generally not revisit its selection of a

49

comparison market.  *See* Appx1082 ("{W}e do not find that the record as further developed compels reconsideration of our finding.").

### C. Commerce's Third-Country Market Determination Is Consistent With Its Practice And Supported By Substantial Evidence

On the merits, Commerce's selection of Germany as the comparison market is supported by substantial evidence and should be sustained. In choosing Germany over France as the appropriate third-country market, Commerce explained that, though France was more similar to the United States market in some ways, other factors weighed in favor of Germany.  Appx1003-1005.  Although Commerce found that Prochamp's sales to France had the [                                    ] to match with U.S. sales, the products sold in each of the third-country markets all appeared to be very similar.  Appx1004.  On the other hand, Commerce found that Prochamp sold a [                    ] quantity of merchandise to Germany:  [          ] of U.S. sales by volume, as compared to [          ] of U.S. sales to volume in France.  Appx1003. Thus, Commerce reasonably determined that the [

                          ] did not outweigh the [                          ] overall quantity of merchandise sold to the German market.  Appx1004.

50

Commerce's analysis draws on the fact that Prochamp's merchandise sold in Germany and its merchandise sold in France are identical to the CPMs sold in the United States with regard to three of the six product characteristics — container type, certified organic and packing solution — and very similar with regard to the remaining two product characteristics — mushroom style and product labeling.  Appx1003-1004.  CPMs sold to France are more similar to CPMs sold to the United States with regard to only a single product characteristic:  the net drained weight of the CPMs.  *Id.*  Hence, Commerce reasonably found that the products sold in France and Germany "all appear to be very similar" to the merchandise sold in the United States.  Appx1004.  In sum, Commerce found that a slight superiority in product specificity among a group of products that were all "very similar" did not outweigh the fact that Prochamp's sales volume to Germany is [                    ] its sales volume to France.  *Id.*[4]

---

[4]  Accordingly, Commerce's decision does not run afoul of the hierarchical reading of 19 C.F.R. § 351.404(e) that was espoused in *Viraj Forgings, Ltd. v. United States*, 350 F. Supp. 2d 1316 (Ct. Int'l Trade 2004).  The *Viraj Forgings* Court read the regulation to provide a "seriatim instruction" that requires Commerce to look first to product

Giorgio challenges Commerce's decision on three grounds. Pl. Br. 44-57. First, Giorgio argues that Commerce's finding is unsupported by substantial evidence because Prochamp made [      ] German sales with a net drained weight of [                              ], which would match identically the "vast majority" of sales to the United States, whereas sales to France had closer matches in net drained weight. Pl. Br. 45-48.

The "simple math" of Giorgio's argument, Pl. Br. 47, pertains to net drained weight alone, which is only one of the six product characteristics. Commerce acknowledged that CPMs sold to France were a closer match with respect to this characteristic, but found that all the merchandise was "very similar" to the CPMs sold to the United States. Appx1004; Appx1082. Indeed, Giorgio elides the five other product characteristics, for which the German and French sales were equally similar. Consequently, the [         ] volume of sales to

---

similarity and then to sales volume if product similarity "is not feasible." 350 F. Supp. 2d at 1324. The Court therefore rejected Commerce's selection of a third-country market on the basis of sales volume "without indicating whether {Commerce} considered the other enumerated criteria" in the regulation. *Id.* Here, Commerce first determined that products were "very similar" in all possible comparative markets and then proceeded to select Germany on the basis of sales volume. Appx1004.

Germany provides more extensive matching with sales to the United States on these five characteristics, rendering the German market the "largest and most robust" third-country market. Appx1003-1004; Appx1082. In essence, Commerce chose between the German database with more voluminous comparisons for CPMs identical to those sold in the United States with respect to five of the six product characteristics over the French database that offered [               ] the data relative to the U.S. database that was identical with respect to these same five product characteristics. This decision falls within the "particular expertise" Commerce brings to "complex and complicated" antidumping investigations. *See Thai Pineapple Pub. Co. v. United States*, 187 F.3d 1362, 1367 (Fed. Cir. 1999), *superseded by statute as stated by Dillinger France S.A. v. United States*, 981 F.3d 1318, 1322 (Fed. Cir. 2020).

