**Responses and Replies**

<u>1:23-cv-00133-MMB Giorgio Foods, Inc. v. United States</u>

**U.S. Court of International Trade**

**LIVE Database**

**Notice of Electronic Filing**

The following transaction was entered by Powell, Brittney on 2/19/2024 at 8:08 PM EDT and filed on 2/19/2024
| | |
|---|---|
| **Case Name:** | Giorgio Foods, Inc. v. United States |
| **Case Number:** | <u>1:23-cv-00133-MMB</u> |
| **Filer:** | Prochamp B.V. |
| **Document Number:** | <u>33</u> |

**Docket Text:**
**Confidential Confidential Response** *of Prochamp BV to Plaintiff's Rule 56.2* **to Motion** *For Judgment Upon Agency Record* **(related document(s)[31], [29], [24], [25], [22]). Reply due by 3/18/2024. Filed by Brittney Renee Powell of Fox Rothschild LLP on behalf of Prochamp B.V.. (Attachments: # (1) Proposed Order) (Powell, Brittney)**

**1:23-cv-00133-MMB Notice has been electronically mailed to:**

Alexander Douglas Keyser    akeyser@foxrothschild.com

Alexander Paul Fried    alexander.fried@trade.gov

Brittney Renee Powell    bpowell@foxrothschild.com

Daniel Bertoni    daniel.bertoni@usdoj.gov

John M. Herrmann , II    jherrmann@kelleydrye.com, tradenotifications@kelleydrye.com

Joshua Rubin Morey    jmorey@kelleydrye.com, mrespicio@kellydrye.com, tradenotifications@kelleydrye.com

Lizbeth R. Levinson    llevinson@foxrothschild.com

Paul Charles Rosenthal    prosenthal@kelleydrye.com, tradenotifications@kelleydrye.com

**1:23-cv-00133-MMB Notice has been delivered by other means to:**

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** C:\fakepath\Prochamp BV Response Brief - Confidential Version.pdf
**Electronic document Stamp:**
[STAMP citStamp_ID=992012590 [Date=2/19/2024] [FileNumber=1198885-0] [
2edb978ff8fff44f95bb0766c1ab682b80b9160d3f844e8c79f9273a79419f1a607caf
b9ce620b7c8aee08e04299277750fd41180ce68618066f06c7219cef4e]]
**Document description:** Proposed Order
**Original filename:** C:\fakepath\Proposed Order Prochamp Response Brief.pdf
**Electronic document Stamp:**
[STAMP citStamp_ID=992012590 [Date=2/19/2024] [FileNumber=1198885-1] [
22048148611cca9d1beb8b303cd3baa58ac780d9ed727f2f1641d7d1e65073c50e6cc6
c2e80f7988fe7713577efc504996f898f91f5be740946fce2d4ba2d075]]

Before: The Honorable Judge M. Miller Baker

| | |
|---|---|
| **GIORGIO FOODS, INC.,** | |
| **Plaintiff,** | **Court No. 23-00133** |
| **v.** | |
| **THE UNITED STATES,** | |
| **Defendant,** | |
| **and** | |
| **PROCHAMP B.V.,** | |
| **Defendant-Intervenor.** | **PUBLIC VERSION** |

## DEFENDANT-INTERVENOR'S RESPONSE TO PLAINTIFF'S RULE 56.2 MOTION FOR JUDGMENT UPON THE AGENCY RECORD

Lizbeth R. Levinson
Brittney R. Powell
Alexander D. Keyser

FOX ROTHSCHILD LLP
2020 K Street, NW
Suite 500 East
Washington, DC  20006
Phone: (202) 361-3100
Email:
akeyser@foxrothschild.com

155244020.1

## TABLE OF CONTENTS

TABLE OF CONTENTS                                                          i-ii

TABLE OF AUTHORITIES                                                       iii-iv

I.     ADMINISTRATIVE DECISION UNDER REVIEW                                2

II.    STATEMENT OF THE ISSUES                                             2

III.   STANDARD OF REVIEW                                                  3

IV.    STATEMENT OF THE CASE                                               4

V.     SUMMARY OF THE ARGUMENT                                            6

VI.    ARGUMENT                                                            8

       A.   Commerce Correctly Selected Germany as the Comparison
            Third-Country Market for the Normal Value Calculation          8

            1.   Factual Background for Commerce's Selection of Germany
                 as the Third Country Markey                               8

            2.   Substantial Evidence Supports Commerce's Selection of
                 Germany as the Comparison Third-Country Market            13

       B.   Commerce's Determination Not to Apply an Adverse Inference
            Was Supported by substantial Evidence                          18

            1.   Legal Standard for Application of An Adverse Inference     18

            2.   Prochamp Did Not Impede Commerce's Investigation by
                 Reporting Third-Country Market Viability in the Section A
                 Questionnaire Response                                    21

            3.   Prochamp Cooperated with Commerce's Instructions by
                 Using the Language of the Label to Determine the
                 Destination Market                                        23

4.   Prochamp' S Response to Commerce's Inquiries Concerning Channels of Distribution did Not Warrant an Adverse Inference                                                         28

5.   Commerce's Determination Not to Apply Adverse Facts Available Concerning Prochamp's Financial Statements was Supported by Substantial Evidence                              31

   i.   Prochamp Compiled with Commerce's Requests for Information Concerning Financial Statements            31

   ii.  Prochamp Provided All Relevant Financial Information and Left No Gap to be Filled by an Adverse Inference                                          34

V.   CONCLUSION                                                                 39

155243707.1

## TABLE OF AUTHORITIES

### FEDERAL STATUTES

19 U.S.C. § 1516a(b)(1)(B) .......................................................................... 3

19 U.S.C. § 1677e(a)-(b) ............................................................................. 18

19 U.S.C. § 1677e(a)(2) ......................................................................... 18, 27

19 U.S.C. § 1677e(b) ................................................................................... 19

19 U.S.C. § 1677m(d) .................................................................................. 30

### FEDERAL REGULATIONS

19 C.F.R. § 351.404(e) ..................................................................... 6, 13, 14, 17

19 C.F.R. § 351.404(e)(1)-(2) ...................................................................... 13

### FEDERAL CASES

*Atl. Sugar, Ltd. v. United States*,
   744 F.2d 1556, 1562 (Fed. Cir. 1984 ................................................. 4, 18, 27

