NONCONFIDENTIAL

# UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| GIORGIO FOODS, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES, ) | Court No. 23-00133 |
| ) | |
| Defendant, ) | |
| ) | |
| and ) | |
| ) | |
| PROCHAMP B.V., ) | |
| ) | |
| Defendant-Intervenor. ) | |

## <u>PLAINTIFF'S REPLY BRIEF</u>

JOHN M. HERRMANN
PAUL C. ROSENTHAL
JOSHUA R. MOREY
KELLEY DRYE & WARREN LLP
3050 K Street, N.W., Suite 400
Washington, DC 20007
(202) 342-8400

Counsel to Giorgio Foods, Inc.

March 18, 2024

NONCONFIDENTIAL

## Table of Contents

Page

I.  Commerce's Selection of Germany as the Third-Country Comparison Market is Unlawful ....................................... 2

    A.  Defendant Fails to Defend One of the Fundamental Bases for Commerce's Decision to Reject Plaintiff's Arguments in the Final Determination ......................................................................... 2

    B.  Commerce Incorrectly Weighed Sales Volumes and Product Characteristics in Selecting Germany as the Comparison Market .................................... 8

    C.  Commerce Incorrectly Analyzed the Channels in Which Prochamp Sold CPMs in Various Markets .............. 17

    D.  Commerce Verified That Prochamp Reported Its German Sales Volume Incorrectly ....................................... 18

II.  Commerce's Determination Not to Assign Prochamp a Dumping Margin Based On Total Adverse Facts Available is Not Supported By Substantial Evidence ................... 22

    A.  Prochamp Significantly Impeded the Proceeding With Regard To Commerce's Selection of an Appropriate Comparison Market ......................................... 22

    B.  Prochamp Withheld Information Concerning the Existence of Financial Statements It Maintained in the Ordinary Course of Business and Significantly Impeded Commerce's Conduct of the Proceeding .......................................................................... 28

    C.  Prochamp Failed to Cooperate to the Best of Its Ability ................................................................................. 31

**NONCONFIDENTIAL**

III.   Conclusion ........................................................................ 34

NONCONFIDENTIAL

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ad Hoc Coal. Of Am. Sap Producers v. United States,*
Ct.  No. 23-00010, Slip Op. 24-26, at 18, 2024 Ct. Intl.
Trade LEXIS 28  (Mar. 1, 2024) ........................................................2

*Asociación de Exportadores e Industriales de Aceitunas de
Mesa v. United States,*
523 F. Supp. 3d 1393 (Ct. Int'l Trade 2021), *aff'd upon
remand*, 589 F. Supp. 3d 1346 (Ct. Int'l Trade 2022),
appeal docketed No. 23-1162 (Fed. Cir. Nov. 18, 2022) ......................5

*Burlington Truck Lines, Inc. v. United States,*
371 U.S. 156 (1962) ........................................................................3, 8

*Hyundai Heavy Indus., Co. v. United States,*
332 F. Supp. 3d 1331 (Ct. Int'l Trade 2018), *aff'd without
op.*, 2020 U.S. App. LEXIS 28,400 (Fed. Cir. Sept. 8, 2020) ...............4

*Jindal Poly Films Ltd. of India v. United States,*
365 F. Supp. 3d 1379 (Ct. Int'l Trade 2019).......................................5

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
463 U.S. 29 (1983) ........................................................................5, 8

*NMB Singapore Ltd. v. United States,*
557 F.3d 1316 (Fed. Cir. 2009) .........................................................5

*Shijiazhuang Goodman Trading Co. v. United States,*
172 F. Supp. 3d 1363 (Ct. Int'l Trade 2016).......................................8

*Sunpower Corp. v. United States,*
179 F. Supp. 3d 1286 (Ct. Int'l Trade 2016).......................................8

*Viraj Forgings, Ltd. v. United States,*
350 F. Supp. 2d 1316 (Ct. Int'l Trade 2004).......................................9

NONCONFIDENTIAL

*Zhejiang Mach. Imp. & Exp. Corp. v. United States*,
471 F. Supp. 3d 1313 (Ct. Int'l Trade 2020)........................................3

## Statutes

19 U.S.C. § 1516a(b)(2)(A)........................................................ 10

19 U.S.C. § 1677e(a) ........................................................ 19, 20

19 U.S.C. § 1677e(a)(2)(A) ........................................................ 19

19 U.S.C. § 1677e(a)(2)(C) ........................................................ 14, 19

19 U.S.C. § 1677e(b) ........................................................ 19

## Administrative Determinations

*Certain Preserved Mushrooms From the Netherlands: Final
Affirmative Determination of Sales at Less Than Fair
Value*, 88 Fed. Reg. 18,115 (Dep't Commerce Mar. 27,
2023) ("*Final Determination*") and accompanying *Decision
Memorandum for the Final Affirmative Determination in
the Less-Than-Fair-Value Investigation of Certain
Preserved Mushrooms from the Netherlands* (Mar. 20,
2023).......................................................................... *passim*

*Memorandum to Abdelali Elouaradia from Eva Kim re: Less-
Than-Fair-Value Investigation of Raw Honey from
Argentina: Selection of Appropriate Third Country Market*
(Dep't Commerce Aug. 11, 2021) (ACCESS barcode:
4151668-01)................................................................. 11, 24

