A-421-815
Remand
Giorgio Foods
**Public Version**
E&C/OIII:  BQ

***Giorgio Foods, Inc. v. United States*, Court No. 23-00133, Slip Op. 24-79**
**(CIT July 17, 2024)**
**Certain Preserved Mushrooms from the Netherlands**

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**

## I.  SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of redetermination pursuant to the remand opinion and order of the U.S. Court of International Trade (the Court) issued in *Giorgio Foods, Inc. v. United States,* Court No. 23-00133 (CIT July 17, 2024).[1]  This action arises out of Commerce's final affirmative determination in the investigation of sales at less than fair value (LTFV) on certain preserved mushrooms (mushrooms) from the Netherlands covering the period of investigation (POI) January 1, 2021, through December 31, 2021.[2]

The Court remanded the *Final Determination* for reconsideration of Commerce's finding that respondent Prochamp B.V. (Prochamp) "sold a 'significantly larger overall quantity' of mushrooms in 'the German market' than in France or Israel."[3]  The Court specifically found that

> {the quantity and value of sales consumed in the German third-country market}
> must have been lower than {the amount reported and relied upon by Commerce in
> its third country selection determination} because some of those mushrooms were
> "likely" sold to consumers in another country.  Absent any better explanation,
> {Commerce} could not reasonably conclude that the Dutch company's exports to

---

[1] *See Giorgio Foods, Inc. v. United States*, Court No. 23-00133, Slip Op. 24-79 (CIT July 17, 2024) (*Remand Opinion*); *see also Giorgio Foods, Inc. v. United States*, Court No. 23-00133, ECF No. 44 (CIT July 17, 2024) (*Remand Order*).
[2] *See Certain Preserved Mushrooms from the Netherlands:  Final Affirmative Determination of Sales at Less Than Fair Value*, 88 FR 18115 (March 27, 2023) (*Final Determination*), and accompanying Issues and Decision Memorandum (IDM).
[3] *See Remand Order* at 1.

Germany were "significantly" larger than those to France.  The court must return this issue to the agency for reconsideration.[4]

In light of the Court's opinion and order, on remand, Commerce re-examined the information on the record regarding its third-country market selection to reconcile the conclusion that Germany reflected a significantly larger market than that of France with statements acknowledging that German-market information contained a subset of transactions likely not ultimately consumed in Germany, including information submitted to the record of this remand proceeding which Commerce re-opened for the narrow purpose of addressing the Court's concerns.

Upon reexamination, Commerce finds it is appropriate to continue to rely upon the German third-country comparison market data, as submitted, as the record allows for Commerce to reasonably estimate the percentage of German-language-labelled products sold to Prochamp's largest German customer, which may have then been sold downstream by this customer for retail consumption in another German-speaking country (*i.e.*, Austria).  Commerce also reconsidered the relative size of the German market accounting for potential Austrian consumption and finds that it does not conflict with the prior conclusion that Prochamp's shipments of merchandise consumed in Germany were significantly larger than the shipments of merchandise consumed in France (or Israel).  As a result, we have not altered our decision to use the prices of the foreign like product destined for the German market as the basis for normal value (NV), and we have made no changes to the margin calculations in the *Final Determination*.  Thus, the weighted-average dumping margin assigned to Prochamp continues to be 0.00 percent.

---

[4] *See Remand Opinion* at 20-21.

## II.    BACKGROUND

On March 31, 2022, Giorgio Foods, Inc. (the petitioner) filed with Commerce an antidumping duty petition concerning imports of mushrooms from the Netherlands.[5]  On April 20, 2022, Commerce initiated an LTFV investigation on mushrooms from the Netherlands.[6]  On May 17, 2022, following initiation, Commerce determined to individually examine Prochamp as one of the mandatory respondents in this investigation,[7] and on May 19, 2022, Commerce issued Prochamp the initial questionnaire.[8]

The Tariff Act of 1930, as amended (the Act), requires Commerce to compare the export price or constructed export price of the subject merchandise with the NV.[9]  Typically, NV will be the price at which subject merchandise is sold in the exporting country, *i.e.* the home market.[10]  However, under section 773(a)(1)(C)(ii) of the Act, Commerce will base NV on third-country market prices when, *inter alia*, Commerce determines that the home market is not viable, *i.e.* the aggregate volume of sales in the home market is less than five percent of the volume of U.S. sales.  When the home market is not viable, section 773(a)(1)(B)(ii) of the Act directs Commerce to base NV on prices in a third-country market if:  (1) prices in that market are representative; (2) the aggregate quantity (or, if quantity is not appropriate, value) of sales in the third-country market is five percent or more of the aggregate quantity (or value) of U.S. sales; and (3) no "particular market situation" exists that would prevent appropriate comparisons with U.S. prices.  To this end, Commerce, in its initial questionnaire, instructs the respondent to report whether there is a viable home market for the subject merchandise and, if there is not, to provide sales

---

[5] *See* Petitioner's Letter, "Petition for the Imposition of Antidumping Duties," dated March 31, 2022.
[6] *See Certain Preserved Mushrooms from France, the Netherlands, Poland, and Spain:  Initiation of Less-Than-Fair-Value Investigations*, 87 FR 24941 (April 27, 2022).
[7] *See* Memorandum, "Respondent Selection," dated May 17, 2022.
[8] *See* Commerce's Letter, "Request for Information," dated May 19, 2022 (Initial Questionnaire).
[9] *See generally* section 773 of the Act.
[10] *See* section 773(a)(1)(B)(i) of the Act.

information for the respondent's three largest third-country markets, provided each meets the five percent threshold.[11]

Where prices in more than one third-country market satisfy the requirements of section 773(a)(1)(B)(ii) of the Act, Commerce will generally select the third-country market on the basis of the following criteria set forth in 19 CFR 351.404(e):  (1) whether the foreign like product exported to a particular third-country market is more similar to the subject merchandise exported to the United States than the foreign like product exported to other third-country markets; (2) whether the volume of sales to a particular third-country market is larger than the volume of sales to other third-country markets; and (3) other factors that Commerce considers appropriate.

Information presented by Prochamp showed that it did not have a viable home market within the meaning of section 773(a)(1)(C) of the Act during the POI.[12]  Accordingly, Commerce determined it appropriate to base Prochamp's NV on its sale prices to a third-country market.[13] Further, Commerce determined that all of the third-country markets for which Prochamp provided sales information (*i.e.*, Germany, France, and Israel) met the requirements set forth in section 773(a)(1)(C) of the Act, in that the aggregate quantity of sales in each of these markets is at least five percent of the volume of sales of subject merchandise, and may serve as a basis for NV.[14]  Based on information provided to the record, Commerce determined that, when taken as a whole, the products shipped by Prochamp and consumed in Germany are sufficiently comparable to the products sold in the United States, and Germany provides the most robust data and most similar channel of distribution and customer type when compared to the French and Israeli

---

[11] *See* Initial Questionnaire at A-2.
[12] *See* Prochamp's Letter, "Submission of Prochamp B.V.'s Section A Response," dated June 21, 2022 (Prochamp's AQR).
[13] *See* section 773(a)(1)(B)(ii) of the Act; *see also* Memorandum, "Selection of Appropriate Third Country Market," dated August 26, 2022 at 4 (Third Country Selection Memorandum).
[14] *See* Third Country Selection Memorandum at 4.

markets.[15]  Commerce thus requested,[16] and Prochamp provided, information reflecting sales to the German market for the purposes of its comparison market "Section B" reporting throughout the investigation.[17]

Prior to the determination of the appropriate third-country market, Prochamp identified the method that it used to determine the relevant country for the purposes of reporting the quantity and value of sales "consumed" in each market, including the difficulties and presumptions involved due to the nature of the product and the operations of its customers.[18] Specifically, Prochamp noted that, because certain customers are large retailers which operate across national borders in the common European market (in particular, its largest customer in both the French and German market, [        ]), use of simply the customer's corporate address as listed on the invoice or the delivery address for each transaction as a basis for determining the market destination would not provide the most accurate account of where the merchandise was most likely consumed.[19]  For example, all sales to [        ], a German company, are invoiced to a German address and, as such, considered to be sales to a German customer for the purposes of Prochamp's internal recordkeeping.[20]  Moreover, while certain sales are shipped directly to the customer's warehouses in various markets, the majority are delivered to the customer's local distribution warehouse in the Netherlands from which the customer then distributes the merchandise downstream to its regional distribution warehouses or specific retail grocery

