**Slip Op. 25-90**

**UNITED STATES
COURT OF INTERNATIONAL TRADE**

---

**Court No. 23-00133**

---

GIORGIO FOODS, INC.,

*Plaintiff,*

v.

UNITED STATES,

*Defendant,*

and

PROCHAMP B.V.,

*Defendant-Intervenor.*

---

Before: M. Miller Baker, Judge

**OPINION**

[The court sustains Commerce's redetermination.]

Dated: July 16, 2025

*John M. Herrmann*, *Joshua R. Morey*, and *Julia A. Fox*, Kelley Drye & Warren LLP, Washington, DC, on the comments for Plaintiff.

*Yaakov M. Roth*, Acting Assistant Attorney General; *Patricia M. McCarthy*, Director; *Tara K. Hogan*, Assistant Director; and *Daniel Bertoni*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, on the

comments for Defendant. Of counsel for Defendant was *Ruslan Klafehn*, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, Washington, DC.

*Lizbeth R. Levinson*, *Brittney R. Powell*, and *Alexander D. Keyser*, Fox Rothschild LLP, Washington, DC, on the comments for Defendant-Intervenor.

*Baker*, Judge: This case involving a challenge to the Department of Commerce's calculation of the dumping margin assigned to mushrooms from the Netherlands returns after remand. *See Giorgio Foods, Inc. v. United States*, Case 23-133, Slip Op. 24-79, 2024 WL 3534491 (CIT July 17, 2024). In that opinion, the court directed Commerce to reconsider its selection of Germany as the third country for determining normal value under 19 U.S.C. § 1677b(a)(1)(C)(ii) and 19 C.F.R. § 351.404(e). After reopening the record, the agency again picked that nation. This time, the court sustains that choice.[1]

# I

An antidumping investigation requires Commerce to figure out, among other things, the "normal value"

---

[1] In so doing, the court declines to redact certain confidential record material that it finds does not qualify as "business proprietary information" under the applicable Commerce regulation, 19 C.F.R. § 351.105(c). *See* 19 U.S.C. § 1516a(b)(2)(B) (providing that the court "shall . . . preserve[] in any action under this section" the "confidential or privileged status accorded to any documents, comments, or information," except that it "may disclose such material under such terms and conditions as it may order").

of the merchandise in question. *See Giorgio Foods*, Slip
Op. 24-79, at 2, 2024 WL 3534491, at *1. In most cases,
"normal value" refers to "the price at which the foreign
like product is first sold . . . for consumption in the ex-
porting country." 19 U.S.C. § 1677b(a)(1)(B)(i). In
other words, the agency calculates the commodity's re-
tail price in the home market. *See Smith-Corona Grp.
v. United States*, 713 F.2d 1568, 1573 (Fed. Cir. 1983)
(explaining that "[t]he home market sales method is
preferred" for ascertaining normal value).

When home-market transactions are less than five
percent of the product's sales in the United States, *see*
19 U.S.C. § 1677b(a)(1)(C)(ii), Commerce determines
normal value differently. In those circumstances, it ex-
amines "the price at which the foreign like product is
. . . sold (or offered for sale) for consumption" in a third
country, *id*. § 1677b(a)(1)(B)(ii), subject to several con-
ditions, *see id*. § 1677b(a)(1)(B)(ii)(I)–(III).

The statute does not say what happens if more than
one country satisfies those conditions. In such cases,
the applicable regulation provides that the Depart-
ment "generally will select the third country based on"
certain "criteria." 19 C.F.R. § 351.404(e). Those are
product similarity, *id*. § 351.404(e)(1), sales volume,
*id*. § 351.404(e)(2), and "other factors as . . . appropri-
ate," *id*. § 351.404(e)(3).