Additionally, the statutory "preference for identical matches," highlighted by Giorgio, does not control Commerce's selection of the appropriate third-country market. *See* Pl. Br. 46 (citing 19 U.S.C. § 1677(16)). Section 1677(16) governs Commerce's designation of a "foreign like product." Commerce is not required to compare only identical products. Indeed, Section 1677(16) defines "foreign like

53

product" to include both identical and similar merchandise.  19 U.S.C.

§ 1677(16)(B)(i)-(ii).  Giorgio has never argued — and does not appear to

argue now — that the CPMs sold to Germany do not qualify as a foreign

like product.  Section 1677b(a)(1)(B)(ii), which governs the calculation of

normal value and is the relevant statute here, takes as a premise that a

foreign like product has been selected for use in calculating normal

value.  Therefore, section 1677(16) is irrelevant and Giorgio's

"preference" argument a distraction.

Purportedly to demonstrate the "impact" of Commerce's analysis,

Giorgio refers to a chart attached to its brief and designated

Attachment 1.  Pl. Br. 48.  Giorgio appears to have obtained the

information presented in Attachment 1 from Commerce's calculation

memorandum that was generated on the same day as Commerce's final

decision.  *See* Appx1266.  But Giorgio cites no authority requiring that

Commerce base its third-country market selection on the results of a

margin calculation that did not exist until after Commerce made the

precursor decision of which third-country market to use.  Because the

data in Attachment 1 were available to Giorgio only after Commerce

made a final decision, the analysis that the attachment performs was

54

not provided to Commerce to allow the agency to apply its expertise and, if necessary, further develop the record. *See McKart v. United States*, 395 U.S. 185, 194 (1969) ("{J}udicial review may be hindered by the failure of the litigant to allow the agency to make a factual record, or to exercise its discretion or apply its expertise."); *Sandvik Steel Co. v. United States*, 164 F.3d 596, 600 (Fed. Cir. 1998). As detailed above, Commerce selected Germany as the comparison market because it provided the most robust dataset to calculate normal value. Appx1003-1004; Appx1082. Therefore, the Court should decline to entertain Attachment 1 and Giorgio's related arguments.

Second, Giorgio argues that the record does not support Commerce's finding that the German and U.S. sales channels and types of customers are similar. Pl. Br. 50. Importantly, Commerce did not ultimately rely on this finding to make its comparison-market selection. Appx1004-1005. In its August 26, 2022 third-country memorandum, Commerce explained that this factor "further support{ed}" Commerce's choice of Germany. Appx1004. But when this finding was no longer supported by record evidence, Commerce explained that the factor was "not determinative, and merely provided additional corroboration for

the selection of Germany." Appx1082 (emphasis added). Thus, Commerce's selection of Germany rests on other bases.

Third, Giorgio argues that the volume of German sales Prochamp reported is not reliable because Prochamp revised its reporting sales volume and its reporting methodology. Pl. Br. 54. Prochamp indeed revised its reported volume of sales to Germany twice and these revisions reduced the reported sales volume. However, Prochamp submitted those revisions on August 1 and August 25, 2022, Appx4859; Appx5306, before Commerce chose Germany as the comparison market on August 26, 2022, Appx1000, so Commerce's decision is based on the final, verified numbers.

Giorgio further contends that Prochamp's German sales are overstated because a subset of Prochamp's sales to its largest German customer contain the code [          ], denoting the countries [          ] and [          ]. Pl. Br. 54-55. But this argument does not carry weight.