*Altax Inc. v. United States*,
   370 F.3d 1108, 1116 (Fed. Cir. 2004) .................................................... 19

*American Honey Producers Association v. United States*,
   653 F. Supp. 3d 1329, 1335 (Ct. Int'l Trade 2023) ................................... 38

*Burlington Truck Lines, Inc. v. United States*,
   371 U.S. 156, 158 (1962 ......................................................................... 3

*Chaparral Steel v. United States*,
   901 F. 2d 1097 (Fed. Cir. 1990) ............................................................. 19

*Consol. Edison Co. v. NLRB*,
   305 U.S. 197, 229 (1951) ......................................................................... 3

*Essar Steel Ltd. v. United States*,
   678 F.3d 1268, 1276 (Fed. Cir. 2012) .................................................... 19

*Fujitsu General. Ltd. v. United States*,
   88 F.3d 1034, 1038 (Fed. Cir. 1996) ........................................................ 3

*Gerber Food (Yunnan) Co. v. United States*,
   387 F. Supp. 2d 1270, 1280 (CIT 2005) (Gerber I) ............................... 19, 27

*Guizhou Tyre Co. v. United States*,
   43 CIT ___, ___, Slip Op. 19-59 at 7 (May 15, 2019) ............................ 20

*Hyundai Steel Co. v. United States*,
   518 F. Supp. 3d 1309, 1322 (CIT April 27, 2021) .................................. 30

*Maverick Tube Corp.. v. United States*,
   857 F.3d 1353, 1359 (Fed. Cir. 2017) .................................................... 17

*Nippon Steel Corp. v. United States*,
   458 F.3d 1345, 1352 (Fed. Cir. 2006) ...................................................... 3

# FEDERAL CASES CONT'D

*Nucor Corp. v. United States,*
  728 F. Supp. 730, 734 (CIT 1989) ........................... 4

*PAM, S.p.A. v. United States,*
  582 F.3d 1339 (Fed. Cir. 2009) ........................... 15, 17, 27

*Rhone Poulenc, Inc. v. United States,*
  899 F.2d 1185, 1191 (Fed. Cir. 1990) ........................... 20

*Risen Energy Co., Ltd. v. United States,*
  477 F. Supp. 3d 1332 (Ct. Int'l Trade 2020) ........................... 19

*Sodium Nitrate from India,*
  88 Fed. Reg. 1042 (January 6, 2023) ........................... 36

*Timken Co. v. United States,*
  240 F. Supp. 2d 1228, 1234 (Ct. Int'l Trade 2002) ........................... 19

*Viet I-Mei Frozen Foods Co. v. United States,*
  839 F. 3d 1099, 1109 (Fed. Cir. 2016) ........................... 20

# ADMINISTRATIVE DECISIONS

*Canned Pineapple Fruit from Thailand:*
  68 Fed. Reg. 65247 (November 19, 2003) ........................... *13*

*Certain Preserved Mushrooms from the Netherlands:*
  88 Fed. Reg. 18,115 (March 27, 2023) ........................... *et passim*

*Polyethylene Terephthalate Sheet from the Sultanate of Oman:*
  85 Fed. Reg. 12513 (Dep't of Commerce March 14, 2020) ........................... 13

## Glossary

| Acronym | Item |
|:---:|:---|
| CPMs | certain preserved mushrooms |
| EU | European Union |
| AFA | adverse facts available |
| GAAP | generally accepted accounting principles |

Before: The Honorable Judge M. Miller Baker

| | |
|---|---|
| **GIORGIO FOODS, INC.,** | |
| **Plaintiff,** | **Court No. 23-00133** |
| **v.** | |
| **THE UNITED STATES,** | |
| **Defendant,** | |
| **and** | |
| **PROCHAMP B.V.,** | |
| **Defendant-Intervenor.** | |

## DEFENDANT-INTERVENOR'S OPPOSITION TO PLAINTIFF'S RULE 56.2 MOTION FOR JUDGMENT UPON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade, Defendant-Intervenor, Prochamp B.V., respectfully submits this brief to respond to the motion for judgment upon the

Public Version

agency record filed by Plaintiff, Giorgio Foods, Inc. ("Giorgio"). This response brief is timely filed in accordance with the Court's Order dated February 12, 2024. Since the Department of Commerce's ("Commerce") investigation of certain preserved mushrooms ("CPM") from the Netherlands is supported by substantial evidence, we join the Defendant United States in requesting that the Court deny Plaintiff's motion and sustain Commerce's final determination.

## I.    ADMINISTRATIVE DECISION UNDER REVIEW

The administrative determination at issue in this proceeding is the final determination of the less-than-fair value investigation concerning CPMs from the Netherlands. *See Certain Preserved Mushrooms from the Netherlands: Final Affirmative Determination of Sales at Less Than Fair Value*, 88 Fed. Reg. 18,115 (Dep't Commerce March 27, 2023); Joint Appendix ("Appx")1271-1273. The period of investigation is January 1, 2021 through December 31, 2021.

## II.    STATEMENT OF THE ISSUES

1.  Whether Commerce's selection of Germany as the comparison market to determine normal value for Prochamp B.V. was supported by substantial evidence.

155225683.1

Public Version

2. Whether Commerce's determinations that there was no basis to

   rely on facts otherwise available since no gaps existed in the

   record and that Prochamp cooperated to the best of its ability were

   supported by substantial evidence.

## III.   STANDARD OF REVIEW

When reviewing an antidumping duty determination, the Court must sustain Commerce's results unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B); *see also Fujitsu General Ltd. v. United States*, 88 F. 3d 1034,1038 (Fed. Cir. 1996). Substantial evidence is "more than a mere scintilla," and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *PAM, S.P.A. v. United States*, 582 F. 3d 1336, 1339 (Fed. Cir. 2009), *quoting Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1951).

A party challenging Commerce's determination under the substantial evidence standard "has chosen a course with a high barrier to reversal." *Nippon Steel Corp. v. United States,* 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation and internal quotation marks omitted). In order for a determination to satisfy this standard "{t}here must be a

155225683.1

Public Version

rational connection between the facts found and the choice made."