Memorandum to Melissa G. Skinner re: *2018-2019
Administrative Review of the Antidumping Duty Order on
Welded Line Pipe from the Republic of Turkey; Selection of
an Appropriate Third Country Market*, (Dep't Commerce
Apr. 16, 2020) (ACCESS barcode: 3966047-01) ............................24-25

**NONCONFIDENTIAL**

Memorandum to Jill E. Pollack re: *Certain Frozen Warmwater Shrimp from India; Selection of an Appropriate Third Country Market* (Dep't Commerce Nov. 30, 2020) (ACCESS barcode: 4059889-01) ...................................24-25

**NONCONFIDENTIAL**

Glossary

| Acronym | Item |
|---------|------|
| [    ] | [                              ] |
| CPMs | certain preserved mushrooms |
| [    ] | [                              ] |
| DIFMER | difference in merchandise |

NONCONFIDENTIAL

## Plaintiff's Reply Brief

This brief, filed on behalf of Giorgio Foods, Inc. (hereinafter "Giorgio" or "Plaintiff"), replies to the response briefs submitted on behalf of Defendant, the United States, and Defendant-Intervenor, Prochamp B.V. *See* Defendant's Opposition to Plaintiff's Rule 56.2 Motion for Judgement Upon the Agency Record (ECF No. 27) (hereinafter, "Def.'s Resp."); Defendant-Intervenor's Response to Plaintiff's Rule 56.2 Motion for Judgement Upon the Agency Record (ECF No. 33) (hereinafter "Prochamp's Resp."). For the reasons set forth in Plaintiff's opening brief (ECF No. 24) ("Pl.'s Br.") and this reply, the Court should grant Plaintiff's Rule 56.2 motion for judgment on the agency record and remand the agency's final determination[1] for reconsideration consistent with Plaintiff's request for relief.

---

[1]   *See Certain Preserved Mushrooms From the Netherlands: Final Affirmative Determination of Sales at Less Than Fair Value*, 88 Fed. Reg. 18,115 (Dep't Commerce Mar. 27, 2023) (hereinafter "*Final Determination*") (Appx1271-1273) and accompanying *Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Certain Preserved Mushrooms from the Netherlands* (Mar. 20, 2023) (Appx1007-1083).

NONCONFIDENTIAL

## I.  Commerce's Selection of Germany as the Third-Country Comparison Market is Unlawful

### A.  Defendant Fails to Defend One of the Fundamental Bases for Commerce's Decision to Reject Plaintiff's Arguments in the Final Determination

As Plaintiff explained in its opening brief, one of the fundamental bases Commerce identified in its final determination decision memorandum affirming the selection of Germany as the comparison market is that "Commerce . . . must identify a viable and appropriate third country as a concrete basis for normal value early in a proceeding." Appx1080; Pl.'s Br. at 35-41. Commerce's decision memorandum reiterated points made in its comparison market selection memorandum,[2] essentially stating that its decision is not subject to reconsideration:

> . . . the petitioner does not clearly identify the appropriate remedy it now seeks in the final determination proceeding. To the extent that the petitioner implies that Commerce should revisit its comparison market viability determination, it provides neither a statutory basis nor case precedent for Commerce to do so, much less suggest an administrative framework for how such a reconsideration would be administrable at

---

[2]  Appx1000-1006.

> the final state of this investigation even if Commerce were to agree that the basis for this initial determination was unsupported. *Regardless, Commerce is not revisiting its comparison market viability determination for Prochamp, consistent with our practice.*

Appx1081 (emphasis added). As addressed in Plaintiff's opening brief, this argument cannot be sustained, as it would effectively insulate Commerce's determination from judicial review – and, specifically, an assessment of whether Commerce's determination is supported by substantial evidence. *See* Pl.'s Br. at 35-41. Moreover, "it is settled that {Commerce} has the authority to reconsider any decision on any aspect of an investigation made earlier in a proceeding prior to reaching a final determination." *Ad Hoc Coal. Of Am. Sap Producers v. United States*, Ct. No. 23-00010, Slip Op. 24-26, at 18, 2024 Ct. Intl. Trade LEXIS 28, at *14 (Mar. 1, 2024) (citations omitted).

In its response brief, Defendant argues that Plaintiff's challenge to Commerce's selection of Germany as the appropriate comparison market is "a red-herring" and asserts that "Commerce {did not} somehow 'insulate{}' its choice of Germany from reconsideration or judicial review." Def.'s Resp. at 49. Defendant's claims, however, are

inconsistent with the plain language in Commerce's decision
memorandum that is quoted above. As such, Plaintiff's argument is not
a "red-herring," but rather addresses head on Commerce's explanation
of its decision to select Germany as the comparison market. Indeed,
Defendant's failure to defend such a significant aspect of Commerce's
explanation for selecting Germany as the comparison market requires
remand for further analysis and explanation, as Defendant's briefing
raises fundamental questions regarding the basis for Commerce's
selection of a comparison market – and whether that determination is
supported by substantial evidence and in accordance with law. *Zhejiang
Mach. Imp. & Exp. Corp. v. United States*, 471 F. Supp. 3d 1313, 1348-
49 (Ct. Int'l Trade 2020) ("The Government's present argument that
this finding is unimportant, then, is at best a *post hoc* rationalization
that cannot be used to meet Commerce's responsibility to explain its
determination. Instead, because Commerce itself deems the finding as
relevant to its determination, it should be required to address the
revised translation.") (internal citations omitted); *see also Burlington
Truck Lines, Inc. v. United States*, 371 U.S. 156, 168-69 (1962)

NONCONFIDENTIAL

(admonishing that "courts may not accept ... counsel's *post hoc* rationalizations for agency action; {rather,} an agency's ... order {may} be upheld, if at all, on the same basis articulated in the order by the agency itself ....").