---

[15] *Id.* at 4-6.
[16] *See* Commerce's Letter, "Prochamp's Section B and C Supplemental Questionnaire," dated September 2, 2022.
[17] *See* Prochamp's Letter, "Submission of Prochamp B.V.'s Supplemental Sections B & C Response," dated September 23, 2022 (Prochamp's SBCQR).
[18] *See* Prochamp's Letter, "Submission of Prochamp B.V.'s Response to Supplemental Section A Questionnaire, Part Two," dated August 1, 2022 (Prochamp's SAQR2) at 2, 6, and 10; *see also* Prochamp's AQR at 3; and Prochamp's SBCQR at 7-9.
[19] *Id.*
[20] *Id.*  Third Country market identification methodology was reviewed at verification and detailed in Commerce's Memorandum, "Sales Verification of Prochamp B.V.," dated January 11, 2023 (Prochamp's Sales Verification Report), at 10-13.

locations all over the E.U., but Prochamp has no ability to determine actual delivery locations of the downstream distribution for retail sale.[21]  In addition, sales to the customer of identical mushroom products often differ only by the label applied to the product.[22]

Accordingly, two containers of mushroom products sold to one customer may reflect identical mushrooms in identical cans differing only by the label affixed, sold at the same price, to the same German customer (pursuant to the same underlying sales contract) and delivered to the customer's local distribution warehouse in the Netherlands.  From the perspective of Prochamp's internal recordkeeping, these simply reflect German sales (*i.e.*, sales of the same product with two different labels to a customer based in Germany and paid from that customer's German bank) but because the otherwise identical mushrooms are labeled with a German language label on one container and a French language label on the other container (and are ordered and invoiced based on the specific product codes given based on the label affixed to the product), the market of ultimate distribution/consumption may otherwise be reasonably inferred. As such, Prochamp noted that the best estimation of country of consumption could otherwise be derived from the language labelling of the product itself, with French-language labels presumed to be consumed in France, German-language labels presumed to be consumed in Germany, Italian-language labels presumed to be consumed in Italy, *etc.*[23]  Accordingly, Prochamp's reporting of the quantity and value totals for the purposes of third-country market selection at the outset of the investigation, and subsequent submission of Prochamp's German-market sales data, reflected the sales of German language labeled products.  Notably, sales to [    ] reflected approximately [  ] percent by quantity and [  ] percent by value of merchandise attributed to the

---

[21] *See* Prochamp's Sales Verification Report at 10-13.
[22] *Id.* at SVE-9 and SVE-10.
[23] *See*, *e.g.*, Prochamp's SAQR2 at 2, 6, and 10; Prochamp's AQR at 3; and Prochamp's SBCQR at 7-9.

French market, and approximately [   ] percent of merchandise reported in the German comparison market sales data by quantity and value.[24]

Commerce generally accepted Prochamp's methodology and statements to the record regarding market identification in the initial record-building stage of the investigation for the purpose of third-country market selection, generally verified the reporting to be consistent with the methodology described, and found Prochamp's market identification to be accurate and reasonable. Therefore, Commerce continued to find its selection of Germany as the appropriate third-country comparison market to be reasonably supported in its *Final Determination*.[25] However, though Commerce concluded that Prochamp's market identification methodology based predominantly on label languages to be generally accurate and reasonable, and found Prochamp to be fully cooperative, observations over the course of the investigation revealed certain limitations  in identifying the consumption market on the basis of label language, as recorded by the product label code in Prochamp's books and records.

First, at verification, Commerce observed that certain products with a product label code suffix "CH" were included in the German-market sales data due to German being the primary language on the label, but in fact reflected the Swiss country code and contained multiple languages and, as such, reflected Swiss consumption.[26] Such products were removed from the German-market sales data for the purposes of the *Final Determination*, and Commerce otherwise reviewed product labels of merchandise reported in the German-market sales data to all customers at verification and confirmed that the labels reflected primarily German language

---

[24] *See* Prochamp's SAQR2 at Exhibit A - 29.2 (Listing of Sales Orders for France Market); and Prochamp's November 29, 2022 "prochamptc03" comparison market sales database (prochamptc03).
[25] *See Final Determination* IDM at Comments 9 and 16.
[26] *See* Prochamp's Sales Verification Report at SVE-9.

labeling generally indicative of German-market consumption (or, at least, not suggestive of likely consumption in a market other than Germany).[27]

Second, sales of certain products to the largest customer, either delivered to the customer's local distribution warehouse in the Netherlands, or direct-shipped to Germany, which otherwise reflected a German-language label, were listed with a product code identifier in Prochamp's system identifying them with a "DE/AT" label code, implying that such sales could be distributed by the customer for ultimate consumption in retail locations either in Germany or Austria (shipping documents also indicated both German and Austrian country codes associated with the sale).[28]  Though all sales were to a German customer and shipped either to the local warehouse in the Netherlands or a warehouse located in Germany, and neither the internal code nor shipping documentation reflected that any such merchandise was definitively consumed outside of Germany, the existence of the combined DE/AT code strongly suggested that the customer treated the German and Austrian markets as a single German-language market for the purposes of its own distribution.  Commerce acknowledged that a conclusion could be reasonably made that at least some of the German total reported was comprised of an unspecified amount of Austrian-consumed merchandise.  However, Commerce did not find that the existence of information which suggested that the merchandise may be sold for retail consumption in Austria detracted from Commerce's initial third-country market selection nor the reliability of the German-market sales data subsequently submitted, stating the following in the *Final Determination*:

> Otherwise, we acknowledge that the German database contains sales of products which indicate on the face of their product descriptions, as well as other sales-specific documents, that they may be distributed to other German-speaking countries for final consumption, as well as a smaller amount of sales with multi-

---

[27] *See Final Determination* IDM at Comment 9; *see also* Prochamp Sales Verification Report at SVE-9.
[28] *See* Prochamp Sales Verification Report at 12 and SVE-10 and -11.

language labels, including German, which could be ultimately consumed in countries other than Germany. We note, however, that Prochamp has been forthcoming regarding its inability to identify the final destination of consumption regarding German labeled products sold to German customers and delivered to distribution warehouses between Germany and German-speaking parts of Europe, or otherwise. This issue has been identified on the record from early in the proceeding, and Prochamp has been cooperative with all requests in this regard. We verified Prochamp's statements to be accurate and, as discussed above, did not find information which contradicted the reporting or otherwise suggested that pinpointing the destination of final consumption to a greater degree of accuracy was possible. Notably, we did not find evidence that sales existed otherwise which could be attributable to likely German consumption and were not included in the database, nor – with the exception of the sales mentioned above which were removed – did we find instances of sales included in the third country database where the record suggested German consumption was unlikely or more likely in a non-German market. As such, Commerce finds that the third country database submitted, which consists entirely of sales to German customers of products containing German language on their labels, reflects the best possible effort that Prochamp could reasonably make to construct a database which includes all sales which indicate likely consumption in Germany. Further, there is no evidence which suggests that the any of the sales reported in the database were definitively consumed in a country, or even more likely to be consumed in a country, other than Germany.[29]

Both in the underlying record and in litigation, the petitioner argues that the record establishes a pattern of non-cooperation on behalf of Prochamp, which withheld information critical to the third-country market selection, resulting in the improper identification and selection of Germany as the comparison market.[30] The petitioner further alleges that such issues persisted to the extent that the third-country sales data are unusable for the calculation of NV and that application of facts available with an adverse inference with respect to comparison market sales reporting is warranted. Specifically, according to the petitioner: A) Prochamp provided inaccurate, inconsistent, and constantly changing information concerning sales volumes in its third-country markets; B) Prochamp either disregarded highly relevant information in its

---

[29] *See Final Determination* IDM at Comment 9.
[30] *See* Petitioner's Letter, "Petitioner's Affirmative Case Brief Regarding Prochamp, B.V.," dated January 26, 2023, at 40-52.