II

At the request of domestic producer Giorgio Foods,
Commerce opened an antidumping investigation into
preserved mushrooms from the Netherlands. *Giorgio*

*Foods*, Slip Op. 24-79, at 6, 2024 WL 3534491, at \*2. The Department selected Prochamp B.V., a Dutch producer, as a mandatory respondent. Appx13796. As home-market transactions fell below the five-percent threshold, the agency identified Germany, France, and Israel as candidates for calculating normal value. Appx13797. Commerce found that all three satisfied the requirements of § 1677b(a)(1)(B)(ii) and therefore turned to the factors specified in 19 C.F.R. § 351.404(e). *Id.*

Applying those criteria, the agency found that Prochamp's "significantly larger overall quantity" of sales in Germany "outweigh[ed]" the "slight difference" in product similarity that otherwise pointed toward using France. Appx1004. For this and other reasons, the Department ultimately assigned the Dutch company a dumping rate of zero. *Giorgio Foods*, Slip Op. 24-79, at 13, 2024 WL 3534491, at \*5 (citing Appx1272).

Giorgio then filed this suit. Among other things, it attacked Commerce's selection of Germany as the third-country market. The agency's conclusion relied on Prochamp's sales data, which included purchases by "a multinational retailer that could just as easily have been distributed to other German-speaking countries." *Id.* at 12, 2024 WL 3534491, at \*4 (cleaned up and citing Appx1064). The Department gave no justification for its assumption that the mushrooms likely made their way to stores in Germany—it was thus "unknown the extent to which mushrooms sold to that retailer were in turn resold *in Germany* for consumption" as required by the statute. *Id.* at 18, 2024 WL 3534491, at \*6 (emphasis in original); *cf.* 19 U.S.C.

§ 1677b(a)(1)(B)(ii). Since "any better explanation" for Commerce's decision was "absent," the court "return[ed] this issue to the agency for reconsideration." *Id.* at 20–21, 2024 WL 3534491, at *7.

On remand, the Department read this court's opinion as requiring it to "reconcile its selection of Germany as the third-country market based on the volume of sales to [that country] with record information suggesting that . . . some portion of the German-market sales were likely distributed to other German-speaking countries for consumption." Appx13805 (internal quotation marks omitted).[2] Commerce noted the record had no information detailing "downstream distribution activities" of Prochamp's customer such that it could reliably determine what portion of sales

---

[2] Commerce mischaracterized the court's opinion, which did not describe Prochamp's sales to a multinational retailer as "German-market sales." Instead, the court said that most of that company's "*ostensible* 'German' sales were to a multinational retailer, which received them at a warehouse outside of that country." *Giorgio Foods*, Slip Op. 24-79, at 18, 2024 WL 3534491, at *6 (emphasis added). The problem was that the record did not indicate "the extent to which mushrooms sold to that retailer were in turn resold *in Germany* for consumption." *Id.* (emphasis in original). Under the statute, "[w]hat matters is not where the product is ultimately consumed," but where "the product is *'sold or offered for sale* for consumption.'" *Id.* at 19 n.14, 2024 WL 3534491, at *6 n.14 (emphasis added). A sale *to* a retailer is not a sale "for consumption," in contrast to a sale *by* a retailer. *See* 19 U.S.C. § 1677b(a)(1)(B)(ii). Thus, while the *Department* initially considered the sales to the retailer to be "German-market" sales, the court did not.

were made in German versus Austrian retail outlets. Appx13806–13807.

The agency thus reopened the record to collect new data allowing it to approximate the proportion of retail sales made in those countries. *Id.* It added new evidence, including information about (1) the number of retail stores operated by Prochamp's largest customer in Germany and Austria, the other German-speaking country where the customer potentially sold the product; (2) population data for those two countries; and (3) publicly available figures "regarding mushroom consumption" in those countries. Appx13807.[3]

The Department analyzed the new data and found that, as to each set, the ratio between Germany and Austria was around 90 percent to 10 percent. Appx13808. The agency found this evidence "reasonably support[s]" the conclusion that "the Austrian market portion" of the Dutch company's sales to its largest customer was around 10 percent of "German-labeled mushrooms" because of the "high level of consistency between these figures." *Id.*

Commerce then approximated Prochamp's total sales for consumption in Germany. It did so by adding together (1) total sales of German-labeled mushrooms

---

[3] Prochamp similarly added new record information, submitting emails between it and two of its customers identifying product numbers sold exclusively in Germany and those also sold in other countries. *Id.* It also provided website data from a third customer showing that it did not operate in any other countries where German is an official language. *Id.* & n.51.

to the Dutch company's largest customer, reduced by 10% to account for the Austrian market; and (2) sales to other customers, excluding (i) those products known to be sold only in Switzerland and (ii) a "specific product" identified on remand that may have been sold in Germany or yet another country. Appx13808–13809. The net result was somewhat lower than the estimate in its original determination. *See* Appx13809.