The difficulty in tracing the country of consumption in Europe arises because the European common market eliminates any need for Prochamp to record where its customers ultimately distribute their

products for retail sale.  Appx10072.  Where possible, Prochamp looked

to the destination address to determine the destination country.  But

when there was no address — as in the case of sales to Prochamp's

largest [            ] customer, which arranged pick-up and delivery of

CPMs in [                  ] — Prochamp looked to the language on the

product label.  But for a subset of reported sales to this customer, the [

                  ] label is coded [          ], which suggests that the

product was intended for either [          ] or [          ].  *Id.*

Although the sales marked [          ] could have been sold in either [

              ] or [            ], Prochamp made the additional inference that

because the customer was a [            ] company, it was reasonable to

consider it a German sale.  *Id.*

On verification, Commerce agreed that the documentation provided

no way to distinguish sales to these two countries.  Appx10073.

Therefore, with the exception of the [                ] sales discussed

below, Commerce reasonably determined that its "review of the

information provided did not generally conflict with Prochamp's

assertion that the identification of German language label products sold

to German customers was the best possible way to identify products likely to be consumed in Germany." *Id.*

During verification, Prochamp also indicated that the same concerns that exist for [                    ] labeled products likewise exist for the [                ] labeled products, as these products could be sold in [                ] areas of other countries.  Appx10074.

Thus, Commerce based its comparison market decision on the final, corrected numbers provided by Prochamp, with the exception of the [                ] sales that were found at verification to be incorrectly reported as German.  Although Giorgio is correct that the sales containing the label [      ] (denoting sales destined for [                ]) were incorrectly reported as German sales, Pl. Br. 56, Prochamp explained that these sales were reported as German because [                    ] but, given that [      ] is the country code for [                    ], these sales should have been excluded.  Appx10073-10074.  Accordingly, Commerce excluded these sales from its calculations and otherwise found that there was no other information that would have allowed for more accurate identification of sales likely consumed in [                ].  Appx10074; Appx1064; Appx1276.  Thus,

58

Commerce continued to find that the record supported its selection of Germany as the best third-country market.  Appx10074; Appx1064-1065.

As such, for the foregoing reasons, substantial evidence supports Commerce's selection of Germany as the appropriate third-country market.

## **CONCLUSION**

For these reasons, we respectfully request that the Court deny Giorgio's motion for judgment on the administrative record, sustain Commerce's final determination, and enter judgment for the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant
   Attorney General

PATRICIA M. McCARTHY
Director

/s/ Tara K. Hogan
TARA K. HOGAN
Assistant Director

OF COUNSEL:

/s/ Daniel Bertoni

ALEXANDER FRIED
Attorney
Office of the Chief Counsel
   for Trade Enforcement &
   Compliance
U.S. Department of Commerce
1401 Constitution Avenue, NW
Washington, DC 20230

DANIEL BERTONI
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
(202) 353-7968

January 22, 2024

Attorneys for Defendant

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing response complies with the Rules of the United States Court of International Trade and the Court's September 29, 2023 scheduling order, ECF No. 21, because it contains 10,234 words, including text, footnotes, and headings.


_____/s/ Daniel Bertoni_____

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE M. MILLER BAKER, JUDGE
_____

|  |  |  |
|---|---|---|
| GIORGIO FOODS, INC., | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| UNITED STATES, | ) | Court No. 23-00133 |
| Defendant, | ) | |
| and | ) | |
| PROCHAMP B.V., | ) | |
| Defendant-Intervenor. | ) | |

_____)

## <u>ORDER</u>

Upon consideration of the plaintiff's motion for judgment upon the agency record, defendant's response, and all other pertinent papers, it is hereby

ORDERED, that the plaintiff's motion is denied; and it is further

ORDERED, that the underlying final determination is sustained, and it is further

ORDERED, that final judgment is entered for the United States.

_____
M. Miller Baker, Judge


Dated: _____, 2024
New York, New York

2