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 158 (1962);

*Nucor Corp. v. United States*, 728 F. Supp. 730, 734 (Ct. Int'l Trade

1989). Judicial review of agency action must be based on the record as a

whole and the Court sustains Commerce's factual determinations as

long as they are reasonable and supported by the record as a whole,

even if some evidence detracts from the agency's conclusions. *Atl.*

*Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).

## IV.   STATEMENT OF THE CASE

On April 20, 2022, Commerce initiated the less-than-fair value

investigation of CPMs from the Netherlands in response to the petition

filed by Giorgio. Appx10555-10559. As part of the initial stages of the

investigation, Commerce requested comments on product

characteristics to "identify the key physical characteristics of the

subject merchandise in order to report the relevant costs of production

accurately as well as develop the appropriate product comparison

criteria." Appx10556. Commerce selected Prochamp B.V. as one of the

mandatory respondents for individual investigation. Appx1688-1694,

*see also* Appx1970.

155225683.1

Public Version

On May 24, 2022, Commerce determined the final, ordered set of physical characteristics for CPMs. Appx10899-10902. Commerce ranked the importance of these physical characteristics as: 1) container type, 2) net drained weight, 3) mushroom style, 4) certified organic, 5) product labeling, and 6) packaging solution. Appx10900-10902. These characteristics, collectively, defined the control number or CONNUM for model matching purposes. Appx10900.

Prochamp B.V. participated in the investigation by responding fully to all information requests issued by Commerce in a complete and timely manner. Prochamp B.V. responded separately to Section A (general, corporate, sales/distribution activities), Section B (Sales in the Home Market or to a Comparison Country), Section C (United States Sales), and Section D (cost of production) of the initial questionnaire, the third-country market questionnaire, and several supplemental questionnaires in a timely fashion.  On March 27, 2023, Commerce published the final determination in the Federal Register, noting that it calculated a margin of zero percent for Prochamp. *See Certain Preserved Mushrooms from the Netherlands: Final Affirmative Determination of*

5

Public Version

*Sales at Less Than Fair Value*, 88 Fed. Reg. 18,115 (Dep't Commerce March 27, 2023); Appx1271-1273.

## V.    SUMMARY OF THE ARGUMENT

Prochamp joins the United States in rejecting the arguments Petitioner sets forth in its motion for judgment on the agency record and the Court should sustain Commerce's final determination.

First, Commerce appropriately selected Germany as the third-country market comparison country. Despite the Plaintiff's contentions, substantial evidence supports Commerce's selection of Germany over France as the third-country market comparison country. Commerce appropriately weighed all factors under 19 C.F.R. § 351.404(e) in its determination to select Germany as the comparison market. Record evidence and the relevant physical characteristics support Commerce's finding that merchandise sold by Prochamp to all markets is substantially similar. Since these products were substantially similar, Commerce's determination that Germany is the appropriate third-country comparison market since it had the more robust sales volume was supported by substantial evidence and in accordance with law.

6

Public Version

Second, substantial evidence supports Commerce's decision not to apply adverse inferences in determining a dumping margin because Prochamp cooperated to the best of its ability and there were no gaps in the record. With regard to third-country market selection, Prochamp provided all relevant information relating to its sales to Germany and France. It did not impede Commerce's investigation in its responses concerning market viability and channels of distribution, and it did not provide unverifiable information by reporting the destination country in the manner requested by Commerce. With regard to certain financial documents, Prochamp also did not withhold any information, nor did it leave any gap in the record. Prochamp consistently reported that it did not prepare the types of financial documentation requested by Commerce and instead provided equivalent financial documentation. Commerce merely used the abridged financial documents provided at verification to verify the documentation already on the record and to confirm that Prochamp was exempted under Dutch law from preparing complete financial statements.

## VI.  ARGUMENT

### A. Commerce Correctly Selected Germany as the Comparison Third-Country Market for the Normal Value Calculation

#### 1. Factual Background for Commerce's Selection of Germany as the Third-Country Market

In response to the Initial Section A Questionnaire, Prochamp indicated that sales in its home market did not meet the 5% threshold for viability. Appx1705-1706. Instead, Prochamp provided information concerning the volume and value of its sales to its largest third-country markets - France, Germany, and Israel. Appx1706, Appx1735. Prochamp initially determined the destination countries for its merchandise based on the destination port for France and Israel and the customer's address for Germany. Appx1705. This methodology was used because the sales to Germany were largely based on Free Carrier incoterms, and the delivery was taken from Prochamp in the Netherlands. *Id*.

Commerce requested additional information from Prochamp related to its third-country markets following the Section A Response. Appx2253-2258. Prochamp provided a quantity and volume breakdown

155225683.1

Public Version

of its sales of CPMs by physical characteristics, to the United States, France, Germany, and Israel. Appx2265-2271. In both its initial Section A response and the Third-Market Country Supplemental Questionnaire Response, Prochamp recommended that Commerce select Germany as the third-country market for calculating normal value. Appx1707; Appx2266.

Commerce issued a supplemental questionnaire in response to certain deficiency comments made by Plaintiff. Appx2606-2613, Appx2762. Commerce instructed Prochamp to "{p}rovide the quantity and value of all sales with German as the sole language identified on the label." Appx2765. Prochamp therefore revised the total quantity and value reported with respect to comparison market-sales in France and Germany, noting the updated quantities to be:

| Country | Sales Volume in Kilograms | Percentage of the U.S. Market |
|---------|---------------------------|-------------------------------|
| France | [          ] | [    %] |
| Germany | [          ] | [    %] |

Appx4870.