Commerce's decision memorandum also addressed two additional arguments raised by Plaintiff during the administrative proceedings, but stated that the deficiencies identified by Plaintiff involve issues that were "not determinative" in Commerce's selection of Germany as the comparison market. Appx1082 (rejecting Plaintiff's arguments concerning flaws in Commerce's comparison of Prochamp's third country sales with respect to the physical characteristics and volumes of such sales, as well as discrepancies in Prochamp's reporting of its sales channels, as "not determinative" in the agency's selection of Germany as the comparison market).[3]

---

[3]    Commerce's decision memorandum is ambiguous regarding how much weight the agency placed on information concerning the sales channels in which Prochamp sold certain preserved mushrooms. While Commerce stated this factor was "not determinative," the agency also stated it "merely provided additional corroboration for the selection of Germany." Appx1082. In its response brief, however, Defendant states this factor was not relied upon to support the agency's decision. *See* Def.'s Resp. at 55 ("Commerce did not ultimately rely on this finding to make its comparison-market selection.").

Based on a reading of Commerce's decision memorandum and Defendant's response brief, it is unclear what basis the agency is now relying upon for selecting Germany as the comparison market because (1) Defendant claims before this Court that its explanation that it "must identify a viable and appropriate third country as a concrete basis for normal value early in a proceeding" is not a basis for the agency's decision, and (2) Commerce previously explained in its decision memorandum that neither of the factual findings it made in support of its decision to select Germany as the comparison market is "determinative."

Further, Commerce's statement in its decision memorandum that "we find that the record continues to support our selection of Germany as the appropriate third country market in this investigation," without any citation to record information, does not provide a basis for affirming the Department's analysis.[4] Indeed, as discussed above, Commerce now

---

[4]   *Hyundai Heavy Indus., Co. v. United States*, 332 F. Supp. 3d 1331, 1349 (Ct. Int'l Trade 2018) ("Commerce's Issues and Decision Memorandum, by itself, does not constitute substantial evidence. In the absence of substantial evidence, this conclusion must be remanded."), *aff'd without op.*, 2020 U.S. App. LEXIS 28,400 (Fed. Cir. Sept. 8, 2020) (citing *Bowman Transp., Inc. v. Ark.-Best Freight System, Inc.*, 419 U.S. 281, 285-86 (1974)).

NONCONFIDENTIAL

repudiates the explanation for its refusal to revisit its comparison market viability determination in the final decision memorandum, and that same memorandum dismisses as "not determinative" the other factors identified by Plaintiff during the administrative proceedings for which Commerce's preliminary analysis was flawed.

The standard of review requires "Commerce {to} provide{} the required explanation for its determination to allow the court to apply the standard of review." *Jindal Poly Films Ltd. of India v. United States*, 365 F. Supp. 3d 1379, 1384-86 (Ct. Int'l Trade 2019). Defendant's recanting of its explanation that it "must identify a viable and appropriate third country as a concrete basis for normal value early in a proceeding" and Commerce's explanation in its decision memorandum that neither of the factual findings it made in support of its decision to select Germany as the comparison market is "determinative" leave the path of the agency's decision indiscernible. *See NMB Singapore Ltd. v. United States*, 557 F.3d 1316, 1319 (Fed. Cir. 2009) ("{W}hile its explanations do not have to be perfect, the path of Commerce's decision must be reasonably discernable to a reviewing

court.") (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)); *Asociación de Exportadores e Industriales de Aceitunas de Mesa v. United States*, 523 F. Supp. 3d 1393, 1403 n.1 (Ct. Int'l Trade 2021) ("Conclusory statements without more are not reviewable even where the statute applied by Commerce is unambiguous."), *aff'd upon remand*, 589 F. Supp. 3d 1346 (Ct. Int'l Trade 2022), appeal docketed No. 23-1162 (Fed. Cir. Nov. 18, 2022).

As discussed below, Commerce's decision to select Germany as the third-country comparison market is also not supported by substantial evidence. However, Defendant's failure to defend the central element of Commerce's analysis underlying the agency's determination as explained in its final decision memorandum is a standalone reason for this Court to remand the agency's decision, consistent with the standard of review.

### B. Commerce Incorrectly Weighed Sales Volumes and Product Characteristics in Selecting Germany as the Comparison Market

Defendant argues that it properly weighed the volume of Prochamp's sales to third country markets (France and Germany) with the physical characteristics of Prochamp's sales to third country markets and the

United States. Def.'s Resp. at 50-55. While Defendant concedes that "Prochamp's sales to France had the [                                    ] to match with U.S. sales," Defendant argues it appropriately considered the evidence because "the products sold in each of the third-country markets all appeared to be very similar." Def.'s Resp. at 50 (citing Appx1004). Defendant's claim that "the products sold in each of the third-country markets all appeared to be very similar" is not supported by record evidence.