possession or provided incomplete information concerning its knowledge of the country of

consumption; C) the record establishes that various claims made by Prochamp regarding the

destination of its sales based on varying combinations of the customer's address, the port

destination, and the language on the label are false; and D) Prochamp's claim that it is not aware

of the ultimate destination is undermined by evidence on the record and not disclosed prior to

verification.[31]

On appeal, the petitioner challenged Commerce's *Final Determination* in two respects:

1) asserting the selection of Germany as the comparison market is not supported by substantial

evidence (citing Commerce's stated reluctance to reconsider third-country market selection at a

later stage of the investigation, the purportedly erroneous conclusion that slight difference in

product weights that supported using France as the comparison market did not outweigh the

significantly larger overall quantity of products sold in Germany, Commerce's reconsideration

and retraction of statements that similarities in sales channels and customers supported the

selection of Germany, as well as the inconclusive nature of the German-market sales data and

potential inclusion of sales not consumed in Germany);[32] and 2) challenging Commerce's

decision to decline to apply facts otherwise available with an adverse inference to Prochamp

(citing Prochamp's allegedly uncooperative actions and withholding of information with respect

to financial reporting and preparation of standalone financial statements, as well German-market

sales data reporting accuracy).[33]

In the *Remand Opinion*, with respect to the second argument, the Court concluded that

substantial evidence supports Commerce's determination not to use facts otherwise available as

---

[31] *Id.*
[32] *See Giorgio Foods, Inc. v. United States*, Court No. 23-00133, ECF No. 25, at 2-5 (CIT July 17, 2024).
[33] *Id.* at 6-8.

to its selection of the third-country market, and Prochamp's financial reporting, and sustained Commerce's final determination to calculate Prochamp's estimated weighted-average dumping margin from information submitted and not apply facts otherwise available with an adverse inference.[34]  Furthermore, with respect to the first argument, the Court also rejected the petitioner's arguments that Commerce's selection of Germany as the comparison third-country market is unsupported due to purported reluctance to reconsider third-country market selection at a later stage of the proceeding,[35] the conclusion that slight difference in product weights that supported using France as the comparison market did not outweigh the significantly larger overall quantity of products sold in Germany,[36] or Commerce's reconsideration and retraction of statements that similarities in sales channels and customers supported the selection of Germany.[37]  However, the *Remand Opinion* and *Remand Order* directed Commerce to reconsider its finding that Prochamp sold a significantly larger overall quantity of mushrooms in the German market than in the French or Israeli markets, as this conclusion is inconsistent with Commerce's acknowledgement that some quantity of the mushrooms sold in Germany was likely sold in another country.[38]  The Court concluded that "{a}bsent any better explanation, {Commerce} could not reasonably conclude that the Dutch company's exports to Germany were

---

[34] *See Remand Opinion* at 25.
[35] *Id.* at 15-16 ("the agency went ahead… and *did* reconsider that conclusion on the merits.").
[36] *Id.* at 16-17 ("Given that {Commerce} found that five of the six relevant characteristics were identical or nearly so, it apparently (and reasonably) concluded that *on balance* the products sold in all three markets were very similar."… Given that weight was only one of six relevant product characteristics, {Commerce} reasonably determined that the significantly larger volume of German sales—assuming for the moment the reliability of that data—more than offset the *overall* slight difference in product similarity that pointed toward using France as a comparison market.").
[37] *Id.* at 18, n. 13 ("As Commerce's balancing of product similarity versus sales volume was plainly dispositive, this asserted error was at most harmless.").
[38] *Id.* at 19-20 (citing, *e.g.*, *Fla. Gas Transmission Co. v. FERC*, 604 F.3d 636, 641 (D.C. Cir. 2010); and *OSI Pharms. LLC v. Apotex Inc.*, 939 F.3d 1375, 1382 (Fed. Cir. 2019) in support of the principle that mere speculation is not substantial evidence.).

'significantly' larger than those to France," and accordingly remanded this issue to Commerce for reconsideration.[39]

## III.    ANALYSIS

Commerce understands the *Remand Opinion* to require that Commerce reconcile its selection of Germany as the third-country market based on the volume of sales to the German market with record information suggesting that a least some portion of the German-market sales were "likely" distributed to other German-speaking countries for consumption.  In the *Final Determination*, Commerce reasoned that the record supported a presumption that the entirety of sales reported as German indeed reflected products consumed in Germany.  First, no information on the record allowed for the definitive conclusion that the sales with a product label identifier with a "DE/AT" code and shipping documentation suggesting the possibility that Prochamp's customer could distribute the products downstream to Austrian retail locations were *actually* sold outside Germany to retail locations in Austria.[40]  In other words, while the information supported that some subset *could* be distributed in Austria as well as Germany, no sales documents or knowledge otherwise available to Prochamp confirmed this to be the case for any specific sale.[41]  Moreover, all such sales information otherwise available reflected sales to a German customer, of a German-language label product, delivered either to the customer's local distribution warehouse or direct shipped to the customer's facility in Germany.  However, as the Court notes,

---

[39] *Id.* at 20-21.
[40] *See Final Determination* IDM at Comment 9.
[41] The Court identifies this treatment of all reported sales as German as an assumption which irreconcilably contradicts with Commerce's finding that the retailer "likely" resold the mushrooms in Germany *and* another country.  *See Remand Opinion* at 20.  While we do not disagree that this was, ultimately, an assumption, our intent in pointing to the record information which otherwise identified only German addresses and points of contact associated with the sales, including sales of products with the DE/AT product identifier, and identifying that no information otherwise suggested for actual Austrian distribution (*i.e.*, it was only the internal label code itself which suggested for this likelihood), was not to ignore the "likelihood" otherwise recognized, but rather an attempt to point to the record evidence to support that the assumption had a reasonable basis in the record.

some record information suggests that at least some subset of the merchandise sold to the German market might have been distributed by the retailer for retail consumption in the Austrian market.[42]  Thus, the most straightforward way to address the concerns identified by the Court is to quantify and account for the portion of the German market total which may reasonably reflect this heretofore unquantified amount of non-German consumed sales and evaluate whether Commerce's conclusions regarding Germany's relative advantage in size to other potential third-country markets remain supported with the non-German consumption accounted for and removed from the total.  The issue at the outset of this remand proceeding, however, is that while the record of the investigation contains information suggesting that at least some subset of the sales reported in the German market may be distributed by Prochamp's customer for downstream retail consumption in the Austrian market, the record  is devoid of information regarding the downstream distribution activities of the customer which could allow for any such quantification of this amount.  As such, Commerce re-opened and placed new factual information on the record for this purpose, and provided interested parties the opportunity to do the same.[43]  Specifically, Commerce noted:

> In its remand order, the Court remanded for further explanation Commerce's selection of Germany as the appropriate comparison market, in consideration of the information on the record that E&C could not know the actual number of German sales because orders with the German language label were delivered to a warehouse outside of Germany and could have been consumed in German-speaking countries other than Germany (specifically, sales to Prochamp's largest customer which were marked with the label "DE-AT" signaling that such sales could be destined for either Germany or Austria).  Thus, the Court found that {Commerce} could not reasonably conclude that Prochamp's exports to Germany were "significantly" larger than those to France.  Commerce is reopening the record for the narrow

---

[42] As noted in the *Final Determination,* the same concern could also arise for sales with French labeled cans where the assumption was that all such merchandise would be consumed in France, and not ultimately consumed in a different French-speaking market and, as discussed below, the limited information regarding the composition of the French market Q&V on the record indeed suggests that the similar assumptions were included in the initial reporting of French market volume.  *See Final Determination* IDM at Comment 16.