The agency next compared this revised German consumption estimate to the French total. It found the latter to be around two-thirds of the former, "without accounting for consumption of French-labeled merchandise outside of France"—meaning that the French total was not subject to the same scrutiny as its German counterpart. *Id.* The Department thus preliminarily found once more that the total for Germany was "significantly larger" than that for France, even with a bullish estimate of "potential non-German sales" removed. Appx13810. It also observed that the French total was potentially inflated through inclusion of French-label sales outside that country. Appx13810–13811. Even so, it used that figure. Appx13809–13810.

Giorgio contested that renewed finding, arguing the agency used inconclusive and irrelevant information to make its calculation and failed to remedy the problem for which the court remanded in the first place. Appx13813. It also argued that the evidence supported France as the appropriate comparison market, and that the agency "disparaged" that country as a potential comparator "without record support." Appx13824.

Commerce considered and rejected Giorgio's attack on the new evidence. Appx13818. First, the agency noted that alternative estimation methods would have been "even less precise." Appx13814. Next, it found the company's insistence that the Department must calculate actual sales set an implausibly high standard where no information "other than the precise [data detailing] a customer's downstream distribution" would suffice. Appx13815. Commerce then stated that the information Giorgio demanded for Germany was "equally not available" for France. *Id*. It also observed that the company neither argued that the agency's inferences were "unreasonable or lack[ing] support" in the record, nor identified an "actual flaw" in the analysis. Appx13820. Finally, the Department defended its use of the new record information, finding that it showed "[t]he quantity of the affected transactions is small and accounted for conservatively," Appx13821, such that the 10-percent adjustment "likely overstated" Austrian consumption (and understated the same in Germany), Appx13824.

The agency also responded to Giorgio's complaint that it had unfairly "disparaged" the French dataset. *Id*. It said the company had "mischaracterize[d]" its analysis, which simply pointed out that Giorgio's critique of the German sales figures equally applied to "the French market information." *Id*. Commerce explained that its "[o]bservations regarding *potential* issues" with the latter were made not to "disparage" that data, but rather only to note "the challenges in identifying [the] final sale[s] for consumption in either comparison country." *Id*. (emphasis in original).

The Department emphasized that its "conclusions regarding the relative advantage of the German market" over its French counterpart "in terms of quantity" were "not reliant" on its observations regarding potential issues in the latter dataset. Appx13825. "Even if the reported French sales quantity . . . perfectly matche[d] actual volume of sales for consumption" there, selecting "Germany as the comparison market" was still "appropriate" due to its "relative size" despite the adjustments to account for non-German sales. *Id.* "[T]he conservatively adjusted German total remained substantially larger than the French total which was conservatively applied as reported," Appx13826, that is, unadjusted for potential non-French sales. Commerce thus declined to select France as the comparison market. Appx13830.

Giorgio now challenges the agency's redetermination. It argues that the Department failed "to identify accurately the volume" of Prochamp's sales for consumption in Germany. ECF 56, at 3. It also asserts that the French data "do not suffer from the same flaws as" the German figures. *Id.* at 4. Giorgio thus asks the court to "direct Commerce to reconsider France as an alternative." *Id.* at 16.

## III

This time, the Department supported its finding that the German market was the largest by volume with record evidence. The agency reopened the record and considered additional data to calculate what portion of its sales Prochamp made in that market. Appx13806–13807. Using that information, it approxi-

mated the share of German-labelled products sold to other countries and then used that estimate to calculate the Dutch producer's sales in Germany. Appx13808–13809.