9

Public Version

Prochamp subsequently revised its breakdown of comparison market data with regard to the 6 CONNUMs at Commerce's request, and reported the following:

1. All sales to the United States and the third-country markets involved the same container, *i.e.* steel cans, Appx5309;

2. Sales to the United States and France were similar with regard to net drained weight;

3. [    % ] of products sold to the United States were in the style of pieces and stems, [    % ] were mechanically harvested sliced, [    % ] were sliced, [    % ] were mechanically harvested whole, and [    % ] were handpicked. Appx5311. Sales of products to Germany overlapped in style with those to the United States, with [    % ] of products sold to Germany being in the pieces and stems style, [    % ] were mechanically harvested whole, and [    %] were handpicked. *Id.* Prochamp also reported that [    % ] of products sold to France were of the pieces and stems style, [    % ] of products were handpicked, and [    % ] were mechanically harvested whole, *id.*;

155225683.1

Public Version

4.  All sales to all third-country markets were certified organic, Appx5311;

5.  100% of CPMs sold to the United States and Germany had containers sold with private labels affixed. Appx5312. [          %] of sales to France involved containers sold with private brand labels affixed, with the remaining [        % ] of products sold having containers with company brand labels affixed, *id*.;

6.  All sales to all three third-country markets were categorized as other. Appx5313.

Following the submission of this revised data, Commerce selected Germany as the comparison market on August 26, 2022. Appx1000. Commerce made this determination because the products sold in the third-country markets had similar characteristics and Prochamp sold a [                              ] overall quantity of CPMs to Germany, approximately [        %] of sales to the U.S. market, than to the alternative markets. Appx1003-1004.

During the Sales Verification, Prochamp's company officials explained that the country of sale in the European Union ("EU") is "largely immaterial for their purposes, as they are all essentially

Public Version

domestic sales within the common market, and the ultimate country of consumption… is simply not a concern and not recorded or known to them." Appx10072. Commerce verified that Prochamp's database accurately disambiguated sales of [                    ] labeled products, though it could not disambiguate between [

    ] in terms of ultimate consumption. Appx10073-10074. Further, Commerce identified that [        ] sales identified as German were actually meant for the [        ] market. Appx10072-10073. Prochamp explained that these sales were reported as German because it was instructed by Commerce to determine the destination of the country by whether German was the sole language identified on the label. *Id*. Lastly, Prochamp explained that the same issues of identifying the country of ultimate consumption also existed for merchandise with labels in French. Appx10072-10073.

   Commerce ultimately found that Prochamp was cooperative with all requests for information regarding market viability, and was able to verify the sales volume and product characteristics at the time it selected Germany. Appx1059-1061. Thus, Commerce continued to

155225683.1

Public Version

identify Germany as the appropriate choice as the third-country

comparison market. Appx1082.

## 2. Substantial Evidence Supports Commerce's Selection of Germany as the Comparison Third-Country Market

Substantial evidence supports Commerce's selection of Germany as

the third-country comparison market. Pursuant to 19 C.F.R. §

351.404(e)(1)-(2), Commerce considers several criteria when selecting

among multiple viable third country markets:

1) The foreign like product exported to a particular third country is more similar to the subject merchandise exported to the United States than is the foreign like product exported to other third countries;
2) The volume of sales to a particular third country is larger than the volume of sales to other third countries;
3) Such other factors as the Secretary considers appropriate.

Importantly, Commerce's general practice when selecting a third-

country market is to consider all the factors under 19 C.F.R. §

351.404(e) when determining the appropriateness of a third-country

comparison market.[1] Therefore, Commerce will weigh the factors,

---

[1] *Polyethylene Terephthalate Sheet from the Sultanate of Oman: Preliminary Affirmative Determination of Sales at Less than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures,* 85 Fed. Reg. 12513 (Dep't of Commerce March 14, 2020) and accompanying Issues and Decision Memorandum at Normal Value; *see also Canned Pineapple Fruit from Thailand,* 68 Fed. Reg. 65247

13

Public Version

including sales volume, to determine the third country comparison market. Commerce is not required to choose a market to be the third-country comparison market just because it is the "most similar."

The Plaintiff attempts to undermine Commerce's selection of Germany as the third-country market by contending that merchandise sold to France was more similar to the merchandise that was sold to the United States. It bases this argument on a single physical characteristic, [                                ]. However, even in the proceedings cited by the Petitioner, Commerce did not base its determinations solely on the similarities of the merchandise. It also considered the sales volume.[2]

Here, Commerce did not select Germany as the comparison market based solely on the volume of Prochamp's sales to Germany, but rather it considered all factors under 19 C.F.R. § 351.404(e). Appx1081-1082.

---

(Dep't of Commerce November 19, 2003) and accompanying Issues and Decision Memorandum at Comment 19c.

[2] For example, in the Memorandum to Jill E. Pollack re: *Certain Frozen Warmwater Shrimp from India; Selection of an Appropriate Third Country Market*, 3 (Dep't Commerce Nov. 30, 2020) (ACCESS barcode: 4059889-01), Commerce considered both the similarities of the products sold in the viable third-country markets and in the U.S. market and the sales volumes in the selection of the third-country comparison market.

155225683.1

Public Version

Weighing these factors, Commerce appropriately determined that the merchandise Prochamp sold to the United States, France, and Germany were substantially similar, but that the volume of sales to Germany was much larger than the volume of sales to France. *Id*. Since the products were largely similar, and Germany had a substantially larger sales volume, Commerce properly determined Germany was the appropriate third-country comparison market. *Id*.

Plaintiff's argument would require this Court to pretend that the merchandise Prochamp sold to Germany and the United States are so different that a reasonable mind could not be justified in choosing Germany as the comparison market. *PAM, S.P.A. v. United States*, 582 F. 3d 1339. The approach preferred by the Plaintiff, however, conveniently ignores that in 5 out of 6 physical characteristics, Prochamp's sales to Germany are essentially identical to the other third-country markets. For the first physical characteristic, container type, both Prochamp's German and French sales are identical to U.S. sales, with all sales to all markets employing steel cans as containers. Similarly, for the fourth physical characteristic and sixth physical characteristic all of Prochamp's sales to third country markets were

15

Public Version

identical in that they were certified organic and used the same packing solution. Appx5311, Appx5313. Therefore, in three out of six physical characteristics, Prochamp's sales to France and Germany are identical.

With regard to the third physical characteristic, the merchandise's style, Prochamp's German sales and French sales were also equally similar to the sales made to the United States. [        % ] of U.S. sales of CPMs were in the [                         ]. Appx5311.  [        % ] of sales to the German market consisted of CPMs in the [

]. *Id*. [        % ] of sales to the French market also consisted of mushrooms in the [                        ] style.  *Id*. Therefore, for this physical characteristic, sales to Germany and France were essentially the same as well.