As Plaintiff demonstrated in its opening brief (and several times during the underlying administrative proceedings), the physical characteristics of the certain preserved mushrooms ("CPMs") that Prochamp sold in Germany and the United States are quite dissimilar, while the physical characteristics of the CPMs that Prochamp sold to France and the United States are substantially overlapping. *See* Pl.'s Br. at 45-46, 48-49, Attachment 1. Defendant ignores this evidence, instead focusing on the fact that for five out of six physical characteristics, Prochamp's U.S. sales were similar to Prochamp's German and French sales. Def.'s Resp. at 51 ("Commerce's analysis

draws on the fact that Prochamp's merchandise sold in Germany and its merchandise sold in France are identical to the CPMs sold in the United States with regard to three of the six product characteristics — container type, certified organic and packing solution — and very similar with regard to the remaining two product characteristics – mushroom style and product labeling."). But while Commerce has discretion in weighing evidence, it cannot ignore or disregard evidence, which is exactly what the agency did by failing to address Plaintiff's demonstrations throughout the underlying administrative proceeding that Prochamp's German sales would not match with Prochamp's U.S. sales.

First, Commerce's analysis failed to account for the fact that the product matching characteristics identified by the agency at the outset of its investigation are hierarchical, and Germany provided essentially [                    ] for the second most important characteristic – the net drained weight of the mushrooms in each container. In similar circumstances, Commerce has determined that a third-country comparison market where there are greater similarities in product

matching characteristics relative to U.S. sales outweighs a potential
third-country comparison market that has a larger volume of sales
relative to an alternative comparison market. For example, in an
antidumping investigation involving raw honey from Argentina,
Commerce selected Japan as the third-country comparison market even
though the respondent had a higher volume of sales to Belgium and the
respondent's sales to Belgium were "equally similar . . . in terms of four
of the five product characteristics." Memorandum to Abdelali
Elouaradia from Eva Kim re: *Less-Than-Fair-Value Investigation of
Raw Honey from Argentina: Selection of Appropriate Third Country
Market*, at 6-8 (Dep't Commerce Aug. 11, 2021) (ACCESS barcode:
4151668-01). In selecting Japan as the appropriate comparison market,
Commerce specifically noted that based on the greater similarity of a
single product characteristic, the respondent's "sales to Japan are more
likely to yield more matches to its U.S. sales than its sales to Belgium
or France." *Id.* at 7.

    Plaintiff demonstrated throughout the administrative proceedings
below that the same circumstances were true with respect to

Prochamp's sales of CPMs in France. *See* Appx2610-2614, Appx5314-5325, Appx10224-10225. Commerce's failure to analyze or address this evidence and Plaintiff's arguments, and its decision instead to focus solely on the fact that Prochamp's sales in Germany and France were similar with respect to five of six characteristics, ignored an important aspect of the problem – its selection of the appropriate comparison market that would yield a significant number of product matches to generate a meaningful analysis of whether Prochamp was selling CPMs in the United States at less-than-fair-value. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 ("{T}he agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'") (quoting *Burlington Truck Lines,* 371 U.S. at 168); *see also Sunpower Corp. v. United States*, 179 F. Supp. 3d 1286, 1295-96 (Ct. Int'l Trade 2016) ("{A}n agency determination that is arbitrary is *ipso facto* unreasonable," and a determination is arbitrary when it fails to "consider an important aspect of the problem" or "treat{s} similar situations in dissimilar ways.") (citations omitted); *Shijiazhuang*

NONCONFIDENTIAL

*Goodman Trading Co. v. United States*, 172 F. Supp. 3d 1363, 1375-76

(Ct. Int'l Trade 2016) ("Commerce failed to consider a commercially

significant aspect of the comparison it was attempting to make.").

The court has previously explained that:

> Given {the} seriatim instruction, 19 C.F.R. §
> 351.404(e) has a descending hierarchy of criteria
> from which Commerce must select the
> appropriate third country comparison market.
> Here Commerce did not try to work its way
> through the enumerated hierarchy of the
> regulation and its failure to do so lead {sic} to
> absurd results.[8] Commerce deviated from the
> canons of statutory construction and based its
> third country selection on the second enumerated
> criteria without indicating whether it considered
> the other enumerated criteria in making its
> determination. Commerce thus has failed to
> provide a reasonable explanation of its analysis.
> This issue is remanded to Commerce to provide a
> full explanation of its reasoning and the criteria
> it examined in selecting Germany as the
> comparison market.

---

> [8] For example, if the court were to follow
> Commerce's reasoning of selecting the
> appropriate third country based upon the volume
> of sales without considering the similarity of
> merchandise sold in both potential comparison
> markets (as seems to be suggested by Commerce's
> explanation), *then this approach could lead to the
> comparison of products that are either entirely*

> *dissimilar or dissimilar enough that all matches*
> *would be based upon constructed value rather*
> *than on a price to price basis after adjusting for*
> *DIFMER. This would run contrary to the logic of*
> *19 C.F.R. § 351.404(e).*

*Viraj Forgings, Ltd. v. United States*, 350 F. Supp. 2d 1316, 1324 (Ct.

Int'l Trade 2004) (internal citation omitted) (emphasis added). And as

Plaintiff demonstrated in its opening brief, the concern expressed by the

court in *Viraj* is exactly what occurred here -- a lack of robust identical

comparisons between Prochamp's sales of CPMs in Germany and the

United States. *See* Pl.'s Br. at 48-49, Attachment 1.