[43] *See* Memorandum, "Release of Factual Information," dated September 3, 2024 (Commerce's Remand NFI Memo).

purpose of addressing the remand concerns and specifically Judge Miller Baker's
statements regarding the German third country data being inclusive of at least some
sales which may have been consumed not in Germany. [44]

For this purpose, Commerce placed the following information on the record:

A)     Information regarding the number of retail stores operated by Prochamp's
       largest customer in both Austria and Germany.[45]
B)     Population data for Germany and Austria.[46]
C)     Publicly-available information regarding mushroom consumption in
       Germany and Austria.[47]
D)     Information regarding French-speaking populations outside France (to
       complement Attachment I to the *Remand Opinion* re: German-speaking
       areas outside Germany).[48]

In response, Prochamp submitted:

A)     Email communications between Prochamp and [    ], which identify the
       item numbers (which correspond to specific product codes reported) which
       were sold exclusively in Germany in the POR and those which were
       distributed "mainly" but not exclusively in the German market (*i.e.*, which
       could have been distributed outside of Germany).[49]
B)     Email communications between Prochamp and another customer
       [         ] identifying products distributed exclusively in Germany and
       products distributed in Germany and other German-speaking countries.[50]
C)     The website of its third customer reported in the German-market sales data,
       [    ], reflecting its countries of operation.[51]

The petitioner did not submit further information in response to the new factual

information which Commerce placed on the record.

---

[44] *Id.*
[45] *Id.* at Attachment 1.
[46] *Id.* at Attachment 2.
[47] *Id.* at Attachment 3.
[48] *Id.* at Attachment 4.
[49] *See* Prochamp's Letter, "New Factual Information Related to the Ultimate Destination of German Labelled
Merchandise," dated September 13, 2024 (Prochamp's NFI Memo), at Attachment 3 (Email communications with
[   ]) and Attachment 2 (identifying the product codes which reconcile the product item numbers referenced in the
email communications).
[50] *Id.* at Exhibit 5 (email communications between Prochamp and [         ]) and Exhibit 6 (the labels for
products sold by Prochamp to [     ]).
[51] *Id.* at Exhibit 7 (portions of [      ] website showing that [    ] operates only in [    ]
       ]) and Exhibit 8 (reflecting that German is not an official language of either [         ].

*Analysis of Information Submitted*

Information placed on the record allows Commerce to now quantify an approximate amount of the reported German-market total quantity and value of sales which can reasonably account for the record information, which suggests that some sales may "likely" be distributed to non-German, including Austrian, retail locations for ultimate consumption. The information placed on the record by Commerce reflects that the combined Austrian and German population of 92.156 million during the POI breaks down to 83.2 million Germans (90.28 percent) and 8.956 million Austrians (9.72 percent).[52] Total mushroom consumption of both countries reflects 175,179 metric tons (MT) consumed in 2021, breaking down to 157,000 MT consumed in Germany (89.62 percent) and 18,179 MT consumed in Austria (10.38 percent).[53] Lastly, of the 3,505 retail locations which Prochamp's largest German customer operates in both countries, Germany has 3,250 [    ] stores (92.72 percent) and Austria has 255 [    ] stores (7.28 percent).[54] For the sake of simplicity, and due to the high level of consistency between these figures, we read these together to reasonably support that the Austrian market portion of the total volume of mushrooms sold by Prochamp to [    ] to be approximately 10 percent of the total sales of German-labeled mushrooms. The German-market sales data (which reflects the same quantity of POI German market sales as reported in the Supplemental Section A response considered at the time of third-country market selection) reflects a total quantity of sales reported of [        ] kilograms (KG).[55] Within this total, we then identify the total quantity of sales to [    ] of [      ] KG, and reduce that total by the quantity of Swiss merchandise previously

---

[52] *See* Commerce's Remand NFI Memo at Attachment 2.
[53] *Id*. at Attachment 3.
[54] *Id*. at Attachment 1.
[55] *See* prochamptc03, also provided to the remand record at Exhibit 1 of Prochamp's Remand NFI Memo.

removed in the *Final Determination* ([      ] KG),[56] further reduce the [      ] sales total by 10

percent to account for the sales which may likely have been distributed for retail consumption to

Austria pursuant to the information discussed above (approximately [      ] KG, and add back in

the non-[      ] total otherwise reduced to remove the sales of the specific product identified on

the record of this remand which may have been inclusive of sales to [            ].[57]  This then nets

a German market consumption total of [      ] KG, which accounts and reasonably adjusts for

record information suggesting for the potential of non-German consumption.[58]

      The French market quantity total as reported at the time of third country selection

([      ] KG) reflected [   ] percent of the German total by quantity.[59]  When compared to the

revised total quantity of German sales discussed immediately above (*i.e.*, reduced to account for

to the [      ] sales of Swiss-labeled products, the potential amount of [      ] Austrian

distribution, and [

           ]), the reported French market total reflects [   ] percent of the German

market total by quantity.[60]  Accordingly, upon accounting for all potential non-German

consumption identified on the record, the French market remains only approximately [

] the size of the German market for Prochamp, without accounting for consumption of

French-labeled merchandise outside of France.  We do not find that an approximately [      ]

percent relative decrease to the German total found to be "significantly" larger than France in the

---

[56] *See Final Determination* IDM at Comment 9; *see also* Prochamp's Final Analysis Memo.
[57] *See* Prochamp's NFI Memo at Exhibit 5, where Prochamp's customer, [            ] identifies that [

      ].  The sales database reflects only a few sales of this product during the POI totaling [      ] KG of a
[      ] Euro value.
[58] For further detail of the calculations discussed throughout this section, *see* Memorandum, "Third Country
Consumption Analysis Memorandum," dated October 7, 2024 (Third Country Consumption Analysis Memo), at
Attachment.
[59] *See* Prochamp's SAQR2 at Exhibit A-15.
[60] *See* Third Country Consumption Analysis Memo.

underlying third country selection determination supports a reconsideration of that finding.  This analysis, which reflects a German market at least [          ] larger in a relative sense and reflecting [                    ] more kilograms exported in absolute volume when compared to an unadjusted and unscrutinized French market total reported initially (*see* discussion below), continues to be significantly larger than the French market with potential non-German sales taken into account.

Furthermore, we note that the analysis above reflects conservative presumptions which likely overstate the amount of Austrian [                ] sales presumed "likely" in the total German-market sales volume used in the selection of the comparison market, as this analysis applies the 10 percent presumption to <u>all</u> of Prochamp's German language label sales to [      ], without applying the presumption only to the sales for which the product descriptions include the "DE-AT" notation nor contending with the information that Prochamp placed on the record which suggests that the specific products potentially sold in Austria were restricted to an even narrower subset of  the merchandise sold by Prochamp to [      ].[61]  Furthermore, the above analysis conservatively presumes that <u>all</u> sales of [


].[62]

Moreover, the analysis reflects a comparison of German-market sales information verified and scrutinized (with Swiss [      ] sales excluded, potential Austrian consumption within the [      ] total accounted for, and potential [          ] consumption within the [          ] total excluded) compared to a French total submitted early in the proceeding and

---

[61] *See* Prochamp's NFI Memo at Exhibit 3; and Third Country Consumption Analysis Memo at Attachment.
[62] *See* Prochamp's NFI Memo at Exhibit 5; and Third Country Consumption Analysis Memo at Attachment.

which has encountered no such comparable scrutiny of its constituent transactions.  Indeed, a cursory analysis of sales order information provided to support the French total reported prior to the third-country market selection in the early stages of the investigation reflects that the French market total is inclusive of:  A) sales with an "NL/BE" market/language label (indicating likely consumption outside of France in French-speaking areas of Belgium and the Netherlands); and B) sales to a company with the acronym SAM as a suffix, indicating that it is incorporated as a Société Anonyme Monégasque (*i.e.*, sales of French-labeled products to a Monaco-based company, not a French company).  Furthermore, sales support information reflects that its largest sales of subject merchandise to France were to French Overseas Territories,[63] and unlikely to have been consumed in mainland France itself.[64]  As such, the record of both the underlying

---

[63] *See* Prochamp's Letter, "Submission of Prochamp B.V.'s Response to Supplemental Section A Questionnaire, Part Two," dated August 1, 2022 (SSAQR2), at Exhibit A - 29.2 (Listing of Sales Orders for France Market) and 28.2 (5 Highest Invoices for Sales to France).