The agency's estimate of German-market sales was purposely conservative. Commerce applied the 90-percent presumption to *all* of Prochamp's German-language-label sales to its largest customer, even those transactions where the record cast no doubt that they were made in Germany. Appx13810. It also excluded all sales of one product code that could have been made in a different country, even though evidence showed at least some of that line was sold in Germany. *Id.* The Department observed that its approximation thus likely understated the volume of sales in that country while overstating it for other countries. *Id.* Even with these adjustments, the German market "continue[d] to be significantly larger" than its "unadjusted and unscrutinized" French counterpart. *Id.*

Based on old and new record evidence, Commerce approximated the total sales of Prochamp's mushrooms in Germany and accounted for potential downstream sales in other German-speaking countries that it included in its prior calculation. The agency has now provided a "better explanation" that moves its decision out of the realm of "mere speculation," *cf. Giorgio Foods*, Slip Op. 24-79, at 20, 2024 WL 3534491, at *7 (cleaned up), into one with evidence "a reasonable mind might accept as adequate to support" its conclusion, *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003). That satisfies the substantial-evidence standard of review.

Giorgio attacks the Department's collection and use of the new information, arguing that evidence is "inconclusive" and the agency's analysis rests on a "faulty premise." ECF 56, at 12. The company asserts these failures are fatal because Commerce's task on remand was to "quantif[y] the volume of preserved mushrooms that Prochamp sold . . . in Germany." *Id.* at 10; *see also id.* at 11 (the agency's method "does not—and cannot—answer the question [it] set [out] to answer"). It contends that since the new record information does not allow Commerce to quantify the retailer's sales in Germany, the Department "commit[ted] a logical error by generalizing" from the new data. *Id.* at 12.

The court declines the company's invitation to reweigh the augmented record evidence. The new data, and the agency's reasonable inferences from them, support its decision. The Department compared the population, mushroom consumption,[4] and relevant retail outlet totals of Germany and Austria[5] to arrive at

---

[4] Giorgio asserts in passing that "Commerce erred in generalizing population and fresh mushroom consumption data to" the retailer's "sales of *preserved* mushrooms" in Germany and Austria. ECF 56, at 12 (emphasis in original). The record about consumption in those countries, however, is ambiguous as to whether it pertains to fresh, preserved, or both types of mushrooms. *See* Appx13857–13858. In any event, even if that information is limited to fresh mushrooms, it's a reasonable proxy for the consumption of preserved mushrooms.

[5] Giorgio imagines that "Austrian stores may stock mushrooms in higher quantities compared to German ones." ECF 56, at 12. But just as "speculation, conjecture, [or]

(footnote continues on next page)

its estimate. Appx13808. In so doing, it applied conservative presumptions that, if anything, undercounted German retail sales. Appx13810. It then compared that conservative estimate "to a French total submitted early in the proceeding and which [was given] no such comparable scrutiny of its constituent transactions." *Id.*; *see also* Appx13825–13826 (same). In other words, the French total used for the comparison—unlike its German counterpart—received the benefit of the doubt.[6]

In short, the American company is simply wrong to claim that Commerce's redetermination suffers from the same flaws as before. At first, the Department ignored its own finding that Prochamp's customer "likely resold the mushrooms in Germany *and* another country" and insisted on using the German data anyway. *Giorgio Foods*, Slip Op. 24-79, at 20, 2024 WL 3534491, at *7 (cleaned up and emphasis in original). On remand, the agency used the preexisting record and new information to reasonably and conservatively approximate total sales in Germany, compared them to total sales in France that were not subject to such scrutiny, and continued to rely on the former country's data consistent with its policy and 19 C.F.R.

---

divination" cannot support agency action, *Giorgio Foods*, Slip Op. 24-79, at 19, 2024 WL 3534491, at *7 (quoting *Fla. Gas Transmission Co. v. FERC*, 604 F.3d 636, 641 (D.C. Cir. 2010)), neither is it a basis for remand.

[6] Precisely because Commerce used the unadjusted French sales data in making its comparison, Giorgio's grumbling about the Department's purported "disparagement" of that information is irrelevant. *See* ECF 56, at 16–20.

§ 351.404(e). That's all the court required Commerce to do. *See SSIH Equip. S.A. v. U.S. Int'l Trade Comm'n*, 718 F.2d 365, 382 (Fed. Cir. 1983) (if the Department makes a choice based on substantial evidence between "two fairly conflicting views," the court may not substitute its judgment even if its view would have been different "had the matter been before it *de novo*") (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

\* \* \*

The court sustains Commerce's redetermination. A separate judgment will issue. *See* USCIT R. 58(a).

Dated: July 16, 2025          /s/ *M. Miller Baker*
       New York, NY          Judge