Lastly, for the fifth physical characteristic, concerning the types and labels affixed to containers, [        ] % of Prochamp's sales to the United States and German markets involved containers with private brand labels affixed. Appx5312. By contrast, [        % ] of Prochamp's sales to the French market had private brand labels affixed. *Id*. Though this is a very minor difference, it still shows that in some of the relevant

155225683.1

Public Version

physical characteristics, sales to the German market were more similar to the U.S. market than sales to the French market.

Commerce considered each of these physical characteristics, and ultimately found that the products Prochamp sold to Germany, the United States, and France were substantially similar. Commerce did not ignore the similarity criteria under 19 C.F.R. § 351.404(e), but instead appropriately weighed those criteria as well as the sales volumes to the third-country markets.

It is difficult to believe, as the Plaintiff contends, that a reasonable mind would view three steel cans with labels affixed, filled with CPMs of the same style, in the same solution, and be unable to find those CPMs to be essentially the same merchandise. *PAM, S.P.A. v. United States*, 582 F. 3d 1339. It is far more likely that a reasonable mind would accept the evidence in the record was sufficient to support that the CPMs sold to all considered markets were largely similar, since they were nearly identical in 5 out of 6 physical characteristics. *See Maverick Tube Corp. v. United States*, 857 F.3d 1353, 1359 (Fed. Cir. 2017) (citation omitted). Thus, Commerce's decision was undoubtedly based on substantial evidence, since the record clearly shows that sales to the

17

Public Version

German market, French market, and U.S. market were essentially the

same.  Commerce's decision is still reasonable and supported by

substantial evidence, even if some evidence in the record detracts from

its determination. *Atl. Sugar, Ltd. v. United States*, 744 F. 2d 1556,

1562 (Fed. Cir. 1984).

### B. Commerce's Determination Not to Apply an Adverse Inference Was Supported by Substantial Evidence

### 1. Legal Standard for Application of an Adverse Inference

Commerce's decision to calculate a dumping margin for Prochamp

based on the record and not to apply adverse facts available ("AFA")

was supported by substantial evidence. The application of AFA

encompasses a two-part inquiry established by the statute.  *See* 19

U.S.C. § 1677e(a)-(b). The statute first requires Commerce to identify

necessary information missing from the record to determine that a

party has: 1) withheld requested information; 2) failed to provide

information by the established deadline or in the form or manner

requested; 3) significantly impeded the review; or 4) provided

information that cannot be verified. 19 U.S.C. § 1677e(a)(2); *see also*

18

Public Version

*Gerber Food (Yunnan) Co., Ltd. v. United States*, 387 F. Supp. 2d 1270, 1280 (Ct. Int'l Trade 2005).

Commerce must then make a second and separate finding that a party failed to cooperate to the best of its ability to justify the use of an adverse inference when "selecting among the facts otherwise available." 19 U.S.C. § 1677e(b), *see Risen Energy Co., Ltd. v. United States*, 477 F. Supp. 3d 1332 (Ct. Int'l Trade 2020). Further, the application of AFA must be supported by substantial evidence on the record. *Altax Inc. v. United States,* 370 F.3d 1108, 1116 (Fed. Cir. 2004). It is also unquestionable that the antidumping law is not meant to be wielded as a punitive tool. *See Chaparral Steel v. United States*, 901 F. 2d 1097 (Fed. Cir. 1990); *Timken Co. v. United States*, 240 F. Supp. 2d 1228, 1234 (Ct. Int'l Trade 2002) ("Commerce should adhere to the overriding goal of the antidumping law, which is not to create a punitive result…"); *U.S. Steel Corp*. Rather, it is meant to be an "incentive to cooperate with Commerce's investigation. *Essar Steel Ltd. v. United States,* 678 F.3d 1268, 1276 (Fed. Cir. 2012). This is supported by the overall purpose of the statute: to calculate accurate dumping margins. *See*

155225683.1

Public Version

*Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990).

There were no gaps in this administrative record and no failure by Prochamp to cooperate that would justify the application of adverse facts available. *See e.g. Guizhou Tyre Co. v. United States*, 43 CIT ___, ___, Slip Op. 19-59 at 7 (May 15, 2019) (before Commerce can apply adverse facts available it must determine that any gap in the administrative record "was caused by a respondent's failure to cooperate."). Prochamp was a fully cooperative respondent by any reasonable measure and responded to each of Commerce's requests for information to the best of its ability. Even if the record was not perfect, the existence of any errors did not require Commerce to apply adverse inferences as the Plaintiff contends. The "best of its ability" standard found in 19 U.S.C. 1677e "does not require perfection and recognizes that mistakes sometimes occur." *Viet I-Mei Frozen Foods Co. v. United States*, 839 F. 3d 1099, 1109 (Fed. Cir. 2016).

The relevant question in this proceeding is whether Commerce's determination not to apply an adverse inference was supported by substantial evidence. It is not whether Commerce could, and therefore

20

Public Version

should have, applied adverse facts available. Considering Prochamp's compliance with each of Commerce's requests for information, and there being sufficient information on the record to accurately calculate a dumping margin, Commerce's determination was clearly supported by substantial evidence.

### 2. Prochamp Did Not Impede Commerce's Investigation by Reporting Third-Country Market Viability in the Section A Questionnaire Response

Prochamp did not delay or impede Commerce's investigation by informing Commerce of the viability of its home market on in its response to the Initial Section A Questionnaire on June 21, 2022. Plaintiff focuses a great deal on this inconsequential issue. It argues had Prochamp provided the response by June 2, 2022, 14 days after the Section A Questionnaire was issued, Commerce would not have had to wait to issue a comparison market supplemental questionnaire until after the Section A Questionnaire Response. Pl. Br. at 60-61. Yet, the course of action preferred by the Plaintiff would have made no functional difference in how the case actually proceeded. Nor does it show how Commerce's determination not to apply adverse facts available was unsupported by substantial evidence.

21

Public Version

Prochamp was required by the Section A Questionnaire issued on May 19, 2022 to discuss home market viability and to provide the information of its three largest third-country markets if the home market was not viable. Appx1705-1706. Prochamp cooperated with Commerce's request by providing the information for [

                          ] on June 21, 2022. Appx1706, Appx1735. On June 23, 2022, only two days after Prochamp submitted its Section A Response, Commerce issued a supplemental Third-Country Market Supplemental Questionnaire. Appx2253. Commerce also issued a Section A Supplemental Questionnaire (dated July 11, 2022) and a second Third-Country Market Supplemental Questionnaire (dated August 19, 2022), which also sought information, clarification, and instructions from Commerce concerning the Third-Country Market data reported by Prochamp. Appx2762, Appx11562.