Second, Defendant's response brief makes the legally erroneous

argument that "the **[           ]** volume of {Prochamp's} sales to Germany

provides more extensive matching with {Prochamp's} sales to the

United States" with respect to the five characteristics other than net

drained weight, "rendering the German market the 'largest and most

robust' third-country market." Def.'s Resp. at 52-53. This claim reflects

a fundamental misunderstanding of Commerce's product matching

methodology – one of the most basic tenets of Commerce's dumping

calculations. Specifically, Commerce's questionnaire plainly instructs

respondents to:

> Assign a control number to *each unique product* reported in the section B sales data file. *Identical products should be assigned the same control number* in each record in every file in which the product is referenced (*e.g.,* products with identical physical characteristics reported in the foreign market sales file and the U.S. market sales file should have the same control number).

Appx10776 (emphasis added); *see also* Appx10802. In short, in order for a product to be considered "identical," it must be identical with respect to *all* physical characteristics.

As a result, Defendant's claim that "the **[        ]** volume of {Prochamp's} sales to Germany provides more extensive matching with {Prochamp's} sales to the United States" is wrong. This is confirmed by the analysis provided in Plaintiff's opening brief at Attachment 1, which demonstrates there were **[            ]** identical matches between Prochamp's German and U.S. sales. Pl.'s Br. at 48-49, Attachment 1. Thus, Defendant's appeal to the "'particular expertise' Commerce brings to 'complex and complicated' antidumping investigations" does not support the agency's decision here, where Defendant misstates Commerce's own product matching methodology. Def.'s Resp. at 53.

Third, Defendant argues this Court should "decline to entertain Attachment 1 and Giorgio's related arguments," but Defendant's argument is contrary to the standard of review. Def.'s Resp. at 55. The record before this Court consists of "a copy of all information presented to or obtained by" Commerce "during the course of the administrative proceeding" and, therefore, includes Commerce's final calculations. 19 U.S.C. § 1516a(b)(2)(A). Moreover, Plaintiff cites to Commerce's final calculations merely to illustrate the impact that Commerce's failed comparison market selection analysis had on the agency's final dumping calculations. In its submissions urging Commerce to reconsider its selection of Germany as the third-country comparison market, Plaintiff demonstrated there would be very limited matches between Prochamp's German and U.S. sales. *See* Appx2610-2614, Appx5314-5325, Appx10224-10225. Plaintiff's citation of Commerce's final calculations merely identifies additional record information that substantiates Plaintiff's argument made throughout the underlying proceedings.

### C.   Commerce Incorrectly Analyzed the Channels in Which Prochamp Sold CPMs in Various Markets

Commerce's decision memorandum is ambiguous regarding how much weight the agency placed on the similarities and differences between the channels in which Prochamp sold CPMs in each of the potential comparison markets. In particular, Commerce's final determination decision memorandum states both that this factor was "not determinative" in the agency's analysis, as well as that this consideration "provided additional corroboration for the selection of Germany." Appx1082. In its response brief filed with this Court, however, Defendant states explicitly that the similarities and differences between Prochamp's sales channels in the various comparison markets were not relied upon by the agency to support Commerce's selection of Germany. *See* Def.'s Resp. at 56 (asserting that "Commerce's selection of Germany rests on other bases").

Defendant's admission is significant because it clarifies that in selecting Germany as the comparison market, Commerce did not rely on Prochamp's self-serving statement that the German and U.S. sales channels were similar. Contrary to Prochamp's assertion, the record

NONCONFIDENTIAL

demonstrates that the company's French sales were sold through channels that are more similar to Prochamp's U.S. sales than were Prochamp's German sales. *See* Pl.'s Br. at 52-53 (demonstrating that Prochamp's sales to the United States and France involve sales **[**

**]**,

whereas Prochamp's German sales involve only the former). Thus, record information concerning the channels through which Prochamp sold CPMs supports the selection of France, and Commerce failed to account for this evidence in selecting Germany as the comparison market, thereby rendering its decision unsupported by substantial evidence.

D. **Commerce Verified That Prochamp Reported Its German Sales Volume Incorrectly**

Defendant's response brief acknowledges that Prochamp revised its reported volume of CPMs sales in Germany twice, but asserts that:

> Prochamp submitted those revisions on August 1 and August 25, 2022, Appx4859; Appx5306, before Commerce chose Germany as the comparison market on August 26, 2022, Appx1000, so Commerce's decision is based on the final, *verified* numbers.

NONCONFIDENTIAL

Def.'s Resp. at 56 (emphasis added). Contrary to Defendant's claim that Commerce relied on a "verified" sales volume in selecting Germany as the comparison market, Commerce actually verified that Prochamp's reported German sales volume was wrong.

As detailed in Plaintiff's opening brief, with respect to the sales identified by Prochamp as involving sales of CPMs in Germany, Commerce verified that:

1. "Prochamp has no actual knowledge of the eventual destination of the product within [     ] own distribution chain, or that it even left the Netherlands." Appx10072.

2. "{V}irtually all [          ] language labels for [              ] brand contained label code identifying the products as [        ]," demonstrating these sales, which account for nearly all of Prochamp's so-called German sales, are for "retail display in either the [     ] market." *Id.*

3. There were additional sales included in Prochamp's German sales volume that were unambiguously sold to [              ] Appx10073-10074.

Pl.'s Br. at 55-56. Thus, Defendant's claim that "Commerce's decision is based on the final, *verified* numbers" concerning Prochamp's sales of CPMs in Germany is wrong.