[64] With respect to the latter information, Commerce takes no position as to whether or not sales distributed to a specific French Overseas Territory should or should not be considered "French" market consumption, but notes this only to further identify that the ability to disambiguate "consumption" is complex in this case, regardless of the market selected.  As such, we continue to find that Prochamp's use of language labelling reflected the best available information to determine consumption generally and, even where certain issues were identified subsequently, remained a reasonable and well-supported proxy for consumption throughout this proceeding particularly given that the appropriate third country market must necessarily be determined early in a case.  *See Certain Oil Country Tubular Goods from Saudi Arabia:  Final Determination of Sales at Less Than Fair Value*, 79 FR 41986 (July 18, 2014), and accompanying IDM at Comment 2 (establishing that Commerce must necessarily identify a viable and appropriate third country as a concrete basis for normal value early in a proceeding and detailing the its rationale to not subsequently revisit the initial viability determination regardless of whether some, all, or no sales are subsequently determined to be usable in the calculation of normal value); *see also Notice of Final Determination of Sales at Less Than Fair Value:  Bottle-Grade Polyethylene Terephthalate (PET) Resin from Indonesia*, 70 FR 13456 (March 21, 2005), and accompanying IDM at Comment 11 ("We disagree with the petitioner that {Commerce} should revisit its market viability determination, as a matter of policy, after completing its analysis of the comments received at the time of the final determination.  The decision of which comparison market to use is normally made at an early stage in an investigation in order 'that respondents can provide the necessary sales information and {Commerce} can meet its statutory deadlines.  If issues decided in the course of the case *e.g.*, date of sale, cause the viability of the comparison market to change, it is simply too late to request, analyze and verify another database.'" (citing *Antidumping Duties; Countervailing Duties; Proposed Rule*, 61 FR 7307, 7334 (February 27, 1996)).  *See Final Results of Redetermination Pursuant to Court Remand, Stupp Corporation et al. v. United States*, Consol. Court No. 15-00334, Slip Op. 19-134, dated January 14, 2020, in response to *Stupp Corporation et al. v. United States*, Consol. Court No. 15-00334, Slip Op. 19-134 (CIT 2019); and *Final Results of Redetermination Pursuant to Court Remand, Stupp Corporation et al. v. United States*, Consol. Court No. 15-00334, Slip Op. 19-2, dated May 2, 2019, in response to *Stupp Corporation et al. v. United States*, Consol. Court No. 15- 00334, Slip Op. 19-2 (CIT 2019).

investigation and the new information provided on the remand record indicates that the

identifiable volume of Prochamp's sales to the German market, relative to its sales to the French

market, is equal to, if not increased from, what Commerce estimated from the record evidence at

the time of the selection of the third-country market.  This is the case even when accounting for

potential Austrian and [          ] sales discussed herein, were the French market total reported

to be given the same level of scrutiny.  Finally, we note that the revised German market

consumption quantity of [          ] KG remains nearly double that of the [          ] KG

reported for Israel (the third largest non-U.S. market reported by Prochamp, but for which no

party advocated for selection as the appropriate third country comparison market in the

investigation).  This similarly continues to support Commerce's underlying conclusion that the

German market is significantly larger than the Israeli market.[65]

## IV.    INTERESTED PARTY COMMENTS

Commerce released its draft results of redetermination on October 7, 2024, in which we

provided interested parties the opportunity to submit comment for consideration in these final

results of redetermination.[66]  Prochamp and the petitioner submitted timely comments on the

Draft Redetermination on October 19, 2024.[67]  Prochamp's Comments indicated support for the

Draft Redetermination, concluding that "Commerce's Draft Remand Results provide a more

comprehensive explanation for its selection of Germany as Prochamp's third-country comparison

market.  Accordingly, Commerce's Draft Remand Results fully comply with the Court's Order,

---

[65] *See* Prochamp's SAQR2 at Exhibit A-15; *see also* Third Country Consumption Analysis Memo at Attachment.
[66] *See* Draft Results of Redetermination Pursuant to Court Remand, *Giorgio Foods, Inc. v. United States,* Court No. 23-00133, Slip Op. 24-79 (CIT July 17, 2024), dated October 7, 2024 (Draft Redetermination).  The Third Country Consumption Analysis Memo accompanied release of the Draft Redetermination.
[67] *See* Prochamp's Letter, "Certain Preserved Mushrooms from Netherlands: Comments on Draft Remand Results," dated October 18, 2024 (Prochamp's Comments); and Petitioner's Letter, "Certain Preserved Mushrooms from the Netherlands – Petitioner's Comments on Draft Redetermination Pursuant to Court Remand," dated October 18, 2024 (Petitioner's Comments).

are supported by substantial evidence and are otherwise in accordance with law," and otherwise identified no substantive issues for Commerce to address.[68]  In providing substantive comment in opposition to the findings in the Draft Redetermination, the petitioner asserts that:  (1) the "draft redetermination fails to address the issue remanded by the Court – and continues to rely on speculation instead of facts that are specifically relevant to the sales activities of respondent {Prochamp}"; (2) "the agency's draft remand is unlawful";[69] and (3) Commerce should request an additional extension of time to submit its final results of redetermination, and instruct Prochamp to submit a French sales data.[70]

After considering these comments, we disagree with the petitioner that the Draft Redetermination fails to address the issue remanded by the Court, and have made no changes to the Draft Redetermination.  We summarize and address the petitioner's comments below.

**Comment 1:   Whether Information Relied upon is Inconclusive and Irrelevant and Fails to Remedy the Fundamental Issue Remanded by the Court**

The petitioner did not provide the requested executive summary regarding its comments on the Draft Redetermination.  Accordingly, the petitioner's arguments may be found at pages 2 through 6 of its comments.[71]

**Commerce's Position:**

We disagree with the petitioner.  The Draft Redetermination did note that the record does not contain information which allows for precise quantification of downstream distribution activities of Prochamp's unaffiliated customer, [      ].  However, identification of this purported "flaw" sets up a strawman which ignores the critical fact that the central issue is not Prochamp's sales activities, but those of its unaffiliated customer and that customer's downstream sales

---

[68] *See* Prochamp's Comments at 3.
[69] *See* Petitioner's Comments at 1-2.
[70] *Id.* at 9.
[71] *Id*. at 2-6.

activities.  While Prochamp does not have specific knowledge of [      ]'s distribution activities

to [      ] own downstream locations, that type of information is maintained by [      ], the

respondent's unaffiliated customer.  Commerce maintains no expectation that respondents have

access to details of their unaffiliated customers' downstream distribution operations.  Thus, in

this investigation, Commerce could not expect that Prochamp would know how [      ]

distributes the mushrooms that it purchased from Prochamp to its retail stores to the level of

detail which can reasonably pinpoint likely market of final sale for consumption because that

information was not known to Prochamp in the normal course of business and unlikely to be

obtained to the record by Prochamp, much less at the early stages of the proceeding prior to the

comparison market selection decision.

　　　　Without knowing exactly where each sale was ultimately consumed, Prochamp's

methodology for reporting third-country market sales used a combination of customer address,

language-labelling, and product coding as the best proxy for the country of consumption.

Indeed, more standard methods such as customer address or shipping destination would have

been even less precise to determine the appropriate third-country market.  For example, if only

customer address was used, the third-country market would have been Germany, because all

sales would have been to the German [      ] customer regardless of language label, despite

record evidence plainly demonstrating that final consumption would have been outside of

Germany.  Similarly, if shipping destination had been used, the fact that [      ] used a local

warehouse in the Netherlands would have resulted in finding that Prochamp had a viable home

market despite the record evidence suggesting that those sales would not have been consumed in

the Dutch market.  In other words, Prochamp identified language-labeling as the best proxy for

consumption early in the investigation and prior to the third country selection decision as an

attempt to acknowledge and address precisely the issues identified by the petitioner over the course of the investigation and litigation.