Commerce only made its selection of Germany as the third-country market after Prochamp responded to each of these questionnaires. Appx1000. Despite the Plaintiff's contentions, it is not clear how a hypothetical earlier third-country market questionnaire would have radically altered Commerce's selection of the third-country market. The

22

Public Version

response to the Section A Questionnaire was one of the first stages of

the investigation. What is clear is that Prochamp did not impede

Commerce's investigation by first discussing market viability in its

Section A Questionnaire Response, since Commerce had sufficient time

to create, issue, and clarify *three* subsequent questionnaires concerning

third-country market viability. Since Commerce received the relevant

information early in the investigation and was not impeded in any way,

its determination to not apply adverse facts available is supported by

substantial evidence.

### 3. Prochamp Cooperated with Commerce's Instructions by Using the Language of the Label to Determine the Destination Market

Plaintiff also attempts to argue that Prochamp was not cooperative

and misleading in how it reported its sales to third-country markets. Pl.

Br. at 69. In doing so, Plaintiff conveniently ignores the complex facts

that led to Commerce's ultimate selection of Germany as the

comparison third-country market. Prochamp is a company based in the

Netherlands with significant sales in the common European

marketplace. Prochamp identified from the beginning of the

investigation that there were unique challenges in identifying the final

23

Public Version

destination country for products sold to European customers. Appx1705, Appx10072. In its initial Section A Questionnaire Response, Prochamp determined the ultimate destination country based on the destination port for France and Israel and the customer's address for Germany, supported by the German language product packaging. Appx1705. Since Prochamp did not record the ultimate destination country in the ordinary course of business, Prochamp sought to provide the requested information in a reasonable fashion. Appx1705, Appx10072.

It was not until Commerce issued its Section A Supplemental Questionnaire that Commerce instructed Prochamp to provide the quantity and value data based on the sole language identified on the label. Appx2765. With this instruction, Commerce made it clear that it believed the best way to determine the destination country was through the language on the label.[3] Prochamp was not attempting to inflate its German sales with its initial response. It was simply trying to report the quantity and value data in a reasonable way. Once Commerce

---

[3] Notably this instruction did not answer the question of how Prochamp was to determine the final destination country where more than one language was present on the label and the customer's address was in Germany.

24

Public Version

clarified how it preferred Prochamp to determine the destination
country, Prochamp revised the quantity and value information to an
amount that Commerce verified at its Sales Verification. Appx4870.
Importantly, even with the smaller revised quantity, the number of
sales to Germany was nearly [        ] Prochamp's sales to France.
Appx10072-10074.

Even after these revisions, Plaintiff continues to argue that
Prochamp inflated its sales to Germany. Pl. Br. at 55-57. First, it
stresses that a minute number of sales Prochamp counted as German
sales were actually sold to [            ]. Pl. Br. at 52, 56. But
Prochamp counted these sales as German sales in compliance with
Commerce's instructions because the sole language on the label was [
    ] and the customer had a [        ] address. Appx10072-
10074, Appx1080-1082. Prochamp was following Commerce's
instructions to base the final destination on the language of the label.
Appx10072-10074. Further, there were only [      ] sales that were
actually to [          ] that Prochamp counted as German.
Appx10073. Commerce was able to exclude this information from its

25

Public Version

final calculations, and still found that the number of sales to Germany was more robust than that of sales to France. Appx10073-10074.

Second, the Plaintiff attempts to mischaracterize the issue with identifying whether a German labelled product is destined for [

] as a scheme by Prochamp devised to deceive Commerce and inflate its German sales. Pl. Br. at 52, 56. This argument ignores that Prochamp reported this data as German in compliance with the request for information by Commerce. Appx2765. The [                    ] label for a subset of Prochamp's reported sales to a certain customer are coded [          ], which suggests that the product could go to either [             ] or [          ]. Appx10072-10074. But this customer is a [            ] company, and Prochamp keeps no records of where that customer ultimately distributes the merchandise. *Id.* Since the label for those sales were in [           ] and the customer was [            ], it was certainly reasonable for Prochamp and Commerce to count those sales as [             ]. *Id.* Plaintiff cannot meaningfully allege that Prochamp was purposefully mischaracterizing its sales where it was simply following instructions by Commerce to the best of its ability. Indeed, it is unclear how adverse facts available

26

Public Version

would be appropriate with regard to country identification since Prochamp did not: 1) withhold requested information, 2) fail to provide information by the established deadline or in the form requested; 3) significantly impede the review; or 4) provide information that cannot be verified. Appx10073-10074.[4]

Lastly, the Plaintiff's argument conveniently ignores that due to the complexities created by the European common marketplace, the same issues would exist if Commerce used France as the third-country comparison market. Appx10073. There are several countries in Europe, including Belgium and Switzerland, that recognize French as an official language. Prochamp's products with French labels could be destined for parts of those countries instead of France, as Prochamp explained at verification. *Id*.

To determine the best third-country comparison market, Commerce asked Prochamp to determine the ultimate destination of a product by the language on the label. No party has ever claimed this was a perfect mechanism, but given the unique and complex circumstances present in

---

[4] 19 U.S.C. § 1677e(a)(2); *see also Gerber Food (Yunnan) Co., Ltd. v. United States*, 387 F. Supp. 2d 1270, 1280.

155225683.1

Public Version

the European market, it was the most accurate way to determine the
ultimate destination of Prochamp's sales. Appx10073, Appx1080-1082.
Simply because some evidence on the record potentially detracts from
Commerce's finding does not mean that its decision was not supported
by substantial evidence. *Atl. Sugar, Ltd. v. United States*, 744 F. 2d
1562. A reasonable mind could accept this information as adequate to
support the third-country market determination made by Commerce,
since it was the best way to determine the accurate quantity and value
of Prochamp's sales to third-country markets. *PAM, S.P.A. v. United
States*, 582 F. 3d 1339. Thus, the Court should find Commerce's decision
to be supported by substantial evidence.