NONCONFIDENTIAL

Contrary to the assertions in Defendant's response brief, Commerce made its selection based on the sales volume reported by Prochamp that was inclusive of all of the company's German, **[                    ]** sales. While Commerce did not acknowledge this issue until after it completed verification, Plaintiff identified the issue based on Prochamp's questionnaire responses in comments submitted just days after Commerce issued the comparison market selection memorandum. Appx5316-5318.

In its response brief, Defendant attempts to explain away the issue with Prochamp's reported German sales volume as an issue impacting all European sales. *See* Def.'s Resp. at 56-58. In particular, Defendant states that the "difficulty in tracing the country of consumption in Europe arises because the European common market eliminates any need for Prochamp to record where its customers ultimately distribute their products for retail sale." *Id.* (citing Appx10072). Defendant's assertion, however, is wrong. Prochamp's inability to identify the destination of its sales is not an issue with respect to Prochamp's European sales in general, but only Prochamp's sales to **[**

**NONCONFIDENTIAL**

**]**, which "arranges pick-up of the finished merchandise

using **[**                    **]** and transports it to a **[**        **]**

in **[**

**]** Appx10071-10072. **[**

**]**

Appx8780-8788. In other words, **[**

**]** In

contrast, Prochamp's sales **[**

**]** Appx5187-5191.[5] Moreover, unlike Prochamp's sales

**[**

**]**

---

[5]    Since Prochamp did not submit a sales database based on the company's French sales, Petitioner is using Prochamp's French purchase orders (as reported at Appx5187-5191) as a proxy for the company's customer breakdown.

*Id.* Thus, Defendant's attempt to extrapolate the problems with

Prochamp's German sales volume to French sales is erroneous.

## II.  **Commerce's Determination Not to Assign Prochamp a Dumping Margin Based On Total Adverse Facts Available is Not Supported By Substantial Evidence**

### A.  **Prochamp Significantly Impeded the Proceeding With Regard To Commerce's Selection of an Appropriate Comparison Market**

In its opening brief, Plaintiff identified three reasons that

Commerce's factual finding under 19 U.S.C. § 1677e(a)(2)(C) that

Prochamp did not "significantly impede" the proceeding with respect to

the agency's selection of a comparison market is not supported by

substantial evidence:

> 1. Prochamp failed to notify Commerce that its home market was not viable within 14 days of the date Prochamp received the agency's questionnaire, despite the questionnaire's explicit instructions to do so and Prochamp's claim 33 days later that it had **[          ]** of the foreign like product in the home market. Pl.'s Br. at 60-61 (citing Appx10722-Appx10723, Appx10754; Appx1706, Appx1734-1735).
>
> 2. Prochamp asserted in its initial response that Germany was the most appropriate comparison market for the antidumping investigation because "the product sold to the USA and Germany are the same," "the channel of

NONCONFIDENTIAL

export/distribution i.e. all sales are made to unaffiliated customers in both the countries," and the German sales volume was more than **[          ]**, despite all of these claims being inaccurate. Pl.'s Br. at 61-63.

3. Prochamp completely failed to respond to a lengthy set of questions the Department issued regarding the sale channels and types of customers for each of the potential comparison markets. Pl.'s Br. at 64 (citing Appx4859-4860).

Defendant claims that each of the bases identified by Plaintiff is wrong, but as discussed below, it is Defendant's response that is wrong in each instance. Def.'s Resp. at 39-44.

With respect to the first issue, Defendant asserts "a lack of advance notice of Prochamp's non-viable home market did not matter operationally for Commerce, because Section A of the antidumping questionnaire contains instructions on how to report home market viability." Def.'s Resp. at 41. This explanation, however, is contrary to the plain language of the agency's questionnaire, as well as Commerce's subsequent actions in this and other cases where a respondent's home market is not viable.

In particular, Commerce's questionnaire explicitly instructs respondents that if the home market sales volume is close to the

NONCONFIDENTIAL

viability threshold, the respondent should "contact the official in charge by no later than fourteen calendar days after the issuance of this questionnaire." Appx10754. The purpose of this advanced notice is clear. Commerce typically issues a supplemental questionnaire requesting additional information (which is not requested in the Section A questionnaire or any other section of Commerce's initial antidumping questionnaire) regarding the physical characteristics and sales channels of a respondent's sales in viable third country markets. *See* Appx2253-2258; Memorandum to Abdelali Elouaradia from Eva Kim re: *Less-Than-Fair-Value Investigation of Raw Honey from Argentina: Selection of Appropriate Third Country Market*, at 2-4 (Dep't Commerce Aug. 11, 2021) (ACCESS barcode: 4151668-01) (addressing Commerce's request for additional information concerning two respondents' third country sales in a supplemental questionnaire issued *before* either respondent filed its Section A questionnaire response); Memorandum to Melissa G. Skinner re: *2018-2019 Administrative Review of the Antidumping Duty Order on Welded Line Pipe from the Republic of Turkey; Selection of an Appropriate Third Country Market*, at 2 (Dep't Commerce Apr. 16,

2020) (ACCESS barcode: 3966047-01) (discussing issuance of a supplemental questionnaire on third country sales); Memorandum to Jill E. Pollack re: *Certain Frozen Warmwater Shrimp from India; Selection of an Appropriate Third Country Market*, at 3 (Dep't Commerce Nov. 30, 2020) (ACCESS barcode: 4059889-01) (same). Defendant's attempt to brush off this delay by claiming "Commerce would have had to wait for Prochamp's Section A response," therefore, is wrong and is inconsistent with the agency's stated policy of reaching comparison market decisions early in the proceeding.