Still, the petitioner equates the fact that the record lacks Prochamp's *unaffiliated customer's* downstream distribution and sales information with an impermissible flaw in Prochamp's underlying reporting and Commerce's subsequent analysis and determination—a flaw which would exist for the record information for the French market as well. Based on this false equivalency, the petitioner argues that Commerce's finding that Germany is the appropriate third-country market is unsupported and that Commerce, to satisfy the Court's concerns, must necessarily make a finding that the German market is not usable and select France as the comparison market in the alternative. The petitioner reasons that the lack of Prochamp's unaffiliated customer's downstream distribution and sales information created an impermissible gap in part due to Commerce's choice to not request this information ("agency chose not to collect such relevant information from Prochamp directly").[72]

In so arguing, the petitioner effectively is setting a standard where any alternative explanation or information relied upon, other than the precise information of a customer's downstream distribution and sales information, is impermissible and thus compels the petitioner's desired result, even if the same information is equally not available for sales to the alternative French market. However, by conflating Commerce's request for *Prochamp's* sales activities with a request for Prochamp's *customer's* downstream distribution and sales activities, the petitioner incorrectly suggests that such information was, and is, reasonably available, and as a result should have been expected to have been provided at the time of third country selection. In supporting this position, the petitioner repeatedly mischaracterizes the purportedly critical

---

[72] *See* Petitioner's Comments at 2.

information as evidence related to "Prochamp's sales activities,"[73] "{information related to the} mix of Prochamp's sales marked with German and Austrian product code"[74] and "record evidence relevant to Prochamp's sales,"[75] again obscuring the fact that any such information referenced is not Prochamp's own sales information, which the record otherwise contains, in full, but sales information for the unaffiliated customer which would only be available to that unaffiliated customer.[76]

Among other issues, the petitioner's arguments equate to an expectation that Commerce should have brought to bear the full *post hoc* comprehension of the record of the investigation in applying scrutiny to the record as it existed at the time of the selection of the viable, third-country comparison market, whereby it could have identified the size of the German market vis-à-vis other third-country markets based on information not typically available at the time but submitted by Prochamp to explain and further substantiate its identification of the market of consumption. We disagree that the record as further developed as a result of this remand proceeding supports any such conclusion, and thus the record available to Commerce at the

---

[73] *Id.*

[74] *Id.* at 3.  It is unclear what information Commerce or Prochamp could have further placed on the record to address this, nor what gap exists at present regarding the mix of Prochamp's sales to [    ] of the two products with a "DE/AT" country code in the product description.  All such sales data regarding the sale of the products by Prochamp to [    ] is contained on the record.  The record is clear that Prochamp has label coding designated with a DE/AT tag which identifies a German language labeled product for its largest German customer and ships products with this label to either the customer's locations in Germany or the customer's local distribution warehouses in the Netherlands.  The record contains complete information regarding the "mix" of sales executed by Prochamp and its customer.  Again, the record lacks information regarding how the unaffiliated customer then distributes these products downstream in Germany or Austria, which is a commercial choice of the customer, not Prochamp.

[75] *Id.* at 5.

[76] Imprecise characterization detracts from the petitioner's comments elsewhere.  For example, the petitioner states that "reported *sales* may be sold to Germany or Austria with no way of determining which sales are made in either country".  *Id.* at 5.  However, this is flatly incorrect:  all sales are made to German customers and delivered to locations in Germany or to [    ]'s local distribution warehouse.  This fact is not disputed.  The central question involves downstream distribution and final consumption of sales executed to the German customer.  There are no sales "sold to" Austria in question.  If the question simply involved disambiguating sales made to German customers, invoiced to German addresses, delivered in Germany or to a local warehouse operated by the German customer, of German language labeled mushrooms, from sales made to Austrian customers or delivered to Austria, there is no issue to resolve.

beginning of the investigation certainly did not compel such scrutiny or lead to the conclusion

the petitioner asserts.  Indeed, the instant record was atypical in that it contained an unusually

large amount of information regarding sales in potential third country comparison markets at the

time of selection resulting from the identification of this consumption issue early and

Prochamp's fulsome responses regarding questions addressing this issue and the market

identification methodology used.

      The selection of the third-country comparison market typically relies on quantity and

value worksheets tallying market sales totals with some reconciliation to relevant export sales

accounts, as appropriate, informed in certain cases by further supplemental responses with

respect to the products sold in the comparison markets.  However, the information which allows

the petitioner to argue that potential non-German sales for consumption may have been included

within the reported German market total (*i.e.*, language label codes, product codes, screenprints

of actual labels, transportation documents, *etc.*) and that information should have been taken into

consideration at the time of the decision to select Germany as the comparison market, is possible

only because of Prochamp's fulsome responses to questions in support of the methodology it

used to disambiguate the market of likely sale for consumption.

      The petitioner's argument takes for granted that any such information was available on

the record at the time to identify the opacity of consumption, and with the full benefit of the

record as further developed, including explanations which further illuminated the record with

respect to Prochamp's level of knowledge of its unaffiliated customer's downstream distribution.

We have taken certain observations gained by the later understanding of the record into account,

to the extent appropriate to address the concerns of the Court in consideration of whether facts

were observable and could have been considered at the time of third-country comparison market

selection.  However, we note that the petitioner's arguments, generally, advocate for an

unrealistic standard whereby Commerce is expected to identify potential issues immediately,

deduce the potential impact from limited information, make presumptions based on

hypotheticals, and hold respondents to a standard whereby they must either fully substantiate

final market of sale for consumption with a customer's information they cannot reasonably be

expected to obtain, otherwise Commerce will determine the market ineligible for selection as the

appropriate comparison country if any record information contains a suggestion of potential

consumption outside that primary market.  Following the petitioner's logic, in the instant

investigation, no information or explanation could ever have been provided to sufficiently

address the Court's concerns, even as part of this redetermination which is far removed from the

time Commerce must select the comparison market in the underlying investigation, short of that

which relies on specific information which cannot reasonably be obtained (for any of

Prochamp's third-country markets, including Germany, France, or Israel) and, thus, the only

permissible conclusion is to find the German market unusable, and to find France usable with the

same gaps in the record information.

Thus, we fundamentally disagree with this characterization of the record and of the

petitioner's interpretation of the *Remand Order* and *Remand Opinion*.  Commerce does not

interpret the Court's *Remand Order* as holding that the only permissible avenue to allow

Commerce to further support its conclusion regarding the substantially larger nature of the

German market required consideration of only transaction-specific information from Prochamp's

customer identifying market consumption of its customers.  Indeed, the Court only instructed

that Commerce reconcile the conclusion that "Prochamp's 'significantly larger overall quantity'

of sales in Germany for consumption 'outweigh{ed}' the 'slight difference' in product similarity

that otherwise pointed toward using France," holding that "{a}bsent any better explanation, {Commerce} could not reasonably conclude that the Dutch company's exports to Germany were 'significantly' larger than those to France."[77]

The Court does not identify specific information required as support for Commerce's determination. Thus, Commerce understands the Court's *Remand Order* as requiring that Commerce reasonably explain why it determined the German market to be significantly larger than that of France, when some portion of the German sales could have been ultimately consumed in Austria, which Commerce acknowledged but did not fully analyze in selecting Germany.

For that purpose, we provided information to the record which further supports the underlying conclusion and reasonably accounts for potential third country consumption.[78] This information consists of country population data, mushroom consumption data, and the number of [    ] retail stores in the German and Austrian market to allow for a reasonable estimate of the amount of sales identified as consumed in the German market for the purposes of Commerce's initial third country selection determination which may have been distributed and consumed in the Austrian market.[79] We then used the resulting 10 percent estimate to adjust the German quantity totals used for the purpose of third country selection to determine whether – accounting for the reasonable estimate of constituent transactions which may reflect potential non-German consumption – Commerce's initial conclusion regarding the significantly larger size of the German market over the French alternative remains supported, and confirmed that this conclusion indeed remains supported.[80]

---

[77] *See Remand Opinion* at 20-21.
[78] *See* Remand NFI Memo.
[79] *Id.*
[80] *See* Part III. Analysis, above; *see also* Third Country Consumption Analysis Memo.

Notably, the petitioner identifies no actual flaw in the calculation or application of our analysis, does not contend that use of any inference supporting the conclusion is unreasonable or lacks support, nor claims that the 10 percent presumption used fails to provide a reasonable estimate of potential Austrian consumption, nor that the conclusion that the German market total less 10 percent to account for potential Austrian consumption remains significantly larger than the volume of the French market is unreasonable.  Rather, the petitioner dismisses the analysis merely because it is not based on specific sales information by Prochamp's unaffiliated customers.  However, as noted above, there is no reasonable basis to expect that Prochamp (or Commerce) would have access to any such information that could unequivocally determine whether merchandise was distributed downstream for sale for consumption to Austria and, if so, the actual amount of sales for consumption in Austria, much less at the time of comparison market selection.[81]  As such, Commerce employed a reasonable solution to address the Court's concerns, *i.e.*, to utilize information in the public domain which might reasonably estimate the volume of Austrian consumption "baked-in" to the German market total to then determine whether Commerce's conclusion regarding the relative significance of the German market compared to the French market remained supported once accounting for this information.  We maintain that this information and analysis is sufficient to address the *Remand Opinion* and *Remand Order*.