### 4. Prochamp's Response to Commerce's Inquiries Concerning Channels of Distribution did Not Warrant an Adverse Inference

Prochamp initially reported to Commerce that its only channel of
distribution for its sales to the United States and Germany involved
direct sales to unaffiliated customers in the retail sector. Appx1716-
1717. In the Initial Section A Questionnaire, Commerce did not request
for Prochamp to breakdown sales to markets based on different
channels. *Id*. Similarly, Prochamp reported in response to the third-

28

Public Version

country market questionnaire, that the channels of distribution for its

sales to the United States and Germany were the same, but that the

channels of distribution to France and Israel involved sales to an

unaffiliated sales agent. Appx2266.

It was not until the Supplemental Section A questionnaire that

Commerce specifically asked Prochamp to break down the quantity and

value of sales to: 1. Retailers, 2. Resellers, 3. Distributors. Appx2765.

In response to that question, Prochamp specifically noted that it did not

make sales to resellers. Appx1720, Appx4860. Further, Prochamp did

provide a revised breakdown of its sales through the originally

identified reported channels, *i.e.* affiliated and unaffiliated channels of

distribution. Appx4870.

Plaintiff argues that because Prochamp did not specifically provide a

breakdown of the quantity and value of sales by retailers and

distributors, that Commerce should have applied an adverse inference.

Pl. Br. at 50-51. But as described above, Prochamp did not ignore or

withhold the requested information such that necessary information

was missing from the record. Throughout the investigation, Prochamp

provided information about certain channels of distribution and made

29

Public Version

revisions according to Commerce's later requests. Appx1716-1717,

Appx2255, Appx2266. Further, Commerce simply did not rely on any

inaccurate information in its final determination, since Commerce

ultimately found that the breakdown by channels of distribution was

not necessary to calculate an accurate dumping margin. Appx1082,

Appx10073-10074; Appx1274-1276.

Even if Prochamp's response had been deficient, under 19 U.S.C. §

1677m(d), Commerce would have been required to inform Prochamp of

the deficiency and provide Prochamp with an opportunity to remedy the

deficiency. Importantly, a failure by Commerce to provide a respondent

with the statutorily required notice of deficiency in its questionnaire

response "can render the decision to {apply facts available} unsupported

by substantial evidence and otherwise contrary to law." *Hyundai Steel*

*Co. v. United States*, 518 F. Supp. 3d 1309, 1322 (Ct. Int'l Trade April

27, 2021).

In the questionnaires following the Supplemental Section A

Questionnaire, Commerce did not notify Prochamp that its response to

the channels of distribution question was deficient, nor did it issue

another questionnaire where it asked for the same breakdown by

30

Public Version

retailer, reseller, and distributor. Appx5292-5300. Therefore, it would have been otherwise contrary to law for Commerce to apply adverse facts available in its final determination on this basis. Further, considering the channels of distribution ultimately had no impact on the final determination, it was reasonable for Commerce to not apply adverse facts available. Substantial evidence thereby supports Commerce's decision not to apply adverse facts available based on Prochamp's responses concerning the channels of distribution.

### 5. Commerce's Determination Not to Apply Adverse Facts Available Concerning Prochamp's Financial Statements was Supported by Substantial Evidence

#### i. Prochamp Complied with Commerce's Requests for Information Concerning Financial Statements

Plaintiff argues that Commerce should have applied AFA because Prochamp purportedly failed to provide certain financial documents (*i.e.,* standalone financial statements).  In Section A of the Initial Questionnaire, Commerce requested that Prochamp provide financial documents for 2020 and 2021, the two most recently completed fiscal years. Appx10763. Prochamp B.V. reported that it is a private company that is [

31

Public Version

]. Appx1708. Prochamp B.V. further reported that though it prepares trial balances for preparation of profit and loss and balance sheets, it does not prepare standalone financial statements. Appx1725. Rather, under Dutch Civil Law section 403 and/ or the Generally Accepted Accounting Principles of the Netherlands (Netherlands GAAP), only [                    ] prepares the consolidated audited financial statements on behalf of its group companies. *Id*. Therefore, the only financial statements Prochamp could and did provide to Commerce were the consolidated financial statements prepared by [                    ] for its group of companies. *Id*. Importantly, these financial statements contained the relevant financial information for Prochamp. *Id*.

Following certain comments made by Giorgio, Commerce issued a supplemental questionnaire, requesting that Prochamp provide its unconsolidated financial statements. Appx2772. In response to this supplemental questionnaire, Prochamp maintained that it did not have unconsolidated financial statements. It also explained that under Dutch Civil law and the Netherlands GAAP, [                    ] is a single tax entity that files a unified tax return, and that it is required to

32

Public Version

prepare only consolidated financial statements for itself and its subsidiaries. Indeed, Prochamp B.V. provided Commerce with a declaration made to the government of the Netherlands which stated that its " [

].” Appx4347.

To show Commerce that all necessary information was contained within the consolidated financial statements, Prochamp also provided the consolidated trial balance for 2021 which showed the [

].

Appx3889-3890, Appx4416-Appx4429. In response to subsequent supplemental questionnaires issued by Commerce, Prochamp continued to explain that it did not prepare the unconsolidated financial statements requested by Commerce. Appx3424, Appx7593-7596, Appx 7603, Appx7875-7876. Yet, it did attempt to comply to the best of its ability by providing Commerce with equivalent information found in the unaudited and audited financial statements for [                    ] in both 2020 and 2021. Appx3424, Appx7593-7596, Appx 7603, Appx7875-7876. Prochamp officials reiterated these facts at the on-site

33

Public Version

cost verification, and explained further that it maintained certain abridged financial documents that did not comply with the Dutch Civil Code. Appx10095. These documents included an abbreviated internal balance sheet and a profit and loss account for each of the individual companies under the [                    ] umbrella. *Id*. Prochamp then provided those documents to Commerce so that it could verify the information already on the record. Appx10095.

Commerce ultimately found that the application of an adverse inference was inappropriate because Prochamp acted to the best of its ability in responding to Commerce's requests for information. Appx1041. Commerce determined that Dutch law exempted Prochamp from preparing standalone financial statements. Appx1050-1052. It further noted that the financial documents provided at verification were not standalone financial statements that should have been reported to Commerce and that these documents were not inconsistent with the full financial statements of [                    ]. *Id*.