Second, regarding Prochamp's inaccurate reporting of comparison market sales volumes, Defendant claims that "Prochamp did not withhold information on sales volume and product characteristics" because "Prochamp corrected any inaccuracies during its {subsequent} reporting." Def.'s Resp. at 41-42. However, as discussed in Plaintiff's opening brief, and again in this reply, Prochamp did not correct the inaccuracies with respect to its German sales volume. *See* Pl.'s Br. at 54-56; section I.D., *supra*. Indeed, Commerce verified that Prochamp's reported German sales volumes remained inaccurate throughout the

NONCONFIDENTIAL

proceeding, as it included sales unambiguously destined for

[                    ], as well as a significant volume of sales that could have

been destined for [                         ] *Id.*

In addition, in the context of seeking to defend Commerce's finding

that Prochamp did not "significantly impede" the proceeding, Defendant

does not address Prochamp's inaccurate assertions regarding its sales

channels. *See* Def.'s Resp. at 41-43. In defending Commerce's

comparison market selection, however, Defendant disavows Commerce's

reliance on the reported sales channels as a basis for its comparison

market selection and confirms that Prochamp's assertions were

inaccurate. Def.'s Resp. at 55 (stating that "when this finding was no

longer supported by record evidence, Commerce explained that the

factor was 'not determinative . . .'"); Appx1082 (stating the sales

channels are "not determinative"). Thus, the administrative record

demonstrates that Prochamp's inaccurate reporting did significantly

impede Commerce's conduct of the proceeding, and Defendant's failure

to address this issue requires remand.

NONCONFIDENTIAL

With respect to the third issue – Prochamp's failure to respond to Commerce's supplemental questions regarding the company's sales channels and customer types for each of the potential comparison markets – Defendant concedes that Prochamp did "not provide the requested breakdown by label language or channel of production." Def.'s Resp. at 44. Defendant argues that "because Commerce verified Prochamp's methodology for reporting German sales and was able to use Prochamp's sales data to perform its margin calculations, Giorgio's argument fails to identify any error in Commerce's determination." *Id.* This argument is erroneous, however, for two reasons. First, Commerce verified that Prochamp's German sales reporting was wrong. Second, the issue is Prochamp's failure to provide the agency with accurate information for purposes of selecting a comparison market, *not* whether Prochamp's German pricing information was accurate. Thus, the fact that Commerce was able to calculate a dumping margin based on flawed and incomplete information submitted to the agency by Prochamp is irrelevant to whether Prochamp significantly impeded Commerce's selection of a comparison market.

**B.**    **Prochamp Withheld Information Concerning the Existence of Financial Statements It Maintained in the Ordinary Course of Business and Significantly Impeded Commerce's Conduct of the Proceeding**

Plaintiff also challenges Commerce's factual findings that Prochamp did not withhold information concerning its financial statements and did not significantly impeded the proceeding by failing to provide the agency with internal financial statements until verification. Pl.'s Br. at 64-67. Specifically, Plaintiff demonstrated that Commerce's initial and supplemental questionnaires instructed Prochamp to submit, among other financial documents, "internal financial statements or profit and loss reports of any kind that are prepared and maintained in the normal course of business" that are relevant to certain preserved mushrooms or the product most closely corresponding to such merchandise, and that Prochamp represented such documents did not exist. Pl.'s Br. at 28-32, 65-66. Further, contrary to Prochamp's representations to Commerce during the underlying proceedings, these documents *did* exist and were accepted by Commerce at verification. *Id.* at 34 (citing Appx10095; Appx9130-9137).

Defendant argues that "{t}he information Prochamp provided was responsive to Commerce's requests, to the extent of Prochamp's ability." Def.'s Resp. at 31. Defendant also argues that Prochamp's omission of unconsolidated financial statements for Prochamp and its affiliates was "reasonably explained." *Id.* The Court should reject both of these arguments. First, Prochamp did not respond to Commerce's request "to the extent of {its} ability." The record unequivocally demonstrates that Prochamp and its affiliates are required to maintain profit and loss and other financial statements (Appx7772-7773, Appx11465, Appx11492) and, as Commerce discovered at verification, Prochamp and its affiliates did, in fact, maintain these documents. Appx10095; Appx9130-9137; *see also* Pl.'s Br. at 31-33. Rather than reporting to Commerce the existence of these internal financial statements, Prochamp denied their existence in responding to Commerce's initial and supplemental questionnaires. Thus, Prochamp did not respond to Commerce's requests "to the extent of {its} ability." Additionally, Prochamp's explanations for failing to provide these explicitly requested documents are not reasonable, given

that Dutch law required Prochamp to maintain these document, and Prochamp did, in fact, maintain them.

Defendant also argues "the abridged financial information Prochamp maintained {and that Commerce collected at verification} were not the kind of financial information Commerce requested." Def.'s Resp. at 33. As Plaintiff demonstrated in its opening brief, however, this argument is contrary to the plain language of Commerce's initial and supplemental questionnaires, which instructed Prochamp explicitly to submit "internal financial statements or profit and loss reports *of any kind* that are prepared and maintained in the normal course of business." Appx1726 (emphasis added), *see also* Appx5895; Pl.'s Br. at 28-32, 65-66. The language in Commerce's questionnaires clearly covers profit and loss statements that Prochamp and its affiliates maintained in the ordinary course of business and submitted to Commerce during verification.