---

[81] Even if precise information from [    ] regarding how it distributes mushrooms downstream to retail locations were available, because the mushrooms are delivered to distribution warehouses, distributed in partial amounts from the amount delivered and potentially co-mingled, it is unlikely this information could be disambiguated in a sales database such that it would reflect only German consumption of each reported transaction.  Thus, detailed information from [    ] would serve only to provide a more precise figure with respect to the amount of sales to be removed to account for Austrian consumption, but could only be used for the same purpose.  Thus, as the petitioner fails to argue that Commerce's estimate reflects an unreasonable proxy for the customer's actual distribution activities, it fails to substantiate how use of such a proxy reflects an irrelevant and inconclusive alternative to information which would be used for the same purpose.

With respect to the petitioner's assertions that the information submitted on the remand record by Prochamp is wholly inconclusive or raises notable further concerns not already addressed, we disagree.  Regarding the sales to [          ], and that customer's indication in correspondence (wherein Prochamp requested further detail regarding downstream distribution markets) that certain sales of [     ] branded mushrooms could be sold downstream to Slovenia,[82] we conservatively accounted for this information in our analysis.  The petitioner suggests that this reflects even further evidence of the inaccuracy of final consumption market identification further suggesting that the German comparison market is unusable.  However, we do not find that this statement raises significantly greater concern that the German market contains a potentially greater amount of sales for consumption in non-German markets not previously considered.  The quantity of the affected transactions is small and accounted for conservatively in our analysis, and the identification of this potential by this one relatively minor customer is mitigated otherwise by responses from [     ], discussed below, which reflects that the proportion of [     ] "DE/AT" product sales distributed downstream and potentially sold outside of Germany may be considerably smaller than Commerce's analysis presumes.

Moreover, [          ]'s statement merely serves to reinforce that the details regarding Prochamp's unaffiliated customers' distribution activities are not generally communicated to Prochamp or known to the respondent in the normal course of business.  Indeed, the correspondence suggests that, up to the point where Prochamp queried its customer for the purposes of this remand segment regarding downstream distribution of products sold during the POI over three years after such transactions took place, it had no knowledge, nor reason to suspect that German language labeled mushroom products to a German customer and shipped to

---

[82] *See* Prochamp's NFI Memo at Exhibit 5.

the customer's location in Germany would be consumed in a non-German market.  This supports

that Prochamp made its best effort to identify German consumption in the initial stages of the

investigation and could not be expected to reasonably provide more accurate information of its

customers' distribution activities not known in the normal course of business.

The petitioner also dismisses the [      ] correspondence provided to the record by

Prochamp as merely "confirm{ing} that Prochamp's reported sales… include sales for

consumption in countries other than Germany."  It is important, however, to contextualize the

correspondence.  No one disagrees that some merchandise with the "DE/AT" label was sold

outside of Germany.  We summarize [      ]'s correspondence in terms of specific products

reported in the following table:

| Sales of [   ] Products | | | | | | |
|---|---|---|---|---|---|---|
| Product Label Code | Product Description | CONNUM | Total QTYU Sold | % Total [   ] Quantity | [   ] Identifier | Prochamp NFI Exhibit 3 |
| [ | | | | | | ] |
| [ | | | | | | ] |
| [ | | | | | | ] |
| [ | | | | | | ] |

*See* Prochamp's NFI Submission at Exhibit 3

To the extent this information "confirms" non-German consumption it does so only by

indicating that sales of one product, which reflected a small fraction of total volume of German

sales reported, was distributed [                                        ].[83]  Granting that the

word [          ] reflects an unambiguous indication that a minority of sales of a product were

distributed to Austria, this acknowledgement pertains to only one product with a "DE/AT"

product label coding reflecting [     ] percent of the sales database.

---

[83] *See* Prochamp Remand NFI Memo at Exhibit 3.

Furthermore, if the petitioner impliedly takes [      ]'s response at face value to indicate conclusively non-German sale for consumption of that product, in part, it must apply that same reading of the plain language for the remainder of the responses provided by [      ] for the other products, which each indicated they were sold for consumption "[                    ]" and provided no indication or inference otherwise of non-German distribution or sale for consumption.  This evidence then plainly indicates that for all other constituent transactions, comprising over 98 percent of the German market total sales volume reported for the purpose of third country selection, [      ] confirmed the sales were "[                    ]" and properly attributed to the German market.  Critically, this includes the DE/AT labeled product which comprises the vast majority of [      ]'s German sales database, and does so with information provided directly from [      ], consistent with the petitioner's own standard.  Thus, to accept that the [      ] correspondence definitively indicates non-German distribution and consumption of one DE/AT labeled product, necessarily accepts that [      ]'s responses for each product otherwise are also accurate and unambiguous.

Commerce notes that the statements provided by [      ] are brief and could not serve as definitive indicators of final distribution/consumption if they were the only information on the record.  However, to the extent that the petitioner dismisses this correspondence because of language stating that one product was "mainly" intended for Germany, that conclusion would have to be taken together with the other language clearly stating that the other product codes were intended only for Germany, as the correspondence indicates.  Under that reasoning, [      ]'s response in Exhibit 3 of its NFI submission otherwise unambiguously confirms that over 99 percent of Prochamp's sales to [      ] are consumed in Germany.  Accordingly, direct evidence provided by the customer reflects that non-German consumption in Austria for DE/AT

labeled sales is miniscule, and Commerce's 10 percent adjustment used in the Draft

Redetermination likely overstated the potential Austrian consumption.  Thus, substantial

evidence supports Commerce's conclusion that the German market is substantially larger than

the French market.

**Comment 2:   Whether Record Information Supports Selection of France as the
Appropriate Comparison Market and Whether Commerce's Statements
Regarding Potential Issues with French Sales Information Improperly
Disparaged France Without Record Support**

The petitioner did not provide the requested executive summary regarding its comments on the
Draft Redetermination.  Accordingly, the petitioner's arguments may be found at pages 7
through 8 of its comments.[84]

**Commerce's Position:**

We disagree with the petitioner.  The petitioner mischaracterizes our statements regarding

the French sales order data and invoices and labels provided for the French market submitted to

the record prior to the third country selection determination, which noted that similar issues with

respect to precise identification of final consumption market identified by the petitioner with

respect to German market information could also be observed in the French market information.

Observations regarding *potential* issues flagged by the limited French sales order information

(and handful of accompanying invoices) on the record are not made to "disparage" a hypothetical

French dataset but, as plainly stated, serve only to identify the challenges in identifying final sale

for consumption in either comparison country, given the nature of the product (a canned food

product), the customers and sales channel involved (large supermarket chains with many levels

of warehousing and distribution), and the potential comparison markets in question (large

economies in the E.U. common market with open, contiguous, borders with other markets which

share the same primary language, all of which contain the same customer's downstream retail

---

[84] *See* Petitioner's Comments at 7-8.

stores).  The petitioner states that these observations cannot be used to infer any definitive conclusions with respect to whether or not the French market total reported (and any hypothetical sales database later submitted) would or would not contain similar issues with respect to market of sale for consumption identification, as no such market was selected, and thus further scrutiny cannot be applied and the observations remain speculative.

Here too the petitioner's logic ignores the proper context that must be applied, *i.e.*, the record at the time of the comparison market selection decision.  Limited information from either market was available at the time (though Prochamp submitted an initial German section B database pending the decision, this database was not yet revised to reflect the third-country market identification methodology later applied), and comparative information generally limited to information provided in the SSAQR2 Exhibits A-28 and A-29, and which contained equivalent information for each country.  At the time Commerce made its selection, it also made reasonable presumptions and observations with respect to the information provided for each country by the time of that decision.

As an initial matter, Commerce's analysis and further explanation in support of the conclusions regarding the relative advantage of the German market, over the French market in terms of quantity, are not reliant on Commerce's observations otherwise regarding transactions attributable to French market consumption.  Even if the reported French sales quantity and value perfectly matches actual volume of sales for consumption in France, the decision to select Germany as the comparison market due to is relative size was appropriate at the time of selection and remains appropriate in consideration of the further developed record and remand record. Our revised analysis determined that the conservatively adjusted German total remained substantially larger that the French total which was conservatively applied as reported.