> ### ii.    Prochamp Provided All Relevant Financial Information and Left No Gap to be Filled by an Adverse Inference

155225683.1

Public Version

Prochamp's representation that it is exempt from the preparation of standalone financial statements is entirely supported by the administrative record. Plaintiff argues that Commerce should have applied adverse facts available based on some perceived lack of cooperation regarding these financial statements. Yet there simply is no gap in the record that Commerce need fill with adverse facts. The financial documents provided by Prochamp at various stages in the investigation created a full record. Appx3889-3890, Appx4416-Appx4429. Appx3424, Appx7593-7596, Appx 7603, Appx7875-7876. Thus, Commerce's determination that Prochamp was exempt from providing standalone financial statements, and its determination not to apply adverse facts available, were supported by substantial evidence.

Importantly, Plaintiff has confused the requirement to prepare abbreviated balance sheets and profit and loss statements with the requirement to prepare financial statements. Financial statements include notes to accounts, a detailed statement of assets and liabilities, and a statement of profit and loss under Part (or Title) 9 of the Dutch Civil Code. Appx10094. Under the Dutch Civil Code and Netherlands GAAP, Prochamp's ultimate holding company, [                    ]

35

was obligated to prepare audited consolidated financial statements for all of its owned subsidiaries. Appx7663. These subsidiaries were not required to prepare such financial statements, because those companies qualified for the exemption under section 403 of the Dutch Civil Code. Therefore, [                          ] subsidiary companies were only required to prepare "abridged document{s}" that do "not need to comply with Part 9 of the Dutch Civil Code." (i.e. a full set of financial statements). Appx11494. This exemption contains only minimum requirements for the abridged financial documents, including an abbreviated balance sheet and an abbreviated profit-and-loss account. Appx11494.

Under the statute, Commerce has generally found that where no gaps exist in the administrative record, there is no basis to consider adverse inferences.[5] To comply with Commerce's requests for information, Prochamp provided all internal books and records

---

[5] *See, e.g. Sodium Nitrate from India: Final Affirmative Countervailing Duty Determination*, 88 Fed. Reg. 1042 (Dep't of Commerce January 6, 2023) and accompanying Issues and Decision Memorandum at Comment 9 (Commerce found that because the companies cooperated with Commerce's requests for information, and there were no gaps in the record, there was no basis to consider adverse inferences.

155225683.1

Public Version

maintained by [                    ] subsidiary companies, including

Prochamp. Appx1052, Appx1725-1726, Appx3426, Appx9136,

Appx9179-9183. This information was the basis for Prochamp's cost of

production and sales reporting. Appx1052, Appx1725-1726, Appx3426,

Appx9136, Appx9179-9183. The administrative record thereby included

all the financial statements that Commerce required for its calculations,

including the trial balance and consolidation worksheets used to

prepare [                    ] audited financial statements.

Additionally, Commerce was able to verify that the 2021 tax returns

of [                ] included a summary financial statement for

each of its wholly-owned subsidiaries. Appx10094-10095. At

verification, Commerce was then able to review the original documents,

obtain copies of [                    ] required 2021 documents, and

review the internal monthly trial report prepared by Prochamp for [

                    ] board of directors. *Id*. Financial statements

normally include notes to accounts and substantial details of elements

of revenue and cost at a minimum. But under Dutch law, none of [

                    ] subsidiaries are required to prepare such

financial statements.

37

Public Version

Commerce also did not admit these documents as new factual information but instead used them to verify the financial documents already on the record. Appx10092-10095, Appx1051. Prochamp's submission of this documentation resembles the facts in *American Honey Producers Association v. United States*. In that case, this Court found that Commerce accepted certain financial statements as part of its verification exercise, and not as new factual information. *American Honey Producers Association v. United States,* 653 F. Supp. 3d 1329, 1335 (Ct. Int'l Trade 2023). This is because Commerce used the information for purposes of verifying the "accuracy of the trial balances the Respondent previously submitted." *Id*. Here, Commerce used the abridged financial documents provided at verification to verify that Prochamp does not prepare complete financial statements in the ordinary course of business. Appx1051, Appx10092-10095. Commerce also used these documents to verify the numbers Prochamp provided throughout the investigation in its specific trial balances and consolidated financial statements. Appx10092-10095.

Commerce's determination not to apply adverse inferences is therefore supported by substantial evidence, since Prochamp fully

cooperated to the best of its ability with Commerce's requests for information and provided all detailed trial balances in the audited consolidated financial statements of [                    ]. The plethora of financial documents provided by Prochamp during the investigation creates a robust record with no gaps. With no gaps in the record, there were no reasonable grounds for Commerce to resort to facts otherwise available with regard to Prochamp's financial statements.

## CONCLUSION

For these reasons, we respectfully join the Defendant in requesting that the Court deny Plaintiff's motion for judgment on the administrative record, sustain Commerce's final determination, and enter judgment for the United States.

Respectfully submitted,

/s/ *Lizbeth R. Levinson*
Lizbeth R. Levinson
Brittney R. Powell
Alexander D. Keyser

FOX ROTHSCHILD LLP
2020 K Street, NW
Suite 500 East

39

Public Version

Washington, DC  20006
Phone: (202) 361-3100
Email:
akeyser@foxrothschild.com

*Counsel to Prochamp B.V.*

40

Public Version

## <u>Word Count Certificate of Compliance</u>

This brief has been prepared utilizing Microsoft Word 2016 using a proportionally spaced typeface (14-point Times New Roman font).

In accordance with this Court's Scheduling Order and the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that this brief complies with the word limitations set forth. Specifically, excluding those exempted portions of the brief, as set forth in 2 B (1) of the Chambers Procedures, I hereby certify that this brief contains 6,899 words. This certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/ *Lizbeth R. Levinson*

Lizbeth R. Levinson
Brittney R. Powell
Alexander D. Keyser

FOX ROTHSCHILD LLP
2020 K Street, NW
Suite 500
Washington, DC  20006
 Tel:   202-794-1183
 Fax:   202-461-3102

February 19, 2024