Lastly, Defendant argues the financial documents that Prochamp provided to Commerce at verification "did not raise concerns of inconsistencies with Prochamp's reported figures or constitute new

NONCONFIDENTIAL

factual information." Def.'s Resp. at 34. This explanation, however, is irrelevant to whether Prochamp "withheld" information and "significantly impeded" the proceeding under 19 U.S.C. § 1677e(a)(2)(A), (C). Like all other factual findings, Commerce's determinations under 19 U.S.C. § 1677e(a) that a respondent did not withhold information, or did not significantly impede an investigation, must be supported by substantial evidence. The fact that the abridged financial documents did not raise concerns or inconsistencies does not negate the fact that Prochamp withheld these documents and significantly impeded Commerce's conduct of the proceeding.[6]

### C.    Prochamp Failed to Cooperate to the Best of Its Ability

Plaintiff demonstrated in its opening brief that no reasonable mind could conclude that "Prochamp was cooperative with all requests for information regarding market viability" and financial documents and,

---

[6]    Plaintiff is aware that a decision to apply an adverse inference in reaching a determination is discretionary under the plain language of 19 U.S.C. § 1677e(b), which provides that Commerce "*may* use an inference that is adverse." While it may be appropriate for Commerce to consider the lack of inconsistencies in determining whether to rely on adverse inferences, that is not what Commerce did here. Instead, Commerce made factual findings that Prochamp did not "withhold" information or "significantly impede" the proceeding under 19 U.S.C. § 1677e(a). These factual findings are not supported by substantial evidence and must be remanded for further deliberations.

NONCONFIDENTIAL

therefore, Commerce's determination is not supported by substantial evidence. Pl.'s Br. at 68-72. As Plaintiff recounted:

1. Commerce verified that Prochamp reported inaccurate German sales volumes;

2. Prochamp described its sales channels in comparison markets incorrectly in responding to Commerce's questionnaire and failed entirely to respond to supplemental questions from the agency regarding this issue; and

3. Prochamp failed to provide financial documents that it was required to maintain under Dutch law, that Commerce explicitly requested, and that Prochamp in fact maintained during the ordinary course of business, as Commerce discovered at verification.

Defendant first seeks to justify Commerce's decision with respect to Prochamp's financial documents, explaining that "Commerce determined that the abridged financial documents Prochamp presented at verification did not fall within the scope of Commerce's prior information requests" and "the information in these documents was not inconsistent with other financial information Prochamp had provided." Def.'s Resp. at 38. With respect to the comparison market selection, Commerce states that Prochamp worked with Commerce to correct any inaccuracies and discrepancies in its initial reporting. *Id.* at 45-46. All

these explanations are wrong for the reasons Plaintiff has identified above in sections II.A. and II.B.

Moreover, as discussed above, Commerce made a factual finding that Prochamp "was cooperative with all requests for information." Appx1059. This characterization of Prochamp's engagement in the underlying proceedings is not accurate or reasonable. Contrary to Defendant's assertion, Prochamp withheld requested financial documents throughout the proceeding, making explicit representations – such as, "Prochamp does not maintain any internal financial statements or profit and loss reports of any kind" – that were directly contradicted at verification. Appx5895. Prochamp also misreported its German sales volume, which Commerce verified was still inaccurate in the final sales database, and Prochamp also misreported information concerning the channels in which it sold CPMs. All of the correct information was available – and in Prochamp's possession – from the beginning of the investigation, but Prochamp failed to cooperate by not responding accurately and completely to Commerce's questions. Thus,

NONCONFIDENTIAL

Commerce's determination the Prochamp cooperated to the best of its ability is not supported by substantial evidence.

###  III.  Conclusion

For the reasons set forth above, Plaintiff respectfully urges this Court to determine that the Department's *Final Determination* is not supported by substantial evidence and is otherwise not in accordance with law. Plaintiff urges this Court to remand the *Final Determination* to the Department with instructions to correct the errors set forth above and in Plaintiff's opening brief.

Respectfully submitted,

/s/ John M. Herrmann
JOHN M. HERRMANN
PAUL C. ROSENTHAL
JOSHUA R. MOREY
KELLEY DRYE & WARREN LLP
3050 K Street, N.W., Suite 400
Washington, DC 20007
(202) 342-8400

Counsel to Plaintiff

Dated: March 18, 2024

## CERTIFICATE OF COMPLIANCE
## WITH COURT OF INTERNATIONAL TRADE
## STANDARD CHAMBERS PROCEDURES

Pursuant to this Court's Order dated September 29, 2023 (ECF No. 21, setting the word limitation for Plaintiff Giorgio Foods, Inc.'s Reply Brief to 7,000 words, counsel for Plaintiff certifies that the attached Reply Brief contains 6,037 words, including footnotes. The word count certification is made in reliance on the word-count feature contained in Microsoft Word Office 2016.

Respectfully submitted,

 /s/ John M. Herrmann
JOHN M. HERRMANN
PAUL C. ROSENTHAL
JOSHUA R. MOREY
KELLEY DRYE & WARREN LLP
3050 K Street, N.W., Suite 400
Washington, DC  20007
(202) 342-8400

Counsel to Plaintiff

Dated:  March 18, 2024