The petitioner's arguments generally appear to be inconsistent in that the petitioner argues that certain sales can be attributed to France because purchase orders indicate that the sales were intended for France, even though further record evidence demonstrates those sales were actually consumed in other French-speaking areas, but with respect to German sales under identical conditions, the petitioner argues that Commerce cannot assume those sales were consumed in Germany.  With respect to statements Commerce made in the Draft Redetermination on whether certain sales were to mainland France, the petitioner stated that "the agency has not identified any evidence that such sales may have been consumed in France despite the fact the company is located in Monaco" and {for sales to a company in New Caledonia} "the record does not in fact indicate these sales were not consumed in mainland France."[85]  The petitioner further argues that mainland French consumption should be presumed for these sales because the purchase order database "consistently reported these companies' country ("Customer Country") as "France" and the port of destination country as "France."[86]  Accepting this logic, it is not then clear why transactions reported as attributable to the German market, to a German customer, delivered to Germany (or to a local warehouse of the German customer), with a German language label, with no direct evidence[87] on the record that the sales

---

[85] This statement is directly contradicted by the record.  Both invoices provided to the record for such sales in the SSAQR2 at Exhibit 28 specifies that such products are to be delivered by ocean freight shipment to "NOUMEA Nieuw-Caledonië" and the label information also provided reflects English, French, Greek, German, and Italian. Even if sales to French Overseas Territories properly classify as French consumption, all direct evidence supports consumption outside mainland France, regardless of the customer or port of destination country otherwise listed.
[86] *See* Petitioner's Comments at 8.
[87] The DE/AT product coding of certain products may suggest for the possibility that such products could have been consumed in Austria but otherwise identifies the customer country and port of destination as Germany.  Despite this, the petitioner argues that Commerce cannot presume those sales were consumed in Germany.  Yet, with respect to French sales, the petitioner argues that certain sales suggesting a non-mainland-France customer location or delivery address on the face of the invoice serves as inadequate basis to presume consumption outside of mainland France where the purchase order database otherwise identified the customer country and port of destination country as France.  If the petitioner's logic is to be applied consistently, then mere indication of the AT in the "DE/AT" country label code similarly would not serve as any such definitive evidence to suggest against German-market classification where Prochamp otherwise identified the customer country and port of destination country as Germany.

were not consumed in Germany, served as an appropriate basis to conclude the German market total was incorrectly identified.[88]  Thus, the petitioner suggests Commerce should apply a different interpretive framework and draw different conclusions for similar types of evidence regarding the French and German markets.

The petitioner then states that other French-market transactions for which transaction-specific information detail was provided in Exhibit 28 of the SSAQR to customer [                ] were properly reported as France.  The petitioner asserts that all evidence on the record reflects that this reporting is correct, as the customer country and delivery location are reported as France in the purchase order database at Exhibit 29.2, and this is consistent with the information on the face of the invoice provided in Exhibit 28.2.  However, the relevance of these [                ] sales is unclear, because Commerce did not identify any potential issues with the reporting of these sales in the Draft Redetermination.  Yet, even here, the record with respect to [                ] sales is not unambiguous.  Specifically, though the sales invoice reflects the customer and delivery address in France, the label itself for the [                ]-branded products is equal parts French and German and lists both [                ]'s French and German corporate addresses as contact information on the label, thus suggesting the downstream distribution of these products by [                ] could, potentially, involve final retail sale for

---

[88] In this way, if the accuracy of Prochamp's initial reporting is given the same deference the petitioner proposes be extended to the French market identification, the CH label description sales later removed from the third country sales database based on evidence that such sales were intended for the Swiss market and Slovenian sales removed based on the [          ] statement on remand did not, by mere virtue of the country code identified on the product code itself or the customer's *post hoc* statement not known to Prochamp at the time, reflect compelling evidence that such transactions should be removed from the German market total for the purpose of third country selection, since such transactions were reported with country and port of delivery as Germany.  Nevertheless, Commerce's analysis on remand conservatively removed or adjusted for all sales reported in the comparison database which identified non-German consumption or the likelihood thereof for the purpose of assessing whether the German market total quantity remained substantially larger than that of the French market total.

consumption in Germany (though the existing record fully supports that Prochamp attributed these sales to the correct market based on information available).

### Comment 3:   Whether Commerce Should Select France as the Comparison Market and Instruct Prochamp to Submit French Sales Data

The petitioner did not provide the requested executive summary regarding its comments on the Draft Redetermination.  Accordingly, the petitioner's arguments may be found at pages 6 through 7 and page 9, of its comments.[89]

**Commerce's Position:**

We disagree that the Court's *Remand Opinion* and *Order* require Commerce to request Prochamp's French sales database.  As noted above, the Court remanded Commerce's third-country market determination based on Commerce's conclusion that the German market volume was substantially higher than the other potential third-country markets, despite evidence indicating that some of those sales were consumed in Austria, and instructed Commerce to further explain this finding.  As explained in detail above, we have done so in this remand redetermination.

It is Commerce's general practice to identify a viable and appropriate third-country market early in a proceeding and to not subsequently revisit the initial viability determination. However, the issue in this remand is whether Commerce's decision to select Germany as the comparison market in the underlying investigation was supported by substantial evidence, given evidence on the investigation record indicating that some sales may not have been consumed in Germany.  In reevaluating the record and assessing evidence collected during the course of this remand, Commerce accounted for the likelihood of potential Austrian consumption and adjusted for a reasonable estimation of the amount of any such consumption.  Based on this analysis,

---

[89] *See* Petitioner's Comments at 6-7 and 9.  The petitioner did not brief this as a distinct comment.  However, statements in Part I.C of the first comment and Part III (the conclusory paragraph) are best addressed together as a distinct comment.

Commerce continues to find that the record supports the conclusion that the German market is substantially larger than the French market, and that Commerce's selection of Germany as the third-country market for calculating NV was based on substantial evidence.

During the course of an investigation or review, it is not Commerce's practice to request that two complete comparison market sales datasets be submitted and compared side-by-side as a prerequisite to determine which market is appropriate for selection. Rather, selection of the appropriate third-country comparison market can be reasonably determined based on broad market and product information from the respondent in response to section A of the questionnaire. Once Commerce selects the third-country market, it then requests the respondent submit the selected third-country sales information. Requiring a respondent to submit sales information for all potential third-country market prior to the selection of the third-country market is both burdensome and unnecessary. The petitioner cites no precedent where two full sales databases are available on the record and evaluated on their relevant merits at the time of selection. The petitioner's proposal that the issue in this remand proceeding may only be resolved upon submission and comparative evaluation of a French sales data vis-à-vis the German sales data effectively establishes a standard which requires respondents to submit multiple complete comparison markets sales data from which Commerce later identifies and later selects the appropriate comparison market. This is not only contrary to Commerce's practice, but it is also unnecessary for the purposes of this remand. As explained in detail above, record evidence collected during the course of this remand proceeding demonstrates that Prochamp's sales to Germany, even conservatively adjusted for potential sales to Austria, are substantially larger than its sales to France.

**V.     FINAL RESULTS OF REDETERMINATION**

We find that a reexamination of the record, in consideration of information placed on the record in this remand segment, allows Commerce to quantify and reasonably account for the proportion of sales reported in the German market by Prochamp which reflect mushrooms which were "likely" to have been sold for downstream retail consumption in a German-speaking market outside of Germany.  Accordingly, the record allows Commerce to continue to reasonably conclude that the volume of Prochamp's sales to Germany remain significantly larger than the volume of sales to France (or Israel), and to find that the selection of Germany as the appropriate third-country comparison market is supported.  Therefore, we have made no changes to the margin calculations from the *Final Determination*, and Commerce determines that the following estimated weighted-average dumping margin exists:

| Producer or Exporter | Estimated Weighted-Average Dumping Margin (percent) |
|---|---|
| Prochamp B.V. | 0.00 |


X _____


Abdelali Elouaradia
Deputy Assistant Secretary
  for Enforcement and Compliance